**UDALL LAW FIRM, LLP**
ATTORNEYS AT LAW
4801 E. BROADWAY BLVD., SUITE 400
TUCSON, ARIZONA 85711-3638
(520) 623-4353
jneff@udalllaw.com
ahofmeyr@udalllaw.com
Jeffrey M. Neff SBN 5603
Adriane Hofmeyr SBN 25100, PCC# 66166
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| D. Stadtler Trust 2015 Trust; Daniel J. Stadtler, a single man,<br><br>Plaintiffs,<br><br>vs.<br><br>Pamela Gorrie, a single woman; *et al*,<br><br>Defendants. | NO. 2:22-CV-00314-DWL<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Plaintiffs D. Stadtler Trust 2015 ("the Trust") and Daniel J. Stadtler ("Mr. Stadtler") hereby oppose the Application for Temporary Restraining Order and Preliminary Injunction filed by Defendants (collectively referred to as "Gorrie") on May 27, 2022 (Doc # 39) ("Application"). Gorrie has **abandoned the commercial property** she bought from Plaintiffs **using Plaintiffs' money**, and for which she has paid not a cent **in over two years**. She seeks now to prevent the Trust from proceeding with a trustee's sale. The Trust has already delayed the trustee's sale twice – once by cancellation in 2021 and again immediately after the filing of the Application. She still has not done what she promised to do – pay for the property or secure investors to pay for the property. Gorrie has known about the current trustee's sale

(now scheduled for June 23) for three months but deliberately waited until two weeks before the (already postponed) trustee's sale, rendering her "sudden emergency" self-induced. The Application has no merit and should be denied. This opposition is supported by the attached Memorandum of Points and Authorities, Exhibits hereto, and the record in this Court to date.

## I. SUMMARY OF PLAINTIFFS' OPPOSITION

Gorrie bought a 540-acre farm in Salome, Arizona ("Farm") from the Trust upon which to grow hemp products ("Hemp Operation"). She borrowed money in the form of a "carryback" loan from the Trust to buy the Farm but refuses to pay for it and now wants to prevent the Trust from exercising its right to sell the Farm at a trustee's sale pursuant to a promissory note and deed of trust she signed on February 4, 2020. Gorrie is unlikely to succeed on the merits of her claims against the Trust, all of which are based on ever-changing theories about why the promissory note is unenforceable. Moreover, she cannot show irreparable harm because not only is the property commercial, but she has also abandoned it. In addition, the equities tip in the Trust's favor because she wants to keep the Farm, has abandoned the Farm but will not pay for the Farm. Finally, she must provide a bond to protect the Trust from a wrongful injunction based on her frivolous and contradictory arguments. The Application should be denied.

## II. FACTUAL BACKGROUND

### 1. The Promissory Note and Deed of Trust authorize a non-judicial trustee's sale upon default

On January 17, 2020, Gorrie, through Innovative Global Distributions, LLC ("IGD"), agreed to purchase the Farm from the Trust for $1,400,000.00 ("Farm Purchase Agreement"). *See* First Amended Complaint ("FAC")[1] ¶¶ 26; Exhibit A to Motion to Dismiss (Doc # 17) ("MTD"); Counterclaim ¶ 14, 15. The Farm Purchase Agreement is attached hereto as

---

[1] *See* Declaration of Plaintiff Dan Stadtler, attached hereto as **Exhibit A,** stating under oath that the allegations in the FAC are true and correct, and that the exhibits attached hereto are true and correct. **Exhibit A**, ¶ 4-5. The FAC thus constitutes evidence in this case.

UDALL LAW FIRM, LLP
4801 E. BROADWAY BLVD., SUITE 400
TUCSON, ARIZONA 85711-3638
(520) 623-4353

**Exhibit B**. IGD agreed to pay $20,000.00 as earnest money, $280,000.00 at closing, and the remaining balance to be seller-financed by the Trust "carrying back" a promissory note secured by a deed of trust. FAC ¶ 27; Counterclaim ¶ 16.

On February 11, 2020, the parties signed an addendum to the Farm Purchase Agreement, in which they changed "line 19 of the Farm Purchase Agreement," so that the down payment was increased to $60,000.00 and $240,000.00 was due within 30 days of closing ("Addendum to Farm Purchase Agreement"). *See* **Exhibit C** hereto; FAC ¶ 44.

