1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    D Stadtler Trust 2015 Trust, et al.,        No. CV-22-00314-PHX-DWL

10                   Plaintiffs,                  **ORDER**

11   v.

12   Pamela Gorrie, et al.,

13                   Defendants.

14

15          Plaintiffs in this action are Daniel Stadtler ("Stadtler") in his individual capacity and

16   in his capacity as trustee for the D. Stadtler Trust 2015 ("the Trust").  (Doc. 131 ¶¶ 1-2.)

17   Defendants are Pamela Gorrie ("Gorrie"), Innovative Global Distributions, LLC ("IGD"),

18   Natural Footprints Organic Farm LP ("NFOF"), and NFF Management LLC ("NFF").  (*Id.*

19   ¶¶ 3-6.)[1]  Pending before the Court is Plaintiffs' motion to disqualify Defendants' counsel.

20   (Doc. 110.)  For the following reasons, the motion is denied.

21                              **RELEVANT BACKGROUND**

22          The facts underlying this dispute and much of the procedural history of this case are

23   set out in a prior order.  (Doc. 129.)  Only a brief summary is necessary here.

24          In 2017, the Trust purchased a 540-acre parcel of agricultural land situated at 68562

25   56th Street, Salome, in La Paz County, Arizona (the "Farm").  (Doc. 131 ¶ 12.)

26          In May 2019, Stadtler hired William Dawson ("Dawson") to "list the [Farm] for

27

28   ─────────────────
     [1]     Gorrie is the sole member of both IGD and NFF.  (Doc. 77 ¶¶ 2, 4.)  She is also a
     limited partner in NFOF; NFF is the general partner.  (*Id.* ¶ 3.)

1  sale and to act as broker."  (*Id.* ¶ 13.)

2       In late 2019, Gorrie became interested in purchasing the Farm for a hemp operation.

3  (Doc. 131 ¶¶ 16-17; Doc. 77 ¶¶ 8-12.)  On November 4, 2019, Dawson (on behalf of

4  Stadtler)[2] and Gorrie began discussing the possibility of the Trust selling the Farm to IGD.

5  (Doc. 131 ¶¶ 14-16; Doc. 77 ¶¶ 11-13.)

6       After various discussions, on January 17, 2020, the Trust and IGD executed a real

7  estate purchase contract (the "Farm Purchase Agreement"), under which IGD would buy

8  the Farm from the Trust for $1.4 million.  (Doc. 131 ¶¶ 34-35; Doc. 77 ¶¶ 14-15.)  The

9  Trust provided seller carryback financing for a large portion of the purchase price.  (Doc.

10  131 ¶¶ 34; Doc. 77 ¶ 17.)

11       For reasons that are disputed, the hemp operation struggled to obtain funding.  (*See,*

12  *e.g.*, Doc. 131 ¶¶ 58, 66, 68; Doc. 77 ¶¶ 24-26.)  Between April 2020 and May 2021, the

13  parties executed various other documents related to the hemp operation, including several

14  revenue sharing agreements, which provided that Plaintiffs would be entitled to a

15  percentage of the hemp operation's revenue.  (Doc. 131 ¶¶ 75-80, 96-103, 111-18; Doc. 77

16  ¶¶ 26-32, 37-42, 58-60.)  The parties also discussed, but did not enter into, a joint venture

17  agreement.  (Doc. 131 ¶¶ 111-15; Doc. 121-6 ¶ 7 [Gorrie decl.].)

18       As relevant here, in late March 2021, Gorrie suggested that she, Stadtler, and

19  Dawson meet with Timothy McCulloch ("Counsel"), an attorney at Dickinson Wright,

20  PLLC ("Dickinson Wright").  (Doc. 110-1 ¶ 20; Doc. 110-3 at 2.)  Text messages from

21  Gorrie to Dawson and Stadtler describe Counsel as a "hemp attorney," note his retainer

22  and hourly rate, and discuss a potential escrow account for the hemp operation.  (Doc.

23  110-3 at 2.)

24       On April 5, 2021, Gorrie, Stadtler, and Dawson met with Counsel in his office at

25  Dickinson Wright.  (Doc. 110-1 ¶¶ 21, 25; Doc. 110-2 ¶¶ 21-23 [Dawson decl.]; Doc. 121-6

26  ¶ 3.)  The exact purpose of the meeting is disputed.  (*See, e.g.*, Doc. 110-1 ¶ 33 [Stadtler

27

28  ---
[2]    Plaintiffs allege that "[a]ll the material conversations and material information Ms. Gorrie had or gave to Mr. Dawson throughout the negotiations were passed on in precise detail to Mr. Stadtler by Mr. Dawson."  (Doc. 131 ¶ 15.)

decl.]; Doc. 121-7 ¶ 5 [McCulloch decl.].)   At the meeting, the parties discussed the possibility of setting up an escrow account for revenue from the hemp sales and a draft joint venture agreement related to the hemp operation.  (*See, e.g.*, Doc. 110-1 ¶¶ 25-29.) The parties dispute whether the issue of joint representation was addressed.  (*Compare* Doc. 110-1 ¶¶ 32-34 [according to Stadtler, "I had paid [Counsel] $5,000.00 for the consultation and to draw up the agreement for us and told [Counsel] 'You're my lawyer.' . . . I understood that [Counsel] was representing all of our interests . . . and he never gave me anything in writing that stated he did not represent my interests"] *and* Doc. 110-2 ¶ 28 [according to Dawson, "As we were leaving, Mr. Stadtler told [Counsel] that he considered [Counsel] to be his lawyer and expected him to protect all of our interests"] *with* Doc. 121-6 ¶¶ 8, 14 [according to Gorrie, "The first thing that [Counsel] discussed at the meeting was his belief that he was solely representing myself and my entities. . . .  I never heard Stadtler or Dawson express to [Counsel] that Stadtler wanted to be represented by [Counsel]"] *and* Doc. 121-7 ¶¶ 6-7, 11 [according to McCulloch, "I did not view the representation as joint and discussed this with all three parties at the same time at the meeting. . . .  In addition, I discussed that I did not believe that a joint representation would be appropriate because of the potential for a conflict to arise. . . .  Stadtler never indicated to me that he wished for me to represent him"].)