Gorrie had represented herself as being an experienced businesswomen who already had investors in place to assist in the purchase of the Farm. *See* Declaration of William Dawson, **Exhibit S** hereto, ¶ 8. In reliance on these representations, the Trust agreed to finance the sale of the Farm. Stadtler Declaration, ¶ 7. IGD signed a **Promissory Note** for $1,340,000.00 ("Promissory Note") and **Deed of Trust** ("DOT"). *See* **Exhibits D and E** hereto; FAC ¶ 33; Exhibit B to MTD; Counterclaim ¶ 18.[2] These two documents have a typed date of February 4, 2020, but in fact are dated as of the date of closing – **February 27, 2020**.[3] The Promissory Note reflects the changes in the Addendum to Farm Purchase Agreement.

On February 27, 2020, the Trust transferred title to the Farm to IGD by Special Warranty Deed ("the Deed"). *See* **Exhibit F** hereto; FAC ¶ 47; Counterclaim ¶ 23.

It is black letter law in Arizona that the Farm Purchase Agreement **merged into the Deed** on February 27, 2020. *Vaughey v. Thompson,* 95 Ariz. 139, 142 (1963); *Title Ins. Co. of Minnesota v. Costain Arizona, Inc*., 164 Ariz. 203, 208, 791 P.2d 1086, 1091 (Ct. App. 1990) ("express or implied provisions in a contract with respect to the title of land to be conveyed are held to be merged in an accepted deed of the land"). For the same reason, the Addendum to Farm Purchase Agreement also **merged into the Deed** on February 27, 2020.

---

[2] The Promissory Note contained standard terms and was drafted by the title company, Pioneer Title Agency (not William Dawson, as alleged by Gorrie) (Counterclaim ¶ 18).

[3] The Escrow Agent originally dated the Promissory Note and Deed of Trust February 4, 2020 and did not revise the date when a new closing date was set for February 27, 2020.

The remedies for default in the DOT include: "That upon default by Trustor in the payment of any indebtedness secured hereby or in the performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written notice thereof, setting forth the nature thereof, and of election to cause to be sold said property, under this Deed of Trust." DOT § 11 (**Exhibit E** hereto).

Over two years later, Gorrie has not paid a cent under the Promissory Note. She paid just enough to ensure that the Farm was transferred to her ($60,000.00) at closing and has paid nothing since. *See* Stadtler Declaration (**Exhibit A** hereto), ¶ 6; FAC ¶ 51; Counterclaim ¶ 26. This fact is not in dispute.

### 2. Two later revenue share agreements between different parties for the Hemp Operation had no impact on the Promissory Note or DOT

On April 10, 2020, the Trust entered into a revenue sharing agreement with Defendant Natural Footprints Organic Farm LP ("NFOF"), which had leased the Farm from IGD. Pursuant to this agreement, NFOF agreed to pay the Trust a percentage of revenue (1% annually for a maximum of 5 years) it generated through the Hemp Operation on the whole Farm ("Whole Farm RSA"). *See* **Exhibit G** hereto; FAC ¶ 59; Counterclaim ¶ 27.[4] Payment from hemp revenues was "not a guaranteed amount." *See* **Exhibit G**, Art. 2, § d.

The Whole Farm RSA could not, and did not, amend the payment obligations under Promissory Note (this is Gorrie's sole argument to avoid enforcement of the DOT – see p. 11 below – and the basis for her breach-of-contract claim against the Trust). NFOF was not a party to the Promissory Note or the Deed of Trust (a fact which Gorrie fails to mention). The Whole Farm RSA does not even mention the Promissory Note or DOT. In fact, in a document drafted by Gorrie's counsel a year later, in May 2021, **Gorrie and her counsel**

---

[4] Gorrie refers to this agreement as the "April 20 Rev Share." Counterclaim ¶ 27, 68 (the second ¶ 68, on page 17 of the Counterclaim). Plaintiffs prefer the term "Whole Farm RSA" as it is more descriptive and more easily distinguishable from the later "Three Acre RSA."

UDALL LAW FIRM, LLP
4801 E. BROADWAY BLVD., SUITE 400
TUCSON, ARIZONA 85711-3638
(520) 623-4353

**acknowledged that the Promissory Note and DOT were still in effect**. *See* **Exhibit Q** hereto, § 8.04(d) (referring to the "**IGD Note securing the 540 acres parcel**").