On April 8, 2021, Stadtler issued a check to Dickinson Wright for $5,000.  (Doc. 124-1 at 4.)  In the memo line, Stadtler wrote "For IGD LLC & Pamela Gorrie."  (*Id.*)[3]

On April 11, 2021, Dawson and Gorrie exchanged a number of text messages in which the issue of legal representation was discussed.  (Doc. 122-3.)[4]  As relevant here, Dawson texted Gorrie: "So here goes the question[,] [Counsel] was to represent all three

---

[3]      The parties agree this check was deposited.  (Doc. 124 at 3; Doc. 132 at 9-10.)

[4]      Stadtler was not included in many of the written communications provided as exhibits by the parties.  (*See, e.g.*, Docs. 110-5, 122-3.)  According to Stadtler, he "rarely text[s]" (although his phone can receive text messages) and does not have an email address. (Doc. 110-1 ¶¶ 23, 41.)  Also, it appears Stadtler relied on Dawson to communicate on his behalf with respect to many of the matters underlying this litigation.  (*See id.* ¶¶ 5, 11; Doc. 121-6 ¶¶ 10-11.)  This may be why many of the relevant communications do not include Stadtler.

of us in the agreement he was writing up[,] correct." (*Id.* at 2.)  In response, Gorrie texted: "You don't tell me what.  I have to have lawyers.  And you all didn't want joe n Blake but forced them to take this.  I can't fix you fuking people over . . . That's on you. . . . They won't let you fuk me out of lawyers period . . . ." (*Id.*)  The parties dispute the meaning of these texts.[5]  The parties also dispute whether Stadtler was represented by other counsel (specifically, Herman C. Zickerman) during the negotiations of the draft joint venture agreement.  (Doc. 120 at 6-8; Doc. 124 at 6-8.)

On April 28, 2021, Dawson and Gorrie again exchanged text messages about Counsel.  Gorrie stated: "We were suppose[d] to hire [Counsel] to be working together. . . . .  It was suppose[d] to be a contract.  Together. . . ." (Doc. 110-3 at 12.)  Dawson responded: "[Counsel] told me the other day he represented you not me or [Stadtler] he didnt [sic] care who paid him he said he cant [sic] represent all of us.  It would get him in trouble with the bar[.]  [Counsel] wanted [Stadtler] to use his own lawyer to ck out the contract he said so." (*Id.*)  Gorrie then said: "What about what I signed up for? . . .  You all paying [Counsel] to fuk with you all?  Cause that's not what I signed up for.  Where we are.  And [Zickerman] isn't a cannabis attorney.  It's kind of fuking ridiculous.  You'll have to get one next probably[.]" (*Id.*)

For reasons that are disputed, the parties' business relationship ultimately fell apart, leading to this litigation.  On February 11, 2022, Plaintiffs filed a complaint in La Paz County Superior Court.  (Doc. 1-2 at 10-27.)  On February 27, 2022, Gorrie removed the action to this Court.  (Doc. 1.)[6]  The notice of removal was filed by Counsel, who identified himself as Gorrie's counsel.  (*Id.*)

On May 2, 2022, Plaintiffs filed a First Amended Complaint ("FAC").  (Doc. 25.)

On May 27, 2022, Defendants filed an answer to the FAC and counterclaims against

---

[5]     Plaintiffs contend that "Gorrie did not deny" the existence of a joint representation. (Doc. 110 at 7.)  Defendants contend that Gorrie's immediate response (together with the remainder of the conversation) demonstrates "that Gorrie considered [Counsel] to be her lawyer and bristled at any attempt by Dawson or Stadtler to interfere with that relationship." (Doc. 120 at 11-13.  *See also* Doc. 122-3 [text messages].)

[6]     Plaintiffs challenged the validity of Gorrie's removal effort (Doc. 11), but the Court eventually denied Plaintiffs' motion to remand (Doc. 21).

Plaintiffs.  (Doc. 38.)  That same day, Defendants (via Counsel) filed a motion for a temporary restraining order ("TRO") based on their counterclaims.  (Doc. 39.)  The TRO sought to block the Trust from pursuing a trustee's sale of the Farm, which was scheduled for June 9, 2022.  (*Id.*)  However, the parties later agreed to postpone the trustee's sale pending the resolution of the TRO request.  (Doc. 60.)

On July 7, 2022, the TRO hearing took place. (Doc. 70.)  As relevant here, Counsel served as counsel for Defendants at the hearing and examined Stadtler, Dawson, and Gorrie.  (*See generally* Doc. 82.)  At the conclusion of the hearing, the Court denied Defendants' TRO request.  (*Id.* at 198-206.)

On October 31, 2022, Plaintiffs filed the pending motion to disqualify Counsel from representing Defendants in this litigation.  (Doc. 110.)  The motion is now fully briefed and neither side requested oral argument.  (Docs. 120, 124, 132.)

On November 11, 2022, Defendants moved for Rule 11 sanctions.  (Doc. 118.)[7]

On December 5, 2022, Plaintiffs filed their operative pleading, the Second Amended Complaint ("SAC").  (Doc. 131.)  The SAC asserts claims for breach of contract, unjust enrichment, fraud, negligent misrepresentation, and conversion/replevin, all of which arise from the parties' previous interactions related to the sale of the Farm and the hemp operation.  (*Id.* ¶¶ 123-72.)  Defendants' operative pleading, filed on June 14, 2022, asserts ten counterclaims based largely on similar theories.  (Doc. 77 ¶¶ 72-121.)[8]

…

…

…

…

---

[7]    This motion is fully briefed (Docs. 125, 130) and the Court will rule on it in due course.  There is some suggestion by Defendants that Plaintiffs' motion to disqualify was filed, at least in part, in retaliation for Defendants' request for Rule 11 sanctions, a draft of which was transmitted to Plaintiffs on October 21, 2022 pursuant to Rule 11(c)(2).  (Doc. 120 at 2-3.)  The Court did not consider this allegation in making its decision about disqualification but, even if it had, such speculation would not change the analysis.

[8]    On January 6, 2023, Defendants filed a motion to amend their First Amended Counterclaim and Third-Party Complaint.  (Doc. 146.)  This motion is not yet fully briefed and the Court will rule on it in due course.