On January 10, 2021, IGD and Mr. Stadtler in his personal capacity (unrelated to the Trust) entered into a revenue share agreement relating to **only three acres** of the Farm (the "Three Acre RSA"). *See* **Exhibit H** hereto; FAC ¶ 70; Counterclaim ¶ 35.[5] This agreement by its own terms had no impact on the Promissory Note or DOT: it states, "**This Agreement shall have no effect on any other Agreement(s) or Revenue Sharing Agreement(s) between the Parties**." **Exhibit H**, p. 2.

On January 14, 2021, Mr. Stadtler and IGD signed a "Personal Loan and Agreement" formalizing the personal loan in the Three Acre RSA ("Personal Loan"). *See* **Exhibit I** hereto; FAC ¶ 73; Counterclaim ¶ 38; MTD Exhibit E. Mr. Stadtler agreed to make an interest-free loan of $75,000.00 to IGD to grow three acres of hemp on the Farm which "**shall be kept separate from any and all other hemp growing operations … on this farm.**" **Exhibit I**, p. 1. Ms. Gorrie guaranteed the Personal Loan.[6] **Exhibit I** p. 2; FAC ¶ 74.

On May 11, 2021, IGD and Mr. Stadtler amended the Three Acre RSA and Personal Loan by signing an addendum with the very specific title of "**Addendum to the Original Personal Loan and Agreement, Revenue Sharing Agreement between Pamela J. Gorrie dba Innovative Global Distribution LLC (the Borrower) and Dan Stadtler (the Lender) executed on January 14, 2021 between the parties**" ("Addendum to Three Acre RSA").[7] *See* **Exhibit J** hereto; FAC ¶ 85; Application, p. 11:12. The opening line states: "The following changes shall be made to the **above mentioned agreements**, this Addendum shall

---

[5] Gorrie refers to this agreement as the "Jan 21 Rev Share Agreement." Counterclaim ¶ 35. Plaintiffs prefer the term "Three Acre RSA" as it is more descriptive and more easily distinguishable from the earlier Whole Farm RSA.

[6] Gorrie seems surprised that a lender would require a personal guarantee on a $75,000.00 loan. Application, p. 8:21 ("Stadtler insisted that [she] sign personally …").

[7] Gorrie refers to this addendum as the "May 21 Rev Share Agreement." Plaintiffs refers to it by its actual title ("addendum" to the Three Acre RSA). Note that Gorrie called it the "May 21, 2021 *Addendum*" in her MTD. MTD, p. 14:2, 5, 8.

-5-

**supersede only** those parts of the original agreements dealing with the changes contained in this Addendum." **Exhibit J**, p. 1 (emphasis added).

### 3. Gorrie has abandoned the Farm

Gorrie attempted to grow hemp on the Farm for about 2 years. It appears that she has now abandoned the Farm. *See* Declaration of private investigator William Edinger attached hereto as **Exhibit K** ("Declaration"). On March 5, 2022, Mr. Edinger drove to the Farm, and from the perimeter of the Farm, observed the following:

1. No agriculture or farming or ranching of any sort was taking place on the Farm. Declaration ¶ 9.

2. The ground had not been worked or tilled, that no seeds had been planted, and no plants were growing. Declaration ¶ 10.

3. There was no irrigation on the land. Declaration ¶ 11.

4. No people were seen at any place on the Farm. Declaration ¶ 12.

5. One piece of equipment was visible, with binoculars, it also did not have any disturbed ground around the tires. Declaration ¶ 13.

6. The covering of a greenhouse was partially blown away and was in a state of disrepair. Declaration ¶ 14.

7. No vehicles had entered the Farm for a while, because there were no tire tracks at any entry point of the Northwest Gate, the ground had no other signs of being disturbed and there was vegetation that was not trampled where a vehicle would have traveled through the gate. Declaration ¶ 15.

8. The Farm was not being utilized for agriculture or any other purpose, and had not been utilized for a while, and the Farm looked abandoned. Declaration ¶ 17-18.

### III. BRIEF PROCEDURAL BACKGROUND

On July 15, 2021, pursuant to § 11 of the DOT, the Trust initiated a non-judicial trustee's sale. *See* Notice of Trustee's Sale, attached hereto as **Exhibit L**.