**DISCUSSION**

I.    Legal Standard

The Court "appl[ies] state law in determining matters of disqualification."  *In re Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("[W]e must follow the reasoned view of the state supreme court when it has spoken on the issue.").  In Arizona, motions to disqualify opposing counsel are "view[ed] with suspicion."  *Gomez v. Superior Court*, 717 P.2d 902, 905 (Ariz. 1986).  "Only in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent."  *Alexander v. Superior Court*, 685 P.2d 1309, 1313 (Ariz. 1984).  "[T]he moving party . . . [must] show sufficient reason why an attorney should be disqualified from representing his client.  Whenever possible the courts should endeavor to reach a solution that is least burdensome upon the client or clients."  *Id.*

The District of Arizona has adopted, by local rule, the Arizona Rules of Professional Conduct.  *See* LRCiv 83.2(e).  Accordingly, this Court must follow those rules when deciding whether disqualification is required.  *Unified Sewerage Agency of Wash. Cnty. v. Jelco Inc.*, 646 F.2d 1339, 1342 n.1 (9th Cir. 1981) (holding that Oregon's ethical rules governed disqualification because "the United States District Court for the District of Oregon has adopted as its rules the disciplinary rules of the State Bar of Oregon" but "express[ing] no opinion on the law to apply where the district court has not designated the applicable rules of professional responsibility").  *See also Quatama Park Townhomes Owners Ass'n v. RBC Real Est. Fin., Inc.*, 365 F. Supp. 3d 1129, 1136-37 (D. Or. 2019) ("When considering a motion to disqualify counsel in the Ninth Circuit, at least when a district court has adopted by local rule the ethical code governing lawyers promulgated by the state in which that court sits, federal courts are directed to apply the law of the forum state . . . .").  The Preamble to the Arizona Rules of Professional Conduct cautions that "violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation."  Ariz. Sup. Ct. R. 42, Ariz. R. Pro. Conduct Preamble ¶ 20.  *See also id.* ("[T]he purpose of the Rules can be subverted when

- 6 -

they are invoked by opposing parties as procedural weapons."); *Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist.*, 810 F. Supp. 2d 929, 944 (D. Ariz. 2011) ("[D]isqualification motions should be subjected to 'particularly strict scrutiny' because of their potential for abuse.") (citation omitted).

II.   The Parties' Arguments

Plaintiffs move to disqualify Counsel and his law firm, Dickinson Wright, from representing Defendants in this matter.  (Doc. 110.)  In broad strokes, Plaintiffs contend that disqualification is necessary because (1) Counsel jointly represented Stadtler and Gorrie in relation to the hemp growing operation and is thus violating Arizona Ethical Rule 1.9 ("ER 1.9") by representing Gorrie against Stadtler in this litigation, which is substantially related to the prior joint representation;[9] (2) Counsel is likely to be a necessary witness in this litigation and is thus prohibited from representing Defendants under ER 3.7(a); and (3) the "public's interest in the administration of justice" further supports disqualification.  (*Id.* at 8-16.)

Defendants oppose the disqualification request.  (Doc. 120.)  As an initial matter, Defendants contend that Plaintiffs' request is "retaliatory, tactical, and driven by antipathy for Defendants' counsel."  (*Id.* at 2-5.)  On the merits, Defendants contend the motion is beset by "factual inaccuracies and evidentiary issues."  (*Id.* at 5.)  In particular, Defendants vigorously dispute Plaintiffs' contention that Stadtler lacked separate counsel in relation to the draft joint venture agreement and argue that Stadtler was, in fact, represented by Zickerman.  (*Id.* at 6-8.)  At any rate, Defendants contend that Counsel did not jointly represent Stadtler and Gorrie at any time (but instead represented only Gorrie) and provide several reasons that the evidence proffered by Plaintiffs to demonstrate joint representation is insufficient.  (*Id.* 8-9.)  Defendants also argue the motion fails on the law because the

---

[9]    Plaintiffs also invoke ER 1.8, which governs the circumstances under which an attorney can accept compensation from a non-client, but do not seem to seek the disqualification of Counsel based on a purported violation of ER 1.8—instead, Plaintiffs' theory is that Counsel was not required to comply with ER 1.8 because the representation of Gorrie and Stadtler was a joint representation, which in turn means that ER 1.9 is implicated.  (Doc. 110 at 9-10.)

"substantially related" test does not apply to a disqualification request premised on a joint representation and, even if it did, Plaintiffs forfeited their ability to object to Counsel's representation of Gorrie by waiting too long to raise the issue. (*Id.* at 13-17.) As for ER 3.7, Defendants argue that Plaintiffs have not met the "high burden" of showing Counsel will give material evidence that is unobtainable elsewhere and may be prejudicial to Stadler (who, at any rate, was never Counsel's client). (*Id.* at 18-20.) Defendants also note that Plaintiffs' arguments under ER 3.7 appear to assume Stadler "might call [Counsel] and force him to testify against his client" and thus waive the alleged attorney-client privilege on which Plaintiffs' disqualification arguments under ER 1.9 are premised. (*Id.* at 20.) Finally, Defendants contend that "public policy is not impacted by the fact[s] in this case" and challenge Plaintiffs' assertions that Stadler was a third-party payor[10] and that Stadler communicated his desire to retain Counsel as counsel for himself. (*Id.* at 17-18, 20-21.)

In reply, Plaintiffs assert that Counsel has neither denied that he received confidential information from Stadler nor provided evidence rebutting the alleged attorney-client relationship. (Doc. 124 at 2.)[11] Plaintiffs also contend that Counsel gave legal advice to Stadler but neither informed Stadler in writing as to the scope of the representation nor obtained informed consent from Stadler to support a conflict waiver. (*Id.*) Plaintiffs then argue that the following facts demonstrate that Counsel jointly represented Stadler and Gorrie: (1) Counsel accepted payment from Stadler for legal services (*i.e.*, a retainer check) yet did not obtain Gorrie's informed consent for that payment, as would be required for a third-party payment from a non-client under ER 1.8(f); (2) for various reasons, the facts averred in declarations from Counsel and Gorrie, even if true, do not establish that Counsel represented Gorrie only; and (3) Stadler was not

---

[10]     Specifically, Defendants characterize the $5,000 check as a loan from Stadler to IGD and Gorrie. (Doc. 120 at 17-18.)