On September 23, 2021, Gorrie's counsel requested that the Trust cancel the trustee's sale so that Gorrie could attempt to secure alternative financing. *See* email from Gorrie's counsel to the Trust's counsel, attached hereto as **Exhibit M**. Relying on this representation, the Trust agreed to cancel that trustee's sale. *See* Cancellation of Notice of Sale recorded on October 7, 2021, attached hereto as **Exhibit N**. The cost to cancel incurred by the Trust was **$8,736.63**. *See* invoice from Pioneer Title attached hereto as **Exhibit O.**

Gorrie failed to secure alternative financing and continued to refuse to make any payments under the Promissory Note.

On February 11, 2022, Plaintiffs filed this lawsuit against IGD, NFOF, NFF and Gorrie for *inter alia* breach of the various agreements between the various parties.

On March 7, 2022, the Trust again initiated a trustee's sale pursuant to the DOT. *See* Notice of Sale attached hereto as **Exhibit P**. The trustee's sale was scheduled to take place on June 9, 2022. Two weeks before the sale, and even though she had known about it since **at least March 2, 2022** (Counterclaim ¶ 68), Gorrie filed the Application together with an "Answer and Counterclaim and Third-Party Response to the Complaint" (Doc # 38) ("Counterclaim").

After receiving the Application, the Trust voluntarily (Gorrie's counsel did not approach undersigned counsel prior to filing the Application) delayed the trustee's sale (for a second time) to permit the Court time to address the issues in the Application. The trustee's sale is now scheduled to take place on June 23, 2022 ("Trustee's Sale").

## IV. <u>GORRIE'S COUNTERCLAIMS AGAINST THE TRUST</u>

To succeed in obtaining a preliminary injunction[8] to stop the Trustee's Sale, Gorrie must show that she is likely to succeed on the merits of her counterclaims against the Trust.

---

[8] Given that the Trust re-scheduled the Trustee's Sale to longer than 10 days after the Application, Gorrie's Application for a Temporary Restraining Order is moot.

UDALL LAW FIRM, LLP
4801 E. BROADWAY BLVD., SUITE 400
TUCSON, ARIZONA 85711-3638
(520) 623-4353

Her counterclaims against the Trust (the only ones relevant to the Trustee's Sale)[9] are:

1. Count I: The Trust breached the Whole Farm RSA by "asserting a default" of the Promissory Note and DOT and proceeding with the Trustee's Sale. Counterclaim, ¶¶ 69. The basis of this claim is that the Whole Farm RSA "modified payment obligations" under the Promissory Note. Counterclaim ¶ 67, 73-74. (As shown later, this is the **only** agreement that Gorrie argues replaced the obligations in the Promissory Note.)[10] This claim is really a defense – that, by not paying, she did not violate the Promissory Note. Gorrie points to no provision in the Whole Farm RSA that the Trust allegedly breached.

2. Count III: That the Trust breached the Addendum to the Three Acre RSA by failing to fund an additional $60,000.00. Counterclaim, ¶78. This claim has no impact on the Trustee's Sale because (1) it makes no allegations regarding, and is unrelated to, the enforceability of the Promissory Note and DOT; and (2) the Trust was not a party to this agreement and therefore cannot be held to be in violation of this agreement.

3. Count IV: That the Trust fraudulently induced Gorrie to sign the Addendum to the Three Acre RSA by *inter alia* promising to further "fund the venture between the parties." Counterclaim, ¶81. This claim has no impact on the Trustee's Sale for the same reasons above, and additionally because she is arguing that this agreement is unenforceable (and therefore could not have replaced any prior agreements).

4. Count V: That the Trust interfered with a seed purchase order by "enticing" a third party lender "not to perform" and to "wrongfully default" Gorrie. Counterclaim, ¶ 87. This claim has no impact on the Trustee's Sale because it makes no allegations regarding, and is unrelated to, the enforceability of the Promissory Note and DOT.

---

[9] The Trustee's Sale at issue involves only the rights of the Trust because it is the Trust who was the Promisor under the Promissory Note and the Beneficiary under the DOT.

[10] Note that this argument is different from the argument she made in her MTD, in which she argued that the Addendum to the Farm Purchase Agreement provided the Trust's only remedies and that the Addendum to the Three Acre RSA remained the only enforceable agreement.