[11]     Plaintiffs' assertion that Counsel has not denied obtaining confidential information from Stadler is difficult to square with the record. (*See, e.g.*, Doc. 121-7 ¶ 14; Doc. 120 at 14-15 ["[T]here could not have been an expectation for Stadler to have kept the information that he stated to [Counsel] confidential from Gorrie because she was sitting right there in the room next to him at the meeting the entire time."].)

represented by Zickerman at the time of the alleged joint representation.  (*Id.* at 3-9.)[12]  As for whether the "substantially related" test applies to a disqualification request premised on a joint representation, Plaintiffs argue that the case cited by Defendants is "inapposite" because it "is a case about duty of confidentiality, not loyalty."  (*Id.* at 9-10.)  Plaintiffs further argue that Counsel has a "non-waivable conflict of interest" under ER 1.7.  (*Id.* at 11-12.)  Finally, Plaintiffs argue that Gorrie "will not be prejudiced [by disqualification] because she already has another attorney, Joseph Urtuzuastegui who represents her in the bankruptcy case, who is up to speed who could step in."  (*Id.* at 12.)

In an authorized surreply, Defendants address the two new declarations (from Zickerman and Delores Aguirre) that Plaintiffs filed in support of their reply[13] and the new arguments raised for the first time in Plaintiffs' reply.  (Doc. 132.)  As for Zickerman's declaration, Defendants contend it "flatly contradicts" the facts alleged by Stadtler and Dawson in their respective declarations.  (*Id.* at 2-3.)[14]  In Defendants' view, Zickerman's repeated revisions to the draft joint venture agreement (to which Dawson was not party), many of which benefited Stadtler, made it reasonable for Counsel to believe that Zickerman represented Stadtler.  (*Id.* at 5-8.)[15]  As for the Aguirre declaration, Defendants reiterate that Stadtler was "not a third-party payor."  (*Id.* at 9-10.)  Defendants further argue that the Aguirre declaration "introduce[s] the idea that Stadtler made four . . . wire transfers in the amount of $17,000 to Gorrie's personal bank account" to pay for Counsel's services, which, although "incorrect" because "those transfers went into the IGD account," supports Defendants' argument that the retainer payment was a loan.  (*Id.*)  Finally, Defendants argue they would be prejudiced by disqualification: "[W]ith all due respect to Mr.

---

[12]    Plaintiffs also defend Stadtler's ability to remember the April 5, 2021 meeting and subsequent payments to Dickinson Wright.  (Doc. 124 at 10-11.)

[13]    Aguirre does Stadtler's bookkeeping.  (Doc. 124-1 at 2.)

[14]    Defendants also argue that Zickerman's declaration "contains irrelevant facts intended solely for pejorative purposes."  (Doc. 132 at 8-9.)

[15]    According to Defendants, the fact that Dawson requested that Zickerman review the draft agreements on Stadtler's behalf (as established by an attached email) "utterly invalidates Plaintiffs' argument that [Counsel] never told Dawson that Stadtler needed an attorney," as asserted in Dawson's declaration.  (*Id.* at 6-7.)

1   Urtuzuastegui, he is a 4th year lawyer whom Plaintiffs argue could simply substitute for

2   undersigned counsel. . . .   And how do Plaintiffs know that Mr. Urtuzuastegui is up to

3   speed?"  (*Id.* at 10.)[16]

4   III.   Analysis

5       A.   **ER 1.9**

6       Plaintiffs contend that Counsel jointly represented Stadtler, Gorrie, and Dawson in

7   matters related to the hemp growing operation and thus, without Stadtler's informed

8   consent, Counsel is violating ER 1.9 by representing Gorrie in litigation against Stadtler

9   that arises from substantially related matters.  (Doc. 110 at 10-14.)

10      ER 1.9, which is entitled "Duties to Former Clients," provides:

11      (a)   A lawyer who has formerly represented a client in a matter shall not
             thereafter represent another person in the same or a substantially
12            related matter in which that person's interests are materially adverse
             to the interests of the former client unless the former client gives
13            informed consent, confirmed in writing.

14      (b)   A lawyer shall not knowingly represent a person in the same or a
             substantially related matter in which a firm with which the lawyer
15            formerly was associated had previously represented a client:

16          (1)   whose interests are materially adverse to that person; and

17          (2)   about whom the lawyer had acquired information protected by
                  ERs 1.6 and 1.9(c) that is material to the matter;

18
        unless the former client gives informed consent, confirmed in writing.
19
        (c)   A lawyer who has formerly represented a client in a matter shall not
20            thereafter:

21          (1)   use information relating to the representation to the
                  disadvantage of the former client except as these Rules would
22                permit or require with respect to a client, or when the
                  information has become generally known; or
23
            (2)   reveal information relating to the representation except as these
24                Rules would permit or require with respect to a client.

25
    *Id.*  "For a conflict to exist pursuant to this provision, the moving party must show: (1) the
26

27      ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [16]   Defendants also assert that, "at one of the pre-litigation meetings held between the
28   parties, Plaintiffs' attorneys specifically made a ER 3.7 argument against Mr.
     Urtuzuastegui's participation because they argued he was a fact witness."  (*Id.* at 10-11.)

existence of an attorney-client relationship; (2) that the former representation was 'the same or substantially related' to the current litigation; and (3) that the current client's interests are 'materially adverse' to the former client's interests." *Roosevelt Irr. Dist.*, 810 F. Supp. 2d at 945 (quoting *Foulke v. Knuck*, 784 P.2d 723, 726-27 (Ariz. Ct. App. 1989)). "Looking to this ethical rule as a guide, Arizona courts have noted that while notifying clients of conflicts and receiving consent to move forward with a representation is an important ethical duty of a lawyer, '[o]nly in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent.'" *SinglePoint Direct Solar, LLC v. Curiel*, 2022 WL 17418428, *2 (D. Ariz. 2022) (quoting *Alexander*, 685 P.2d at 1313).

Here, the parties dispute the first and second elements of the ER 1.9 analysis—that is, whether an attorney-client relationship existed between Counsel and Stadtler and whether the "substantially related" standard applies. Although the parties spill much ink debating the first element (*see, e.g.*, Doc. 110 at 11-14; Doc. 120 at 5-12; Doc. 124 at 3-6), the Court finds it unnecessary to resolve that dispute because, even assuming Plaintiffs are correct, disqualification would not be required under the second element.