-8-

5. Count VIII: That the Trust negligently induced Gorrie to default on her payments under the Promissory Note, and then attempted to foreclose. Counterclaim, ¶ 99,[11] 102. This claim assumes that the Promissory Note and DOT are enforceable and acknowledges that Gorrie has defaulted on payments due thereunder.

**6.** Count IX: That the Trust should be estopped from arguing that the Whole Farm RSA was "not a modification of the Promissory Note and Addendum to the Purchase Agreement." Counterclaim, ¶105. This claim depends on the success of Count I. If Count I fails, this one fails.

7. Count X: That the Trust, as a "joint venturer" with Gorrie, owed her a fiduciary duty, and that the Trust violated its duty by acting "to undermine" Gorrie and to "thwart the outcome of the various ventures." Counterclaim, ¶¶106-110. Again, this claim depends on the success of Count I. When Count I fails, this one fails.

As set forth below, Gorrie's claims have no factual or legal support and thus they cannot prevail

## V. **LEGAL STANDARD**

"A preliminary injunction is an extraordinary and drastic remedy, and never awarded as of right." *Drakes Bay Oyster Co. v. Salazar,* 921 F. Supp. 2d 972, 990 (N.D. Cal.), aff'd sub nom. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) (internal citations omitted).

A party seeking a preliminary injunction bears the burden of establishing four separate factors: "that it is [1] likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest. We consider these factors on a sliding scale, such that a stronger showing of one element may offset a weaker showing of another." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (internal citations omitted).

---

[11] The second ¶ 99 on p. 21.

-9-

## VI. ANALYSIS

### A. Gorrie has not demonstrated a reasonable likelihood of prevailing on the merits

#### 1. No later agreement replaced the Promissory Note or DOT

Gorrie does not even attempt to address the merits of her claims, let alone the likelihood of succeeding on them. Her entire argument is a flippant attempt to create some kind of confusion around the enforceability of the Promissory Note, that the issues cannot "be determined at this stage as the question of the interrelatedness of the various contracts present substantial, difficult and doubtful questions." Application, p. 14:20-22. She does not even mention the Promissory Note or DOT. Instead, she talks about "a myriad of joint ventures," and "as a result of these interactions the borrower has claims against the lender for breach of contract, fraud in the inducement and others." Application, p. 13:18, 14:1-3. That's it. That is Gorrie's entire argument on her likelihood of succeeding on the merits of her claims against the Trust. Application, pp. 13-14

To the extent that Gorrie's failure to address the likelihood of success on her claims is due to her reliance on the existence of "serious questions," that reliance is misguided because, in order for a "serious question" to exist, a movant still must establish "a fair chance of success on the merits." *Piper v. Gooding & Co. Inc.*, 334 F. Supp. 3d 1009, 1021 (D. Ariz. 2018), *citing Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). Again, Gorrie has entirely failed to address the merits of her claims and, accordingly, has not presented a "serious question" for purposes of her request for injunctive relief.

In anticipation of a beefed-up Reply from Gorrie, she has no reasonable likelihood of succeeding on the merits of her claims. She first claims that the Trust breached the Whole Farm RSA by "asserting a default" of the Promissory Note and DOT and proceeding with the Trustee's Sale. Counterclaim, ¶¶ 69. To succeed on this claim, not only must she show that the Promissory Note and DOT are unenforceable, but she must then also show that "asserting a default" was in breach of the Whole Farm RSA (she does not identify which provision). In other words, she must succeed in her argument that the Whole Farm RSA "modified payment

-10-

obligations" under the Promissory Note. Counterclaim ¶ 67, 73-74. This argument is as unavailing as the (different) argument she made in her MTD.

In her now-moot MTD, Gorrie first argued that the Addendum to the Three Acre RSA effectively replaced the Promissory Note (MTD, p. 14-15) and that the Trust's only remedy for non-payment had been pursuant to the Addendum to the Farm Purchase Agreement. MTD, p. 9:13-26. She now changes tack and implies (without explanation) that the Whole Farm RSA replaced the Promissory Note. *See* Counterclaim ¶¶ 64, 65, 67[12], 73-76; Application p. 6:7-11, 13:5-6. Gorrie is highly unlikely to succeed on the merits of this claim.