The Arizona Supreme Court discussed the "problem of representation adverse to that of a former client" in the context of joint representation in *Alexander*, ultimately holding that "the substantial relationship test is not applicable" when the case "does not involve any disclosures of confidential information." 685 P.2d at 1313-16.[17] The *Alexander* court further noted that "there is a recognized presumption that '[a]s between joint clients ordinarily there is no expectation of confidentiality.'" *Id.* at 1315 (citation omitted). This presumption is further supported by an ethics opinion from the Arizona State Bar Association, which provides that "there is no individual confidentiality when a joint representation exists." Ariz. Ethics Op. 07-04, available at

---

[17]    *See also SinglePoint Direct Solar, LLC v. Curiel*, 2022 WL 17418428, *2 (D. Ariz. 2022) ("Although the Arizona Supreme Court was interpreting the old Arizona Ethical Rules in *Alexander*, it did discuss the then Model Rule 1.9 stating "[w]e believe our holding in the present case meets both sections of Rule 1.9.") (quoting *Alexander*, 685 P.2d at 1316).

1   https://tools.azbar.org/RulesofProfessionalConduct/ViewEthicsOpinion.aspx?id=696

2   (internal quotation marks omitted).  *See also Nitrini v. Feinbaum*, 501 P.2d 576, 582 (Ariz.

3   Ct. App. 1972) ("When two or more clients employ the same attorney in the same business,

4   communications made by them in relation to such business are not privileged inter sese nor

5   are they privileged as between any one of the parties and the attorney.") (internal quotation

6   marks omitted).

7       Relying on the principles articulated in *Alexander*, Arizona district courts have

8   rejected disqualification requests premised on the existence of prior joint representation

9   arrangement.  *SinglePoint Direct Solar*, 2022 WL 17418428 at *2 ("Because there is no

10  confidential or privileged information as between jointly represented clients, if a lawyer

11  who at one time jointly represented two clients, and who is now suing one on behalf of the

12  other, discloses information learned from the former client, there is no violation of Rule

13  1.9.").  This interpretation is supported by the fact that Arizona courts have generally

14  characterized the duties owed to former clients (embodied by ER 1.9) as rooted in

15  confidentiality.  *See, e.g.*, *Nitrini*, 501 P.2d at 582 ("The principle which bars an attorney

16  from representing an interest adverse to that of a former client is said to be grounded upon

17  the confidential relationship which exists between attorney and client, and courts take the

18  position that by imposing this disability upon the attorney, confidential information is

19  protected."); *Bicas v. Superior Court*, 567 P.2d 1198, 1201 (Ariz. Ct. App. 1977) (same);

20  *Nichols v. Elkins*, 408 P.2d 34, 39 (Ariz. Ct. App. 1965) ("[T]he foundation of

21  disqualification [from representing an interest adverse to that of a former client] is the

22  existence of a former confidential relationship.").

23      Turning to disqualification, Arizona applies the "substantial relationship" test to

24  determine when an attorney should be disqualified from appearing on behalf of a former

25  client's adversary.  *Alexander*, 685 P.2d at 1315-16.  This test protects attorney-client

26  relationships by promoting the "preservation of secrets and confidences communicated to

27  the lawyer by the client."  *Christensen v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 844 F.2d

28  694, 698 (9th Cir. 1988) (citation omitted).  But as noted, Arizona law presumes there is

no expectation of confidentiality between joint clients.  *Alexander,* 685 P.2d at 1314-15.  *See also* ER 1.7, cmt. 28 ("[A]s between commonly represented clients, the [attorney-client] privilege does not attach.  Hence, it must be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications . . . .").

Here, Plaintiffs contend that Counsel "was representing [Stadtler, Gorrie, and Dawson] jointly and giving them legal advice for their mutual benefit."  (Doc. 110 at 2.)  But even assuming that is true, Stadtler had no reason to believe that any of the information he shared with Counsel would be kept confidential from Gorrie—in fact, she was sitting right next to him as he shared it in her presence.  (*See* Doc. 110-1 ¶¶ 25-35; Doc. 110-2 ¶¶ 21-27.)[18]  After that meeting, it appears Counsel only communicated with Stadtler indirectly through Dawson and, at times, Zickerman.  (*See, e.g.*, Doc. 110-1 ¶¶ 38-41; Doc. 110-3 at 4-18 [text messages between Dawson and Counsel].)  Gorrie was a party to some of those communications.  (Doc. 124-2 [emails between Counsel, Gorrie, and Dawson].)  It is not clear how Stadtler could have reasonably believed these communications would be kept confidential from Gorrie if he believed, as he testifies, that Counsel "was representing all three of us, [Gorrie], me, and [Dawson]."  (Doc. 110-1 ¶ 24.)  Thus, because Counsel never learned any information from Stadtler that was confidential as to Gorrie, "the substantial relationship test is not applicable," *Alexander*, 685 P.2d at 1316, and ER 1.9 has not been violated.  *See also SinglePoint Direct Solar*, 2022 WL 17418428 at *4 ("[W]hen an attorney who jointly represent clients withdraws from the representation of the secondary client and subsequently sues that client on behalf of the primary client, there is no violation of Rule 1.9."); *Nichols*, 408 P.2d at 39 ("[W]hen two or more clients employ the same attorney in the same business, communications made by them in relation to such business are not privileged inter sese nor are they privileged as between any one of the parties and the attorney. . . .  Since these communications are not deemed confidential,

---

[18]    To be clear, the Court provides no opinion as to whether the representation was in fact joint.  If it was not, ER 1.9 would not apply because Stadtler would not be Counsel's former client.  In that scenario, Plaintiffs' arguments for disqualification under ER 1.9 would obviously fail.

1   there is no impediment to or impropriety in the adverse representation by the attorney.").

2   This makes sense from a practical standpoint—it is difficult to see how Stadtler would be

3   prejudiced by Counsel sharing their prior communications with Gorrie if Gorrie herself

4   already knows about them.

5        Plaintiffs contend that the foregoing analysis, which follows the approach taken by

6   the Second Circuit in *Allegaert v. Perot*, 565 F.2d 246 (2d Cir. 1977), is "inapposite"

7   because it focuses on the "duty of confidentiality, not loyalty."  (Doc. 124 at 9-10.)

8   However, Plaintiffs do not explain how the duty of loyalty applies here and reference only

9   one case in support of their position: *Hasco, Inc. v. Roche*, 700 N.E.2d 768 (Ill. App. Ct.