First, Gorrie cannot (and does not) point **to a single clause in a single agreement**, let alone the Whole Farm RSA, that says the Promissory Note was replaced or amended by any of the later agreements between any of the parties. Not a single agreement, let alone the Whole Farm RSA, says that Gorrie would not need to pay for the Farm unless and until she could grow hemp. Gorrie was represented by counsel at the time (her counsel drafted the Whole Farm RSA), and if she had wanted the Whole Farm RSA to have replaced the payment terms in the Promissory Note, **she was free to insert such a provision**. But she did not. In fact, she chose the opposite: the Promissory Note is not even mentioned.

Second, the Whole Farm RSA has no payment obligations at all**.** All that it says is that, **if** the Hemp Operation makes a profit, then Mr. Stadtler will get 1% of the profits. Why would Mr. Stadtler effectively say "I'm giving the Farm to you for free; let's see if you can grow hemp"? He would not and did not. Gorrie's argument makes no sense.

Third, the Whole Farm RSA **is between different parties**. The parties to the Promissory Note and DOT are **Innovative Global Distributions, LLC** and the Trust. The parties to the Whole Farm RSA are **Natural Footprints Organic Farm LP** and the Trust. Again, if Gorrie had wanted to void or amend the Promissory Note, she was free to include IGD in a later agreement, say, the Whole Farm RSA. She did not.

---

[12] The second ¶ 67, on p. 17, as opposed to the ¶ 67 on p. 16.

In the event Gorrie attempts to argue that any other agreement replaced the Promissory Note, such arguments will fail because the later agreements expressly address the issue. The Three Acre RSA expressly provides that "**This Agreement shall have no effect on any other Agreement(s) or Revenue Sharing Agreement(s) between the Parties**." *See* **Exhibit H** hereto, p. 2. It is frivolous to attempt to argue that the Three Acre RSA had any impact on the Promissory Note. Similarly, the Addendum to the Three Acre RSA had no impact on the Promissory Note. One only has to look at its title: "Addendum to the Original Personal Loan and Agreement, Revenue Sharing Agreement between Pamela J. Gorrie dba Innovative Global Distribution LLC (the Borrower) and Dan Stadtler (the Lender) executed on January 14, 2021 between the parties." *See* Exhibit J hereto, p. 1. This agreement was clear: it amended (but did not supersede) only the Three Acre RSA and Personal Loan.

Lastly, in May 2021, Gorrie's **counsel acknowledged in writing that the Promissory Note was still in effect.** In a proposed "Joint Venture Agreement" drafted by Gorrie's counsel (which was never signed by the parties), in proposing a distribution of proceeds to Mr. Stadtler personally (i.e. not the Trust), the draft section § 8.04(e) provided that "all remaining Proceeds shall be distributed on an equal basis between Stadtler and NFO, except that half … shall be used **to pay down the IGD Note securing the 540 acres parcel**." *See* Excerpt of "Joint Venture Agreement," attached hereto as **Exhibit Q**, § 8.04(c). Gorrie and her counsel clearly believed, in May 2021, that the "IGD Note" (which can only be referring to the Promissory Note) **was in full force and effect**.

This acknowledgement by Gorrie and her counsel reinforces the obvious intent of the parties, as memorialized in the signed agreements, that the Promissory Note and DOT at all times remained in effect. Their attempts to avoid the consequences of breaching the Promissory Note by re-writing the agreements are careless at best and disingenuous at worst.

Gorrie's inability to show that the Promissory Note and DOT are unenforceable thwarts Counts I, IX and X of the Counterclaim.

### 2. There is no evidence that the Trust induced Gorrie to violate the Promissory Note

Gorrie simultaneously claims that she was harmed by the Trust because the Trust induced her to violate the Promissory Note. Counterclaim, ¶ 99,[13] 102. This claim is far-fetched and strains credulity. If Gorrie believed that the Trust induced her to enter into any of the RSAs on the express representation that the Trust would not enforce the Note, why did none of the RSAs say so? Why did she not make IGD (the party to the Promissory Note) a party to the Whole Farm RSA? Why did she not insist that the Trust be a party to the Three Acre RSA? The Whole Farm RSA was drafted by her attorney. At the time the Three Acre RSA was drafted, she was represented by her current counsel. The RSAs were written the way they were (without mention of the Promissory Note or DOT, and between different parties) because they were never intended to replace her obligation to pay for the Farm. Gorrie's attempt to play the victim is belied by the fact that she remains in possession of and retains title to a million-dollar piece of arable land for which she has not paid.