10  1998).  Plaintiffs' reliance on *Hasco* is unavailing because this Court must follow Arizona

11  law (and the Arizona courts' construction of Arizona's applicable ethical rules), not the

12  Illinois courts' interpretation of Illinois's ethical rules.  The Arizona Supreme Court has

13  indicated its approval of *Allegaert*.  *Alexander*, 685 P.2d at 1315-16.[19]  So, too, has the

14  Ninth Circuit, albeit in the context of a case applying the California Rules of Professional

15  Conduct.  *Christensen*, 844 F.2d at 699 ("[W]e adopt the rule of *Allegaert* . . . .").  *See also*

16  *Quatama Park*, 365 F. Supp. 3d at 1139 ("[T]he Ninth Circuit has adopted the rule of

17  *Allegaert* in cases applying the ethical rules of Oregon and California . . . .").[20]

18        Accordingly, the Court declines to disqualify Counsel under ER 1.9.  And because

19  Counsel is not disqualified under ER 1.9, Dickinson Wright is not disqualified under ER

20  1.10(d).[21]  *See also Amparano v. ASARCO, Inc.*, 93 P.3d 1086, 1094 (Ariz. Ct. App. 2004)

21  [19]   Specifically, the Arizona Supreme Court cited *Allegaert* in support of the
22  propositions that (1) a secondary client does not have any expectation that his
    communications will be kept secret from primary clients; (2) a firm's primary clients
23  should retain the firm's loyalty over other clients; and (3) the "substantial relationship"
    does not apply to cases that do not involve any disclosures of confidential information by
24  former clients.  *Alexander*, 685 P.2d at 1315-16.

    [20]   The Court acknowledges that some out-of-circuit decisions have interpreted the
25  *Allegaert* rule more narrowly, holding that "it requires a finding that one client is secondary
    to another, and thus, less worthy of an attorney's loyalty."  *Exterior Sys., Inc. v. Noble*
26  *Composites, Inc.*, 175 F. Supp. 2d 1112, 1120-21 (N.D. Ind. 2001).  However, the Ninth
    Circuit has adopted the broader reading of *Allegaert*: "[T]he substantial relationship test is
27  inapplicable when the former client has no reason to believe that information given to
    counsel will not be disclosed to the firm's current client."  *Christensen*, 844 F.2d at 699.

28  [21]   Under ER 1.10(d), "[w]hen a lawyer becomes associated with a firm, no lawyer
    associated in the firm shall knowingly represent a person in a matter in which that lawyer

- 14 -

("[L]ogic dictates that, if Shanker is not disqualified, there can be no imputed disqualification of the associated firm.").

B.    **ER 3.7**

Plaintiffs also contend that Stadtler "could be required to call [Counsel] as a witness in this case" such that Counsel would be "required to give evidence material to the determination of the issues being litigated such as the Parties' intentions as to the revenue share agreements, the Deed of Trust, and whether the Parties' ultimately agreed to enter into a joint venture agreement." (Doc. 110 at 15.)  Plaintiffs continue: "If [Counsel] asserts a position opposite to the information he was given during the course of his joint representation of Plaintiffs and Defendants, he should be required to testify on what the Parties agreed to and intended.  That the testimony would be prejudicial to [Counsel] clients the Defendants, such that he should voluntarily withdraw."  (*Id.* at 15.)

ER 3.7 provides:

(a)    A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1)    the testimony relates to an uncontested issue;

(2)    the testimony relates to the nature and value of legal services rendered in the case; or

(3)    disqualification of the lawyer would work substantial hardship on the client.

(b)    A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by ER 1.7 or ER 1.9.

*Id.*  A motion for disqualification under ER 3.7 must be supported by a showing that the attorney is a "necessary witness."  *Sec. Gen. Life Ins. Co. v. Superior Court*, 718 P.2d 985, 988 (Ariz. 1986).  "[T]here is a dual test for 'necessity.'  First the proposed testimony must be relevant and material.  Then it must also be unobtainable elsewhere."  *Id.*  Additionally, disqualification is warranted only where "the testimony is or may be prejudicial to the

_____

is disqualified under ER 1.9" unless various conditions have been fulfilled.  *See id.* 1.10(d)(1) through (4).

testifying attorney's client." *Powers Reinforcing Fabricators, L.L.C. v. Contes*, 473 P.3d 714, 721 (Ariz. Ct. App. 2020). "The prejudice requirement . . . works to preclude the folly of an attorney giving testimony detrimental to the interest he is advocating as well as to prevent opposing counsel from contriving some tactical need for calling the attorney thereby triggering disqualification." *Id.* at 722 (citation omitted).

Plaintiffs have failed to make a threshold showing that Counsel is a necessary witness. Even assuming that Counsel's testimony would be admissible and material, Plaintiffs have not shown that it could not be obtained from other witnesses, such as Gorrie, Stadtler, or Dawson, all of whom were present at the April 5, 2021 meeting and have provided declarations describing what was said during it. (Docs. 110-1, 110-2, 121-6). The evidence also suggests Dawson communicated extensively with Counsel about the parties' proposed joint venture and thus, to the extent those communications are relevant and admissible, could testify to them. (*See, e.g.*, Doc. 110-2 ¶¶ 30-41.) A mere showing that counsel is a potential, but not necessary, witness is insufficient to trigger disqualification. *Cramton v. Grabbagreen Franchising LLC*, 2020 WL 6680366, *3 (D. Ariz. 2020). *See also Powers Reinforcing Fabricators*, 473 P.3d at 722 (noting that it is an abuse of discretion to grant a motion for disqualification without the required showing that the testimony is material, is not obtainable elsewhere, and may be prejudicial to the testifying attorney's client).

Plaintiffs attempt to sidestep the fact that this information is available from other sources by suggesting that Counsel would "assert[] a position" he knows to be false based on his interactions with the parties before this litigation such that he "should be required" to testify about what the parties actually intended. (Doc. 110 at 15.) This argument is unsupported by the record and unavailing. The mere fact that Stadtler and Gorrie disagree about what was said during the April 5, 2021 meeting does not establish that Counsel, as Gorrie's counsel, is taking a position he knows to be false.

For similar reasons, Plaintiffs fail to establish prejudice. Although "a party can easily be prejudiced when opposing counsel acts as both advocate and witness," "the

obvious dangers inherent in [disqualifying counsel because an adverse party intends to call him as a witness] and the importance of the right to have the counsel of one's choice require careful scrutiny of the facts before such a result is permitted." *Sec. Gen. Life Ins.*, 718 P.2d at 988. Plaintiffs contend that Counsel's testimony "on what the Parties agreed to and intended . . . would be prejudicial to [Counsel's] clients the Defendants." (Doc. 110 at 15.) Such vague, speculative harms fall far short of the high bar required for disqualification.