Gorrie is unlikely to prevail on the merits of Count VIII of her Counterclaim.

### B. Gorrie will not suffer irreparable harm because she has already abandoned the Farm and her damages, if any, are monetary

Irreparable harm for purposes of injunctive relief "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

'Where the harm absent an injunction is loss of an interest in a commercial property, such loss is "easily calculable and compensable in damages" upon conclusion of the litigation.' *In re coyle*, No. 15-CV-04126-YGR, 2016 WL 5673247, at *8 (N.D. Cal. Oct. 3, 2016), quoting *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 471 (9th Cir. 1984).

Here, the **only** irreparable harm that Gorrie alleges she will suffer is that "if the property owner fails to obtain a TRO enjoining a trustee's sale, the property owner waives all

---

[13] The second ¶ 99 on p. 21.

defenses and objections to the sale." Application, p. 15:13-14. Gorrie misinterprets this statute. It does *not* mean that she loses her monetary claims for breach of partnership or other tort or contract claims. Moreover, not a single "defense" or "objection" raised by Gorrie in her Application addresses whether the harm she may suffer if the Trustee's Sale goes ahead is irreparable. The reason she has included no such argument is because she cannot, with plausibility, argue that the repossession of a commercial property that she has abandoned constitutes irreparable harm.

Gorrie herself acknowledges that "this matter carries all of the indicia of a commercial dispute." Application, p. 17:9. It is either a breach of contract case (as alleged by the Trust) or a breach of partnership[14] and/or a breach of contract case (as alleged by Gorrie). Even if Gorrie's allegations are true, all her claims are for monetary damages. She herself states this (in an effort to avoid having to provide a bond) that "the damages being sought stem from contractual damages." Application, p. 17:10-11. She provides no case law whatsoever to show that damages arising from a broken "partnership" are anything but monetary. Purely monetary injuries are not normally considered irreparable. *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984), citing *Los Angeles Memorial Coliseum Comm'n*, 634 F.2d at 1202. *See Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("The possibility that compensatory relief will be available in the ordinary course of litigation weighs heavily against a claim of irreparable harm").

Moreover, the Farm is indisputably a commercial agricultural operation. The Farm is indisputably not Gorrie's personal residence (and she does not allege that it is). The equipment used in the Hemp Operation is gone. She makes no allegations whatsoever that she is actively farming the land, or that she has plans for the Farm in the future. On the contrary, the evidence

---

[14] Although she claims now that the relationship was a partnership, that claim is contradicted by a proposed Joint Venture Agreement, drafted by Gorrie's attorney in May 2021, which, although not signed by the parties, contains a provision that the relationship between the parties, even if they had become "joint venturers," was **not one of partnership.** *See* draft Joint Venture Agreement (attached hereto as Exhibit Q), § 9.09.

-14-

on the record shows that she has abandoned the Farm. *See* Declaration attached. She provides no case law to show that losing commercial agricultural land in a trustee's sale constitutes irreparable harm. If she succeeds on any of her claims, then her damages are purely monetary.

Moreover, she could have made these arguments **three months ago,** when she first knew about the Trustee's Sale. She acknowledges she was on notice on **March 2, 2022**. Counterclaim ¶ 68. By her own choice, presumably as a strategy to improve her chances of obtaining a TRO, **she waited until two weeks before the Trustee' Sale**, at 4:00 p.m. on the Friday before Memorial Day weekend, to file an urgent motion, attempting to create panic and uncertainty in the hopes that the Court will stop the Sale. Nothing new happened between March 2, 2022 and Friday, May 27, 2022 to justify Gorrie's delay in bringing this Application. This is an emergency of her own making and she should not be rewarded, to the Trust's detriment, by canceling the Sale at the last minute. *See Lydo Enterprises, supra*, at 1213.

### C.   The balance of equities tip in the Trust's favor

Gorrie argues that the Trustee's Sale injures her "ability to continue the Hemp Project." Application, p. 16:5-6. First, she should have thought about that before she bought the Farm – that, if she could not pay for it, she might lose it in a trustee's sale. Second, she is not farming it at all; in fact, the Farm lies abandoned.