Finally, "even when the other factors are present, a lawyer should withdraw *only after* it becomes clear an attorney ought to testify." *Powers Reinforcing Fabricators*, 473 P.3d at 722 (internal quotation marks omitted). Here, it is far from clear that Counsel will testify or that there will even be a trial. *See also Sec. Gen. Life Ins.*, 718 P.2d at 988 ("A party's mere declaration of an intention to call opposing counsel as a witness is an insufficient basis for disqualification even if that counsel could give relevant testimony.").

C.      **Public Policy**

Plaintiffs contend that the "public's interest in the administration of justice weighs heavily in favor of disqualification" because Counsel "elicited confidential information from Mr. Stadtler and accepted payment for his services, knowing Mr. Stadtler considered him to be his attorney and without explaining his obligations to Mr. Stadtler and Ms. Gorrie as required by Rules 1.6, 1.8, and 1.9." (Doc. 110 at 16.) Plaintiffs also suggest, albeit somewhat indirectly, that Counsel has a "concurrent conflict of interest" warranting disqualification under ER 1.7(a)(2). (*Id.*)

For reasons already discussed, ER 1.9 is not violated by Counsel representing Defendants in this matter. For similar reasons, ER 1.6 (which is titled "Confidentiality") is not implicated—even assuming joint representation, Stadtler could not have reasonably believed that information he shared with Counsel would be kept confidential as to Gorrie.

ER 1.8 "regulates conflicts and specifies under what circumstances an attorney may accept payment from a third party on behalf of a client." *Enriquez v. Gemini Motor Transp. LP*, 2021 WL 3565731, *1 (D. Ariz. 2021). Plaintiffs contend that, if Counsel was not providing joint representation (but instead solely representing Gorrie), he violated ER

1    1.8(f) by accepting payment from Stadtler for that representation without obtaining

2    Gorrie's informed consent and without determining that there was no interference with the

3    client-lawyer relationship and that her confidential information would be protected.  (Doc.

4    110 at 9-10.)

5         As relevant here, ER 1.8(f) prohibits a lawyer from "accept[ing] compensation for

6    representing a client from one other than the client unless (1) the client gives informed

7    consent; (2) there is no interference with the lawyer's independence of professional

8    judgment or with the client-lawyer relationship; and (3) information relating to

9    representation of a client is protected as required by ER 1.6."  *Id.*  A conflict exists where

10   "there is a significant risk that the lawyer's representation of the client will be materially

11   limited . . . by the lawyer's responsibilities to the third-party payer."  ER 1.8, cmt. 10.

12        The parties dispute whether, assuming Counsel solely represented Gorrie, Stadtler

13   was a third-party payor.  (Doc. 110 at 9-10; Doc. 17-18.)  According to Plaintiffs, Stadtler

14   paid for Gorrie's legal fees directly (Doc. 110 at 9-10); according to Defendants, Stadtler

15   loaned the money to Gorrie and IGD, who then used it for legal representation related to

16   the hemp operations, as part of his overall investment in the project (Doc. 120 at 18).

17        It is unnecessary to attempt to make sense of the voluminous evidence that the

18   parties have provided on this issue because, even if Counsel accepted the $5,000 check in

19   violation of ER 1.8(f),[22] Plaintiffs don't explain how this payment, made in April 2021

20   (more than six months before this litigation arose), creates a conflict of interest sufficient

21   to justify the extreme sanction of disqualification, particularly where the disqualification

22   request wasn't raised until eight months after Counsel first appeared in this action.  As for

23   Plaintiffs' allegation that Counsel "continued to bill Mr. Stadtler for services," this claim

24   is unsupported by the record, which demonstrates only that Stadtler made five wire

25   transfers (totaling $17,000) to Gorrie between March 18, 2021 and April 8, 2021.  (Doc.

26   124-1 at 8-9.)[23]  Again, it is unclear how payments between Stadtler and Gorrie that

27   ─────────────────────

28   [22]   To be clear, the Court does not find that ER 1.8(f) was violated.

     [23]   The parties dispute whether these payments were to Gorrie in her personal capacity
     or "went into the IGD account."  (Doc. 124 at 3 n.1; Doc. 132 at 10.)  This distinction is

occurred more than a year before this suit was filed create "significant risk" that Counsel's representation of Defendants will be materially limited by his responsibilities to Stadtler. Accordingly, the Court is not convinced that the alleged violation of ER 1.8(f) demonstrates that the "public's interest in the administration of justice weighs heavily in favor of disqualification" (Doc. 110 at 16).[24]

Plaintiffs' final public policy argument, which is based on ER 1.7, is equally unavailing.  Under ER 1.7(a),

> a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

*Id.*  "A conflict of interest will be found to exist 'if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.'" *Jamieson v. Slater*, 2006 WL 3421788, *6 (D. Ariz. 2006) (quoting ER 1.7, cmt. 8).  "In such a situation, the conflict effectively forecloses alternatives that would otherwise be available to the client." *Id.* (internal citation omitted).[25]

Here, Plaintiffs have not demonstrated that a conflict of interest exists that would materially limit Counsel's representation of Defendants.  As discussed, Counsel did not obtain information from Stadtler that was confidential as to Gorrie and Plaintiffs provide

---

[24] not material to the Court's analysis.

[24] The Court also notes that Plaintiffs do not identify, nor can the Court find, any case in which counsel was disqualified based on a violation of ER 1.8(f).

[25] The Court assumes without deciding that Stadtler has standing to bring this challenge. *State ex rel. Romley v. Superior Ct. In & For Cnty. of Maricopa*, 891 P.2d 246, 248 (Ariz. Ct. App. 1995) ("Generally, only a client or a former client has standing to challenge legal representation on grounds of conflict of interest.").  As noted elsewhere, the Court makes no finding as to whether Counsel and Stadtler in fact had an attorney-client relationship.