The balance of hardships tip in the Trust's favor. Gorrie retains title to the Farm and remains in possession of the Farm. She has not paid a cent for it since closing. She is not even trying to pay for the Farm. She now denies that she owes the Trust *anything* for the Farm. To make matters worse, she is not even attempting to grow anything on the Farm – for over two years, she has tried to grow hemp, could not, and has now abandoned the land.

In the meantime, the Trust is restrained from being able to do anything valuable or productive with the Farm, or from recouping its losses. Gorrie is being the proverbial "dog in the manger" – she has abandoned the Farm and refuses to pay for it, but she will not permit

the Trust to take it back. She does all of this, not with a plausible explanation supported by relevant law, but with a flippant "the questions" are "difficult." Application, p. 14:22.

The equities favor permitting the Trust to implement agreed-upon remedies for default under a standard Promissory Note and DOT on abandoned land.

### D. An injunction is not in the public interest

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction." *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1229 (D. Or. 2016) (internal citations omitted).

Here, the Trustee's Sale impacts the borrower and the lender only (IGD and the Trust), therefore "public interest" is a neutral factor. But to the extent the Court assesses public interest in the context of the present case, public interest favors permitting lenders to invoke remedies memorialized in written agreements between two parties of equal bargaining power. *See Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) ("Courts have held that the public interest is served by protecting a company's… contractual rights"). And Gorrie has provided no case law to show that standard non-judicial trustee's sales in general violate public policy or interfere with the public interest.

### VII. THE TRUST REQUESTS A BOND IF THE INJUNCTION IS ISSUED

FRCP Rule 65(c) provides that the Court "may issue a preliminary injunction or a temporary restraining order **only if the movant gives security in an amount** that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained" (emphasis added).

"Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future

-16-

proceedings prove that the injunction issued wrongfully." *Edgar v. MITE Corp.*, 457 U.S. 624, 649, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (Stevens, J., concurring in part). "[The party seeking an injunction] made a business judgment that it was willing to incur the 'cost' of a possibly wrongful injunction in order to take its appeal." *Global NAPs Inc. v. Verizon New England Inc.*, 489 F.3d 13, 21 (1st Cir. 2007). "The injunction bond can be seen as a contract in which the court and the applicant 'agree' to the bond amount as the 'price' of a wrongful injunction." *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 240 (3d Cir.2003) (internal citations omitted).

"Rule 65(c)'s bond requirement serves a number of functions. It assures the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff. In addition, the bond provides the plaintiff with notice of the maximum extent of its potential liability." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011) (internal citations omitted). Requiring a bond also acts to "discourag[e] parties from requesting injunctions based on tenuous legal grounds." *Nintendo of Am. v. Lewis Galoob Toys*, 16 F.3d 1032, 1036 (9th Cir.1994).

Here, Gorrie provides no explanation for why she should be excused from providing a bond (other than glibly stating "there is no risk of damage to the Plaintiff"). Application, p. 17:3. On the contrary, a wrongfully delayed trustee's sale exposes the Trust to greater losses than it has already suffered. Gorrie should be required to provide a bond in at least the amount of interest and costs incurred that the Trust stands to lose if a preliminary junction is wrongfully issued. This sum is $516,420.76. *See* Bond Calculation based on Pioneer Title Payoff Quotes attached hereto as **Exhibit R.**

## VIII. CONCLUSION

Gorrie's Application should be denied and the Trust should be permitted to enforce its rights under the Promissory Note and DOT by conducting the Trustee's Sale.

RESPECTFULLY SUBMITTED this 8th day of June, 2022.

        UDALL LAW FIRM, LLP
        By /s/ Adriane J. Hofmeyr
         Jeffrey M. Neff
         Adriane J. Hofmeyr
         *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

Original electronically filed and copies of the foregoing served via the Court's CM/ECF Notification System on June 8, 2022, on all Electronic Case Filing Participants that have appeared in the above-captioned case, or U.S. Mail to parties not registered through CM/ECF:

Timothy I. McCulloch
Dickinson Wright PLLC
1850 N. Central Avenue, Ste. 1400
Phoenix, Arizona 85004-4568
courtdocs@dickinsonwright.com
*Attorney for Defendants*


By:*/s/ Beth Alarcon*