1    little to no analysis of how Counsel's duty of loyalty to Stadtler (assuming it exists)

2    materially limits his representation of Defendants in this matter.   Additionally, "[t]he

3    purpose of [ER 1.7(a)(2)] . . . . is to protect a *current client* from material limitation in *its*

4    representation, caused by its lawyer's responsibilities to another client, a former client, or

5    a third person." *Roosevelt Irr. Dist.*, 810 F. Supp. 2d at 976.  Plaintiffs do not allege that

6    Counsel and Stadtler have a current attorney-client relationship.  (*See generally* Doc. 110.)

7    Therefore, Stadtler is not the party meant to be protected by this rule.  *Roosevelt Irr. Dist.*,

8    810 F. Supp. 2d at 976 ("Arvin and Cooper are not Derouin's current clients, and therefore

9    they simply are not the parties meant to be protected by this rule.").  Any concern, if it

10   exists, belongs to Gorrie, who seems fully aware of Counsel's prior interactions with

11   Stadtler and has expressed no concern.  *See also E.E.O.C. v. Luby's, Inc.*, 347 F. Supp. 2d

12   743, 746 (D. Ariz. 2004) (noting that the current client is "the only party that must worry

13   about whether her representation will be limited" by her lawyer's responsibilities to a third

14   party).[26]

15           **D.    Disqualification As A Remedy**

16           Alternatively, even if Counsel's representation of Defendants violated the ethical

17   rules, the Court would not order disqualification.  "Disqualification of a party's chosen

18   counsel is a severe sanction."  *Kaiser v. AT&T*, 2002 WL 1362054, *7 (D. Ariz. 2002).

19   Thus, when a violation of an ethical rule occurs, Arizona courts apply a balancing test to

20   determine if disqualification is appropriate.  *Roosevelt Irr. Dist.*, 810 F. Supp. 2d at 984

21   ("[A]utomatic disqualification for an ethical violation is not preferable.") (citation

22   omitted).  "Courts have considered the following factors in such an analysis: (1) the nature

23   of the ethical violation; (2) the prejudice to the parties, including the extent of actual or

24   potential delay in the proceedings; (3) the effectiveness of counsel in light of the violations;

25   (4) the public's perception of the profession; and (5) whether a motion to disqualify has

26   been used as a tactical device or a means of harassment."  *Id.*

27   _____

28   [26]     Because of this conclusion, it is unnecessary to further address Plaintiffs' ER 1.7(b)
     arguments.  (Doc. 124 at 11.)

Several factors weigh heavily against disqualification here.  First, Plaintiffs have not demonstrated any harm caused by the alleged ethical violations.  "[T]he central question in any disqualification inquiry is whether there will be harm, going forward in a case, from an attorney's representation of a client."  *SinglePoint Direct Solar*, 2022 WL 17418428 at *6.  "Because . . . of the 'great prejudice often associated with an enforced change of counsel, courts applying these standards have granted disqualification only when the moving party has demonstrated substantial and irreparable harm growing out of the ethical violation.'"  *Richards v. Holsum Bakery, Inc.*, 2009 WL 3740725, *6 (D. Ariz. 2009) (citation omitted).  *But see Foulke*, 784 P.2d at 729 (specific harm not required where there is a "blatant violation of ER 1.9(a)" that "presents a conflict that is anything but remote").  Plaintiffs contend that Counsel "elicited from Mr. Stadtler confidential financial information and other confidential information germane to this action, including questions regarding Ms. Gorrie's debt to the Trust, Mr. Stadtler's thoughts and intentions about the debt, and specifics about Mr. Stadtler's and Mr. Houchin's financial wherewithal." (Doc. 110 at 3.)  However, for the reasons explained elsewhere in this order, Stadtler shared this information with Counsel with no expectation that it would be kept confidential from Gorrie (and, at least at the April 5, 2021 meeting, shared it in Gorrie's presence).  Also, to the extent such information was in fact shared with Counsel and is relevant to this litigation, the alleged harm to Stadtler is far too speculative to constitute a basis for disqualifying Defendants' counsel.  Indeed, even if this Court were to disqualify Counsel, all of the evidence about which Plaintiffs are concerned could still potentially be brought in by substitute counsel because it was shared with Gorrie.

In contrast, disqualification would result in substantial prejudice to Defendants.  Plaintiffs' suggestion that Urtuzuastegui, the attorney representing Gorrie in IGD's bankruptcy litigation, could easily step in and represent Defendants in this matter is unconvincing.  And even accepting Plaintiffs' explanation for the timing of their request, the fact that this case had been pending for nearly eight months before the request was made suggests that disqualification would prejudice Defendants.  Although the Court will

assume that Plaintiffs' motion was not made for the purpose of harassing Defendants and Counsel, that appears to be the result of the request.  Since October 2022 (when this motion was filed), Counsel has been unable to depose Stadtler, whose testimony seems likely to go to the heart of the merits for both sides.  If Defendants must obtain a new attorney, it will cause inconvenience, delay, and additional costs.  Therefore, the Court finds that the hardship of disqualification to Defendants far outweighs any injustice to Plaintiffs.

As for the remaining factors, the nature of the alleged ethical violations is discussed elsewhere in this order, as is the effectiveness of Counsel in light of the alleged violations. Neither party addresses the "public's perception of the profession" factor, and the Court does not find it instructive in this case.

IV.    Costs And Fees

Defendants request "all costs and fees incurred in responding to this Motion as a sanction and for such other relief as the Court deems proper." (Doc. 120 at 21.)  Defendants do not indicate the basis for this request and Plaintiffs do not address it in their reply.

The Court has the inherent authority to sanction a litigant for bad faith conduct by ordering it to pay the other side's legal fees.  *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 103-04 (2017) ("[S]uch an order is limited to the fees the innocent party incurred solely because of the misconduct . . . .").  Additionally, Rule 11 "allows a court to award sanctions where a party makes a frivolous filing or where a party files a pleading or paper for an improper purpose."  *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1415 (9th Cir. 1990).  "A filing is frivolous if no competent attorney would believe it was well-grounded in fact and warranted by law."  *Id.*

Here, sanctions are not warranted under either standard.  Although perhaps weak, Plaintiffs' disqualification request was reasonable given Counsel's prior interactions with Stadtler, which were related to the hemp growing operation (*i.e.*, the facts underlying this dispute), and the existence of some (albeit non-binding) case law from other jurisdictions suggesting that the "substantial relationship" test might apply in this circumstance. Moreover, Defendants can only speculate that the motion was made in bad faith or for an

improper purpose.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to disqualify Defendants' counsel (Doc. 110) is **denied**.

Dated this 23rd day of January, 2023.

_____
Dominic W. Lanza
United States District Judge