**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D Stadtler Trust 2015 Trust, et al., | No. CV-22-00314-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Pamela Gorrie, et al., | |
| Defendants. | |

In this action, Daniel Stadtler ("Stadtler"), in his individual capacity and in his capacity as trustee for the D. Stadtler Trust 2015 ("the Trust") (collectively, "the Stadtler Parties"), has sued Pamela Gorrie ("Gorrie"), Innovative Global Distributions, LLC ("IGD"), Natural Footprints Organic Farm LP ("NFOF"), and NFF Management LLC ("NFF") (collectively, "the Gorrie Parties"). (Doc. 131.)[1] The Gorrie Parties assert counterclaims against the Stadtler Parties and third-party claims against William Houchin ("Houchin"). (Doc. 77.) Houchin asserts third-party counterclaims against the Gorrie Parties. (Doc. 134.)

These sprawling claims arise from a hemp operation in Salome, Arizona. In early 2020, IGD purchased a 540-acre parcel of agricultural land from the Trust via seller carryback financing. Then, between April 2020 and May 2021, the parties executed various other documents related to the hemp operation, including several revenue sharing

---

[1] Gorrie is the sole member of both IGD and NFF. (Doc. 77 at 3 ¶¶ 2, 4.) She is also a limited partner in NFOF; NFF is the general partner. (*Id.* at 3 ¶ 3.)

1    agreements.  Ultimately, and for reasons that are disputed, the hemp operation did not

2    succeed and the parties' relationships deteriorated, leading to this litigation.

3           Now pending before the Court are (1) the Gorrie Parties' motion for sanctions

4    (Doc. 118); (2) the Gorrie Parties' motion for leave to file a second amended counterclaim

5    and first amended third-party complaint (Doc. 146); (3) the Stadtler Parties' motion to

6    dismiss the Gorrie Parties' counterclaims (Doc. 87); (4) the Gorrie Parties' partial motion

7    to dismiss the Stadler Parties' claims (Doc. 136) and the Stadtler Parties' corresponding

8    motion to strike (Doc. 142); and (5) the Gorrie Parties' partial motion to dismiss Houchin's

9    third-party counterclaims (Doc. 158).

10                            **RELEVANT BACKGROUND**

11          The winding history of this dispute, some of which is laid out in previous orders

12   (Docs. 129, 165), is familiar to the parties.  Only a brief summary is necessary here.

13   Additional information bearing on the individual motions is provided in the Discussion.

14   I.    Facts

15          In 2017, the Trust purchased a 540-acre parcel of agricultural land situated at 68562

16   56th Street, Salome, Arizona (the "Farm").  (Doc. 131 ¶ 12.)

17          In May 2019, Stadtler hired non-party William Dawson ("Dawson") "to list the

18   [Farm] for sale and to act as broker."  (*Id.* ¶ 13.)

19          In late 2019, Gorrie became interested in purchasing the Farm for a hemp growing

20   operation.  (*Id.* ¶¶ 14-17; Doc. 77 at 3-4 ¶¶ 8-12.)  In November 2019, Dawson (on behalf

21   of Stadtler)[2] and Gorrie began discussing the possibility of the Trust selling the Farm to

22   IGD.  (Doc. 131 ¶¶ 14-17; Doc. 77 at 4 ¶ 13.)

23          On January 17, 2020, the Trust and IGD executed a real estate purchase contract

24   (the "Farm Purchase Agreement") under which IGD would buy the Farm from the Trust

25   for $1.4 million.  (Doc. 131 ¶¶ 34-35; Doc. 77 at 4 ¶¶ 14-15.)  Under the Farm Purchase

26   Agreement, the Trust provided seller carryback financing for a large portion of the

27   _____

28   [2]      According to the Stadtler Parties, "[a]ll the material conversations and material information Ms. Gorrie had or gave to Mr. Dawson throughout the negotiations were passed on in precise detail to Mr. Stadtler by Mr. Dawson."  (Doc. 131 ¶ 15.)

purchase price—IGD agreed to pay $20,000 upon signing the agreement, $280,000 at closing, and $1.1 million over the following 18 months (according to a payment schedule). (Doc. 131 ¶ 34; Doc. 77 at 4-5 ¶¶ 16-17.)

On February 11, 2020, IGD and the Trust executed an Addendum to the Farm Purchase Agreement (the "Purchase Addendum").  (Doc. 131 ¶ 46; Doc. 77 at 6 ¶ 21.)  The Purchase Addendum required IGD to pay $60,000 at closing and then an additional $240,000 within 30 days of closing.  (Doc. 131 ¶ 46; Doc. 77 at 6 ¶ 21.)  Around the same time, IGD and the Trust executed a Promissory Note for $1.34 million, secured by a Deed of Trust with IGD as the payor and the Trust as the beneficiary.  (Doc. 131 ¶ 47; Doc. 77 at 5-6 ¶¶ 18-20.)

On February 27, 2020, the sale closed.  (Doc. 131 ¶ 56; Doc. 77 at 7 ¶ 23.)

For reasons that are disputed, the hemp operation struggled to obtain funding.  (Doc. 131 ¶¶ 58-60, 66-68; Doc. 77 at 7 ¶¶ 24-26.)  Thus, IGD did not make the $240,000 payment within 30 days of closing.  (Doc. 131 ¶ 68; Doc. 77 at 7 ¶ 26.)

On April 10, 2020, NFOF and the Trust entered into a revenue sharing agreement (the "April 2020 RSA"). (Doc. 131 ¶¶ 75-81; Doc. 77 at 8-9 ¶¶ 28-31.)  At that time, NFOF was leasing the Farm from IGD.  (Doc. 131 ¶ 76; Doc. 77 at 7-8 ¶ 28.)

On January 10, 2021, IGD and Stadtler executed a second revenue sharing agreement, under which Stadtler agreed to extend a $75,000 line of credit to IGD to fund hemp operations on a three-acre parcel of the Farm (the "Three Acre RSA").  (Doc. 131 ¶¶ 94-106; Doc. 77 at 10-11 ¶¶ 37-42.)   Gorrie and Dawson personally guaranteed Stadtler's $75,000 investment (the "Personal Loan and Agreement").  (Doc. 131 ¶¶ 102-05; Doc. 77 at 11 ¶¶ 40-41.)[3]

In March 2021, Gorrie and Houchin were introduced.  (Doc. 77 at 25 ¶¶ 12-14; Doc. 134 at 13 ¶¶ 22-25.)[4]  On March 22, 2021, Gorrie, Houchin, and Stadtler met in Blythe,

[3]    The extent of the personal guarantee is disputed.  (Doc. 131 ¶¶ 102-03; Doc. 77 at 11 ¶ 40.)

[4]    Houchin is Stadtler's nephew.  (Doc. 77 at 12 ¶ 49; Doc. 134 at 12 ¶¶ 15-16.)

- 3 -

Arizona and discussed a potential business relationship related to the hemp operation. (Doc. 77 at 25-26 ¶¶ 14-16; Doc. 134 at 13 ¶¶ 22-27.)

On May 11, 2021, IGD and Stadtler executed an Addendum to the Three Acre RSA (the "Three Acre Addendum"). (Doc. 131 ¶¶ 115-18; Doc. 77 at 14-15 ¶¶ 58-60.) Around the same time, the Gorrie Parties and the Stadtler Parties discussed, but did not enter into, a joint venture agreement. (Doc. 131 ¶¶ 111-15; Doc. 121-6 ¶ 7 [Gorrie decl.].)

On May 26, 2021, IGD and Houchin executed a joint venture agreement (the "JVA") under which Houchin would fund hemp cultivation on a 20-acre portion of the Farm. (Doc. 77 at 26 ¶¶ 18-20; Doc. 134 at 12-14 ¶¶ 12-13, 28-34.) Two days later, IGD and Houchin executed an Addendum to the JVA (the "JVA Addendum"). (Doc. 77 at 26 ¶¶ 21-22; Doc. 134 at 15-16 ¶¶ 48-53.)

For reasons that are disputed, the Gorrie Parties' relationships with the Stadtler Parties and Houchin ultimately fell apart, leading to this litigation.

II.   Procedural History

On February 11, 2022, the Stadtler Parties filed a complaint in La Paz County Superior Court. (Doc. 1-2 at 10-27.) On February 27, 2022, Gorrie removed the action to this Court. (Doc. 1.)[5]

On May 2, 2022, the Stadtler Parties filed a First Amended Complaint ("FAC"). (Doc. 25.)

On May 27, 2022, the Gorrie Parties filed an answer to the FAC, counterclaims against the Stadtler Parties, and third-party claims against Houchin (Doc. 38) and filed a motion for a temporary restraining order ("TRO") based on their counterclaims (Doc. 39). The TRO sought to block the Trust from pursuing a trustee's sale of the Farm, which was scheduled for June 9, 2022. (Doc. 39.) However, the parties later agreed to postpone the trustee's sale pending the resolution of the TRO request. (Doc. 60.)

On July 7, 2022, after an evidentiary hearing (Doc. 70), the Court denied the Gorrie

---

[5]     The Stadtler Parties challenged the validity of Gorrie's removal effort (Doc. 11), but the Court eventually denied the Stadtler Parties' motion to remand (Doc. 21).

Parties' TRO request.  (Doc. 82 at 198-206.)

On July 14, 2022, the Gorrie Parties filed their operative pleading, the first amended Answer, Counterclaim and Third-Party Complaint.  (Doc. 77.)

On August 10, 2022, the Stadtler Parties moved to dismiss the Gorrie Parties' counterclaims.  (Doc. 87.)  The motion is now fully briefed.  (Docs. 90, 95.)

On October 25, 2022, Houchin answered the Gorrie Parties' first amended third-party complaint.  (Doc. 107.)

On November 11, 2022, the Gorrie Parties moved for Rule 11 sanctions against the Stadtler Parties' counsel.  (Doc. 118.)  The motion is now fully briefed.  (Docs. 125, 130.)

On December 5, 2022, the Stadtler Parties filed their operative pleading, the Second Amended Complaint ("SAC").  (Doc. 131.)[6]

On December 9, 2022, Houchin filed his operative pleading, the First Amended Answer to Third-Party Complaint and Third-Party Counterclaim.  (Doc. 134.)

On December 19, 2022, the Gorrie Parties moved to dismiss Counts One through Five of the SAC.  (Doc. 136.)  On January 4, 2023, the Stadtler Parties filed a motion to strike the Gorrie Parties' dismissal motion.  (Doc. 142.)  Both motions are now fully briefed.  (Docs. 142, 159, 162.)

On January 6, 2023, the Gorrie Parties requested leave to file an amended pleading.  (Doc. 146.)  The motion is now fully briefed.  (Docs. 163, 164, 182, 183.)

The same day, the Gorrie Parties filed a second motion for a TRO, again seeking to block the Trust from pursuing a trustee's sale of the Farm.  (Doc. 149.)  On January 11, 2023, after a hearing (Doc. 157), the Court denied this TRO request.  (Doc. 184.)

On January 11, 2023, the Gorrie Parties moved to dismiss Counts One, Two, Four, and Five of Houchin's third-party counterclaim.  (Doc. 158.)  The motion is now fully briefed.  (Docs. 170, 181.)

On January 12, 2023, the trustee's sale of the Farm occurred.  (Doc. 179-1.)

---

[6]       On October 14, 2022, the Stadtler Parties filed a motion for leave to file the SAC. (Doc. 103.)  On November 29, 2022, after extensive briefing (Docs. 109, 114, 115, 123, 126), the Court granted the Stadtler Parties' amendment request.  (Doc. 129.)

**DISCUSSION**

Six motions are pending before the Court.  First, the Gorrie Parties request sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure against the Stadtler Parties' counsel.  (Doc. 118.)  Second, the Gorrie Parties request leave to file an amended pleading. (Doc. 146.)  Third, the Stadtler Parties move to dismiss the counterclaims in the Gorrie Parties' existing pleading.  (Doc. 87.)  Fourth, the Gorrie Parties move to partially dismiss the Stadtler Parties' claims. (Doc. 136.)  Fifth, in a related vein, the Stadtler Parties move to strike the Gorrie Parties' dismissal motion.  (Doc. 142.)  Finally, the Gorrie Parties move to partially dismiss Houchin's counterclaims.  (Doc. 158.)

The Court will address each motion in turn.

I.    The Gorrie Parties' Motion For Sanctions

In their motion to dismiss and supporting reply, the Stadtler Parties argue that the April 2020 RSA is illusory and unenforceable.  (Doc. 87 at 8; Doc. 95 at 3.)  However, during earlier stages of the case, the Stadtler Parties made arguments that were premised on the enforceability of the April 2020 RSA.  Accordingly, the Gorrie Parties have moved for Rule 11 sanctions against the Stadtler Parties' counsel.  (Doc. 118.)

A.    **Additional Background**

In April 2020, the Trust and NFOF (which was leasing the Farm from IGD) signed the April 2020 RSA, which provided that the Trust would receive one percent of the net revenue generated by the hemp growing operation (up to $1 million per year) for a period of five years.  (Doc. 131 ¶¶ 76-80; Doc. 77 at 7-9 ¶¶ 28-31.)

On May 2, 2022, the Stadtler Parties filed their FAC.  (Doc. 25.)  As relevant here, the FAC asserted a breach of contract claim based on the theory that NFOF breached the April 2020 RSA "by failing to share revenue with the Trust."  (*Id.* ¶¶ 110-14.)  The FAC also alleged that "Gorrie, IGD and/or NFOF induced the Trust and/or Mr. Stadtler to enter into the [April 2020 RSA] so that Mr. Stadtler would not foreclose on the Promissory Note and Deed of Trust."  (*Id.* ¶ 100.)

On May 27, 2022, the Gorrie Parties filed their answer to the FAC and

counterclaims.  (Doc. 38.)  As relevant here, the Gorrie Parties asserted a dueling breach of contact claim based on the April 2020 RSA.  (*Id.* at 16-17 ¶¶ 66-71.)  The Gorrie Parties also identified this counterclaim as part of their basis for seeking a TRO to block the trustee's sale.  (Doc. 39 at 17 ["This is a complicated commercial dispute as to whether payment under the Promissory Note was tied to the [April 2020 RSA] under which the Stadtler and the Trust offered to forbear from foreclosing in return for a portion of the Hemp Project profits; there is simply no other consideration.  There are also substantial questions about the later joint ventures which were intended to pay back the loan and Stadtler and the Trust's role in those.  All of these items are substantial, difficult questions which will require substantial litigation.  In the interim, no trustee sale should proceed pending the adjudication of these questions."].)

On July 7, 2022, during the first TRO hearing, the Stadtler Parties urged the Court to deny the Gorrie Parties' TRO request in part because the April 2020 RSA was illusory and unenforceable in light of the Trust's failure to give consideration.  (Doc. 82 at 194-95 ["So the [April 2020 RSA] between [NFOF] and the Trust, the Trust gave zero consideration.  It was a gift."].)  The Court then asked: "Maybe I'm missing something. How, consistent with Rule 11, can you guys have affirmative claims for breach of the [April 2020] RSA when you're coming in here and saying that the contract is [illusory] and is not backed by consideration?"  (*Id.* at 195.)  Counsel for the Stadtler Parties replied: "Can I walk back on that argument then, Your Honor?"  (*Id.*)[7]

On August 10, 2022, the Stadtler Parties moved to dismiss the Gorrie Parties' counterclaims, arguing, among other things, that the April 2020 RSA is "illusory and unenforceable by either party."  (Doc. 87 at 8.)  The Stadtler Parties reiterated this argument

---

[7]     The parties dispute whether the request to "walk back" the argument referred to the position that the April 2020 RSA is illusory and enforceable or to the affirmative claim for breach of the April 2020 RSA.  (*Compare* Doc. 125 at 5 *with* Doc. 130 at 3.)  This dispute is immaterial because Rule 11 does not apply to oral statements.  *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1121 (9th Cir. 2002) ("Rule 11 sanctions are limited to misconduct regarding signed pleadings, motions, and other filings.").  *See also id.* at 1130 ("[I]t does not authorize sanctions for, among other things, discovery abuses or misstatements made to the court during an oral presentation.").

1   in their reply supporting dismissal.  (Doc. 95 at 3 ["The [April 2020 RSA] . . . has no

2   enforceable obligations and is illusory and unenforceable by either party."].)

3        On October 14, 2022, the Stadtler Parties requested leave to file the SAC, asserting

4   that the Court's comments during the July 7, 2022 TRO proceeding had alerted them to the

5   inconsistency between their affirmative breach claim and their position that the April 2020

6   RSA is unenforceable and that they wished to address this inconsistency by eliminating

7   their affirmative claim for breach of the April 2020 RSA.  (Doc. 103 at 2.)[8]

8        On November 11, 2022, while the Stadtler Parties' amendment request was pending,

9   the Gorrie Parties moved for Rule 11 sanctions.  (Doc. 118.)

10       On November 29, 2022, after a full briefing (Docs. 123, 126), the Court granted the

11  Stadtler Parties' request to file the SAC.  (Doc. 129.)  As relevant here, the Court found

12  that the Stadtler Parties had "realized during the July 2022 hearing that [their claim for

13  breach of the April 2020 RSA] lacked merit, then moved in October 2022 to amend the

14  FAC to remove this claim."  (Id. at 6.)[9]  The Court also noted that, although the Stadtler

15  Parties "could have acted a bit more quickly after the July 2022 hearing to make this

16  amendment request," the delay was reasonable given their "brief[] confus[ion] about

17  whether and to what extent [IGD's] bankruptcy filing resulted in a stay of these

---

18  [8]     The Stadtler Parties' exact statement (in their motion for leave to file a SAC) was
19  the following: "As the Court pointed out during the July 7, 2022, evidentiary hearing
    related to [the Gorrie Parties'] application for injunctive relief, [the Stadtler Parties] have
20  realized that their stance on the *3-acre RSA* is unenforceable and illusory is inconsistent
    with the First Amended Complaint which alleges a claim for a breach of that very
21  agreement."  (Doc. 103 at 2, emphasis added.)  However, several facts suggest that the
    Stadtler Parties intended to refer to the April 2020 RSA, not the Three Acre RSA.  First, at
22  the TRO hearing, the Stadtler Parties took the position that the April 2020 RSA was not
    supported by consideration.  (Doc. 82 at 194-95 ["[T]he [April 2020 RSA] between
23  [NFOF] and the Trust, the Trust gave zero consideration."].)  Second, the Stadtler Parties
    also took this position in relation to the April 2020 RSA (not the Three Acre RSA) in the
24  challenged motion to dismiss (Doc. 87 at 8) and reply (Doc. 95 at 3).  Third, the proposed
    SAC, which was attached to the Stadtler Parties' motion to file a SAC, omits the claim for
25  breach of the April 2020 RSA but continues to assert an affirmative claim for breach of the
    Three Acre RSA.  (Doc. 103-1 at 32-33.)  The now-operative SAC includes the same.
26  (Doc. 131 ¶¶ 123-28.)

27  [9]     In its order granting the Stadtler Parties' amendment request, the Court "expresse[d]
    no prejudgment as to [the Gorrie Parties'] pending motion for Rule 11 sanctions," which
28  "challenges [the Stadtler Parties'] prior conduct related to Count Two, not the current act
    of amending the FAC to eliminate Count Two."  (Doc. 129 at 9 n.4.)

proceedings." (*Id.* at 6-7.)

On December 5, 2022, the Stadtler Parties filed their SAC, which does not assert a claim for breach of the April 2020 RSA; as compared to the FAC, the SAC also omits the factual allegation that, to avoid foreclosure, Gorrie induced the Stadtler Parties to enter the April 2020 RSA. (*See generally* Doc. 131.).

The pending motion for Rule 11 sanctions is based on the Stadtler Parties' assertion in their motion to dismiss the Gorrie Parties' counterclaims and supporting reply (Docs. 87 and 95) that the April 2020 RSA is illusory and unenforceable.[10]

B.   **Legal Standard**

Rule 11(b) provides:

> By presenting to the court a pleading, written motion, or other paper— whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
>> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>>
>> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>>
>> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>>
>> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

*Id.* Rule 11(c)(1) provides, in relevant part: "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." *Id.* However, "[t]he court must not impose a monetary

---

[10]   In other words, although the Stadtler Parties have taken this position in other filings—most notably, in the SAC (*i.e.*, their operative pleading)—the Gorrie Parties' sanctions request is limited to the statements made in the Stadtler Parties' motion to dismiss counterclaims (Doc. 87) and reply (Doc. 95). (*See generally* Doc. 118.)

sanction . . . against a represented party for violating Rule 11(b)(2)."  Fed. R. Civ. P. 11(c)(5)(A).

"The application of Rule 11 is a task that requires sensitivity to two competing considerations."  *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1115 (9th Cir. 2001).  "On the one hand, . . . on occasion attorneys engage in litigation tactics so vexatious as to be unjustifiable even within the broad bounds of our adversarial system, and . . . neither the other parties nor the courts should have to abide such behavior or waste time and money coping with it."  *Id.*  Thus, "the central purpose of Rule 11 is to deter baseless filings."  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).  "On the other hand, . . . our system of litigation *is* an adversary one, and . . . presenting the facts and law as favorably as fairly possible in favor of one's client is the nub of the lawyer's task."  *United Nat'l Ins. Co.*, 242 F.3d at 1115.  Sanctions therefore should be imposed "only in the most egregious situations, lest lawyers be deterred from vigorous representation of their clients." *Id.* (citation omitted).  *See also Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) ("Our cases have established that sanctions must be imposed on the signer of a paper if either a) the paper is filed for an improper purpose, or b) the paper is 'frivolous.'  The word 'frivolous' . . . is a shorthand that this court has used to denote a filing that is both baseless and made without a reasonable and competent inquiry.") (citation omitted).

C.    **The Parties' Arguments**

The Gorrie Parties move for sanctions under Rule 11, requesting reimbursement "for all fees and costs associated with responding to the Motion to Dismiss."  (Doc. 118 at 9.)  According to the Gorrie Parties, the Stadtler Parties engaged in sanctionable conduct by arguing that the April 2020 RSA is unenforceable in their motion to dismiss (Doc. 87) and supporting reply (Doc. 95).  (*Id.* at 6-9.)[11]  The Gorrie Parties note that: (1) in the FAC,

---

[11]    In their motion for sanctions, the Gorrie Parties also refer to the Stadtler Parties' position that the Three Acre RSA, rather than the April 2020 RSA, is illusory and unenforceable.  (Doc. 118 at 7.)  As discussed *supra*, this discrepancy first appeared in the Stadtler Parties' motion to amend (although the attached proposed SAC clarified their position).  Thus, the Court interprets the Gorrie Parties' motion for sanctions as requesting sanctions based on the argument actually stated in Plaintiffs' motion to dismiss and

the Stadtler Parties asserted a claim for breach of the April 2020 RSA and alleged that Gorrie induced the Trust to enter the April 2020 RSA for the purpose of avoiding foreclosure on the Farm; (2) the FAC has evidentiary value because it was verified by Stadtler (and was the operative pleading when the offending motion and reply were filed); and (3) the Stadtler Parties' current position, *i.e.*, that the April 2020 RSA is illusory and unenforceable, conflicts with the FAC. (*Id.* at 3-8.) The Gorrie Parties conclude that the Statler Parties' assertion in the motion and reply that the April 2020 RSA is unenforceable violated Rule 11 because the argument lacked evidentiary support, was unsupported by existing law, and was made for an improper purpose. (*Id.* at 6-7.) In a related vein, the Gorrie Parties challenge the timing of the Stadtler Parties' filings, arguing: "What [the Stadtler Parties'] counsel should have done is seek to amend the verified FAC . . . and then file the appropriate Motion to Dismiss after all parties understood the outcome of the amendment process." (*Id.* at 8-9.)[12] The Gorrie Parties contend that sanctions are warranted because the "decision to file the Motion to Dismiss and Reply with the offending argument prior to amending the FAC necessarily resulted in additional work." (*Id.* at 8.)

In response, the Stadtler Parties acknowledge that the FAC included allegations inconsistent with their current position that the April 2020 RSA is illusory and unenforceable. (Doc. 125 at 2-3.) However, the Stadtler Parties argue that Rule 11 sanctions are not warranted simply because a party changes its view on a disputed issue over the course of a case: "Plaintiffs are entitled to amend their pleading to remove a claim

---

supporting reply—*i.e.*, that the April 2020 RSA is unenforceable. This interpretation is supported by the fact that Stadtler Parties also treat the motion for sanctions as premised on the April 2020 RSA argument. (*See* Doc. 125 at 2 ["The gravamen of [the Gorrie Parties'] motion is that in the verified Amended Complaint, [the Stadtler Parties] included allegations regarding the [April 2020 RSA] and allege that [the Gorrie Parties] breached that agreement."].) Alternatively, to the extent the Gorrie Parties seek Rule 11 sanctions based on the Stadtler Parties' allegations about the Three Acre RSA, this request is denied because it does not appear that the Stadtler Parties are taking the position that the Three Acre RSA is unenforceable.

[12] The Gorrie Parties also suggest that amending the FAC might create "additional exposure under Rule 11" for the Stadtler Parties. (Doc. 118 at 8.) This issue is not properly before the Court, as the Gorrie Parties' motion for sanctions challenges only the Stadtler Parties' motion to dismiss and supporting reply.

. . . that they no longer believe is warranted by the evidence and the law, and Plaintiffs are permitted to move for the dismissal of Defendants' counterclaim on the same basis." (*Id.* at 3.)  In their view, the Gorrie Parties' sanctions request is a tactical maneuver: "At least part of [the Gorrie Parties'] defense and counterclaims rely on their theory that [the Gorrie Parties] entered into the [April 2020 RSA] in exchange for Mr. Stadtler agreeing not to foreclose on the Promissory Note and Deed of Trust.  *Of course*, [the Gorrie Parties] do not want [the Stadtler Parties] to amend their pleading to remove . . . the breach of [April 2020 RSA] claim." (*Id.* at 3.)  The Stadtler Parties assert that, during the TRO hearing, they realized that their affirmative claim for breach of the April 2020 RSA (and factual allegation that Gorrie induced Stadtler to execute the April 2020 RSA for the purpose of preventing foreclosure) was not legally warranted or supported by the evidence. (*Id.* at 3-5.)  After this realization, consistent with Rule 11(b), they changed their position. (*Id.* at 3.)  As for the timing of their motion to dismiss, the Stadtler Parties argue that they "could not immediately amend their pleading because [their] claims against [the Gorrie Parties] were stayed by IGD's July 11, 2022, bankruptcy petition until notice of the lifting of the stay was filed on September 16, 2022." (*Id.* at 6.)[13]  The Stadtler Parties also note that the Gorrie Parties categorically denied the allegations in the FAC and argue that "[if] each of the allegations in the Verified Complaint . . . [is] 'evidence' that [the Stadtler Parties] cannot controvert," then the Gorrie Parties' denial of those allegations (in a verified amended answer) is also evidence. (*Id.*)  The Stadtler Parties conclude that "it is obvious that [the Gorrie Parties'] motivation for moving for sanctions and opposing [the Stadtler

---

[13]        The Stadtler Parties initially believed that the stay also prevented them from filing a motion to dismiss the Gorrie Parties' counterclaims. (Doc. 81 at 2-3.)  On August 9, 2022, the Court issued an order explaining that "the automatic stay in this action pertains only to the claims brought *against* IGD.  It does not apply to the counterclaims brought by IGD against the Stadtler Parties, or to any other claims in this action." (Doc. 85 at 2-3.)  The Court also extended the deadline for the Stadtler Parties to respond to the counterclaims to August 23, 2022. (*Id.* at 3-4.)  On August 10, 2022, the Stadtler Parties filed their motion to dismiss. (Doc. 87.)  On September 13, 2022, the bankruptcy stay was lifted as to this litigation. (Doc. 96.)  On October 14, 2022, the Stadtler Parties requested leave to file a SAC. (Doc. 103.)  On November 29, 2022, in an order granting the Stadtler Parties' amendment request, the Court noted that "[the Stadtler Parties] were briefly confused about whether and to what extent this bankruptcy filing resulted in a stay of these proceedings." (Doc. 129 at 7.)

1   Parties'] motion to amend the Amended Complaint . . . is to try to force [the Stadtler

2   Parties] into making [the Gorrie Parties'] breach of Contract claim for them."  (*Id.* at

3   10-11.)

4            In reply, the Gorrie Parties reiterate that the Stadtler Parties' argument that the April

5   2020 RSA is illusory and unenforceable is inconsistent with the allegations in the FAC and

6   "everyone agrees that the inconsistent argument was made while the sworn FAC was the

7   operative pleading."  (Doc. 130 at 2.)  The Gorrie Parties contend that "when [the Stadtler

8   Parties] conducted their analysis and made their argument to dismiss the [April 2020 RSA]

9   breach counterclaim based on the best knowledge of their attorneys' information and belief

10  formed after an inquiry reasonable under the circumstances, that analysis did not take into

11  account the sworn avowals made in the FAC."  (*Id.* at 3-4.)  The Gorrie Parties conclude:

12  "It is simply unreasonable to ignore the fact that a party's sworn operative pleading

13  completely contradicts an argument seeking to dismiss a claim."  (*Id.* at 4.)  As for the

14  bankruptcy stay, the Gorrie Parties note that because "NFOF was never subject to the

15  bankruptcy stay," the Stadtler Parties could have moved to amend the FAC as to the NFOF

16  immediately following the July 7, 2022 TRO hearing.  (*Id.*)

17            D.   **Analysis**

18            A request for Rule 11 sanctions "must describe the specific conduct alleged to

19  violate Rule 11(b)."  *Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir. 2005) (internal

20  quotation marks omitted).  Here, the challenged conduct is the Stadtler Parties' argument,

21  in their motion to dismiss (Doc. 87) and supporting reply (Doc. 95), that the April 2020

22  RSA is illusory and unenforceable.  (Doc. 118 at 7-9.)

23            The challenged conduct did not violate Rule 11(b).  At the outset, to the extent the

24  Gorrie Parties focus on the relative timing of the Stadtler Parties' motion to dismiss and

25  motion to amend their FAC, such arguments are unavailing.  (*See, e.g.*, Doc. 118 at 8

26  ["What Plaintiffs' counsel should have done is seek to amend the verified FAC . . . and

27  then file the appropriate Motion to Dismiss."].)  For one thing, it is not clear that a changed

28  temporal sequence would have alleviated the Gorrie Parties' Rule 11 concerns, which are

largely premised on the fact that the FAC was *verified*, not its status as the then-operative pleading.  Indeed, the Gorrie Parties describe amendment of the FAC as "[a] potential Rule 11 problem of its own."  (*Id.* at 8 n.2.)  More important, the Stadtler Parties' decision to file a motion to dismiss before moving to amend the FAC made sense in light of the bankruptcy stay and applicable filing deadlines.  Specifically, the deadline for the Stadtler Parties to respond to the counterclaims was August 23, 2022.  (Doc. 85 at 3-4.)  However, at that time, the bankruptcy stay applied to claims brought *against* IGD.  (*Id.* at 2-3.)  Although the Gorrie Parties are correct that the Stadtler Parties could have moved to amend the FAC as to NFOF (against which the offending breach of contract claim was alleged), the SAC also includes a new fraudulent inducement claim against all of the Gorrie Parties (including IGD). (Doc. 103-1 ¶¶ 140-55; Doc. 131 ¶¶ 140-55.)  Thus, following the Gorrie Parties' logic, the Stadtler Parties would have had to file two motions to amend their pleadings: first, to amend the FAC as to Gorrie, NFOF, and NFF (before the August 23, 2022 deadline); second, to amend the SAC as to IGD (after September 13, 2022, when the bankruptcy stay was lifted).  Not only it is difficult to see the value of requiring the Stadtler Parties to file multiple amendment requests, but the Gorrie Parties' emphatic opposition to the Stadtler Parties' motion to amend the FAC (*see* Doc. 123) suggests this approach would have led to more motion practice, not less.  At any rate, the purpose of Rule 11 sanctions is to deter baseless filings, *see Cooter & Gell*, 496 U.S. at 393, not to attack opposing counsel's tactical decisions about the timing of various motions, however inconvenient they may be.

Turning to language of Rule 11(b), the Gorrie Parties argue that the Stadtler Parties engaged in sanctionable conduct because, at least at the time the motion to dismiss and reply were filed, the argument that the April 2020 RSA is unenforceable was neither supported by the evidence nor legally tenable.  (Doc. 118 at 7.)[14]  Rule 11 "provides for

---

[14]     The Gorrie Parties also indirectly suggest the challenged argument was made for an improper purpose but provide no supporting analysis.  (Doc. 118 at 6 ["[T]he argument put forward by [the Stadtler Parties'] counsel violate[s] all three subsections of Rule 11 . . . ."].)  In any event, "because the standard governing Rule 11 is objective, the 'improper purpose' inquiry subsumes the 'frivolousness' inquiry when applied to the filing of complaints. . . .  In other words, [papers] are not filed for an improper purpose if they are non-frivolous."

the imposition of sanctions when a filing is frivolous, legally unreasonable, or without factual foundation, or is brought for an improper purpose.  Frivolous filings are 'those that are both baseless and made without a reasonable and competent inquiry.'"  *Est. of Blue v. Cnty. of Los Angeles*, 120 F.3d 982, 985 (9th Cir. 1997) (internal citations omitted).

The Gorrie Parties contend that the Stadtler Parties did not have an "objectively reasonable basis" for asserting that the April 2020 RSA is unenforceable because the allegations in the verified FAC, which are record evidence, contradict that position in two ways: first, the factual allegation that Gorrie induced Stadtler to execute the April 2020 RSA for the purpose of preventing foreclosure (Doc. 25 ¶ 100) conflicts with the Stadtler Parties' contention that the Trust did not give consideration under the agreement; second, the affirmative claim for breach of the April 2020 RSA presumes the agreement is enforceable.  (*See* Doc. 125 at 7-9.  *See also id.* at 9 ["[T]he offending argument is simply one that could not be made in contravention of the verified and sworn FAC."].)  According to the Gorrie Parties, these conflicts demonstrate that the Stadtler Parties did not make a reasonable and competent inquiry before asserting that the April 2020 RSA is unenforceable.  (*Id.* at 8.)

In determining whether Rule 11 has been violated, a "court must consider factual questions regarding the nature of the attorney's prefiling inquiry and the factual basis of the pleading or other paper."  *Cooter*, 492 U.S. at 399.  "Rule 11 . . . imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991).  Here, Stadtler's declaration that "everything alleged" in the FAC is true is indeed record evidence.  (*See also* Doc. 129 at 7-8.)  But the mere fact that the declaration conflicts with the Stadtler Parties' later argument in their motion papers does not demonstrate that the Stadtler Parties lacked an objectively reasonable basis for making the challenged argument.  The Gorrie Parties do not cite, nor can this Court find, any authority compelling the imposition of Rule 11 sanctions, an

---

*CrossFit Inc. v. Martin*, 2017 WL 4224093, *4 (D. Ariz. 2017) (internal quotation marks omitted).  Thus, because the Court finds the Stadtler Parties did not act frivolously, they also did not act with an improper purpose.

1   "extraordinary remedy . . . to be exercised with extreme caution," *In re Keegan Mgmt. Co.,*

2   *Sec. Litig.*, 78 F.3d 431, 437 (9th Cir. 1996), in such circumstances.  "A party moving for

3   Rule 11 sanctions bears the burden of establishing non-compliance."  *McMillin v. Foster*

4   *City*, 2012 WL 5464606, *2 (N.D. Cal. 2012).

5          At any rate, the chronology of this dispute demonstrates why Rule 11 sanctions are

6   unwarranted.  During the July 2022 TRO hearing, the Stadtler Parties argued that the Trust

7   did not give consideration under the April 2020 RSA, rendering it illusory and

8   unenforceable.  In response, the Court questioned the inconsistency between that argument

9   and the Stadtler Parties' affirmative claim for breach of the April 2020 RSA.  (Doc. 82 at

10  194-95.)  Since then, for more than six months, the Stadtler Parties have not asserted any

11  arguments inconsistent with their current position that the April 2020 RSA is unenforceable

12  for lack of consideration (*see* Docs. 87, 95, 103, 125, 126, 131); they also moved to amend

13  the FAC to conform their pleadings to this position when they believed it was reasonable

14  to do so (Doc. 103).   These circumstances suggest that the Stadtler Parties simply

15  abandoned a legal claim after realizing it was inconsistent with their view of the facts.  *See,*

16  *e.g.*, *Lundstrom v. Young*, 2022 WL 15524619, *3 (S.D. Cal. 2022) ("Plaintiff's voluntary

17  abandonment of one claim for relief pled in the Second Amended Complaint does not

18  support Rule 11 sanctions.").

19         The Gorrie Parties' argument that the challenged position is unwarranted by existing

20  law fails for similar reasons.  "A legal argument violates Rule 11(b)(2) if it has 'no chance'

21  of success under existing precedent."  *Excel Fortress Ltd. V. Wilhelm*, 2020 WL 1330664,

22  *10 (D. Ariz. 2020).  The Gorrie Parties do not cite, nor can the Court find, any legal

23  authority suggesting that an argument lacks legal foundation merely because it conflicts

24  with a position previously taken in a verified pleading.  Moreover, applying Rule 11 in

25  such a way would effectively require the Stadtler Parties to continue asserting a legal

26  position even after concluding in good faith that the position isn't supported by their

27  interpretation of the law or the evidence.

28         Finally, it bears emphasizing that "[t]he current version of Rule 11 does not require

the court to impose any sanction at all upon a finding of a Rule 11(b) violation.  Rather, the court has discretion to conclude that, under the circumstances, the violation warrants no sanction."  1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 11, at 278 (2020).  "Judges therefore should impose sanctions on lawyers for their mode of advocacy only in the most egregious situations, lest lawyers be deterred from vigorous representation of their clients."  *United Nat. Ins. Co.*, 242 F.3d at 1115.  The Stadtler Parties' challenged conduct falls far below this high standard.  Accordingly, the Gorrie Parties' sanctions request is denied.

E.   **Attorneys' Fees**

The Stadtler Parties request "an award of their reasonable attorneys' fees" associated with responding to the Gorrie Parties' motion.  (Doc. 125 at 11.)

"If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion."  Fed. R. Civ. P. 11(c)(2).  However, the Stadtler Parties do not explain why an award of attorneys' fees is appropriate here.  Further, given that the Court itself identified the conflicting legal positions asserted by the Stadtler Parties as potentially violative of Rule 11 (Doc. 82 at 194-95), the Court does not find that the Gorrie Parties filed this motion in bad faith or that the motion is frivolous.  *Cf. MetLife Bank, N.A. v. Riley*, 2010 WL 4024898, *4 (D. Nev. 2010) ("Plaintiff requests attorney's fees for the costs incurred in opposing defendants' motion for sanctions.  The court denies plaintiff's request because it does not find clear evidence that defendants filed their motion for any of the nefarious purposes advanced by plaintiffs . . . .").

II.   The Gorrie Parties' Motion To File An Amended Pleading

The Gorrie Parties seek leave to file a second amended counterclaim against the Stadtler Parties and a first amended third-party complaint against Houchin.  (Doc. 146.)  This motion was filed on January 6, 2023, more than six months after the expiration of the July 5, 2022 amendment deadline established by the Rule 16 case management order.  (Doc. 69 at 1.)

…

### A.    Legal Standard

"[W]hen a party seeks to amend a pleading after the pretrial scheduling order's deadline for amending the pleadings has expired, the moving party must satisfy the 'good cause' standard of Federal Rule of Civil Procedure 16(b)(4), which provides that '[a] schedule may be modified only for good cause and with the judge's consent,' rather than the liberal standard of Federal Rule of Civil Procedure 15(a)." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015). "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Id.* "While a court may take into account any prejudice to the party opposing modification of the scheduling order, the focus of the Rule 16(b) inquiry is upon the moving party's reasons for seeking modification." *Id.* (cleaned up). "[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). If the moving party "was not diligent, the inquiry should end." *Id.*

### B.    The Parties' Arguments

The Gorrie Parties' proposed amended pleading includes several new counterclaims against the Stadtler Parties and a new third-party claim against Houchin. According to the Gorrie Parties, "[t]he amendments are occasioned both by the continued investigation of this case which brought to light the new potential claims and by the recent filing of both the [SAC] . . . and the First Amended Third-Party Counterclaim, the factual allegations of each tend to demonstrate that the new claims are appropriately brought." (Doc. 146 at 2, internal citation omitted.) The Gorrie Parties argue that "the interests of justice compel that leave be granted" because "the majority of the amendment to the pleadings is driven by newly taken positions on the part of [the Stadtler Parties] and [Houchin] as enunciated in their respective pleadings." (*Id.*) The Gorrie Parties further argue that "the pleadings in this case have not closed and discovery is in its infancy, so no prejudice would be

occasioned upon any other party." (*Id.*)

The Stadtler Parties oppose amendment. (Doc. 163.) First, the Stadtler Parties contend that "[t]he purpose of Gorrie's motion for leave to amend her claims appears to have been in order file an accompanying second application to restrain the Trustee's sale of the Farm." (*Id.* at 2.) Because "[t]hat application has already been denied" and "[t]he Trustee's sale took place on January 12, 2023," "amending her pleadings for this purpose is futile." (*Id.*) Second, the Stadtler Parties note that "Gorrie's motion is entirely based on Rule 15(a) despite the fact this Court has twice notified the Parties that 'Rule 16(b)'s 'good cause' standard replaces Rule 15(a)(1)(2)'s more liberal standard" when a motion for leave to amend is filed after the amendment deadline in the scheduling order." (*Id.*, citation omitted.) The Stadtler Parties argue that the request fails under the Rule 16(b) standard because the Gorrie Parties were not diligent in seeking amendment, as all of the new allegations are premised on events that "took place in 2020 and 2021." (*Id.*) "Because there is no new evidence in the proposed amended pleading that would not have been discovered 'in the exercise of due diligence' until after the amendment deadline had passed and the amendment could have been timely made, good cause is not shown." (*Id.* at 6, citation omitted.)

In reply, the Gorrie Parties argue that "the current [Case Management Order] is for all intents and purposes a dead letter" and accuse the Stadtler Parties and Houchin of delaying discovery in various ways. (Doc. 182 at 1-4. *See, e.g.*, *id.* at 4 ["The foregoing all demonstrates absolutely that the failure of this case to proceed forward on the discovery schedule under the [Case Management Order] is fully attributable to the Plaintiff's decision to file a near frivolous motion to disqualify."].) According to the Gorrie Parties, the proposed amendments (1) "add[] fraud in the inducement counts as the result of [the Stadtler Parties] fraudulently inducing [the Gorrie Parties] into executing the Farm Purchase Agreement, Promissory Note, Deed of Trust, [Purchase] Addendum . . . and [April 2020 RSA]," (2) "revise[] Count VIII to a tortious interference with business expectancy as [the Gorrie Parties] explained [they] would do in its response to [the Stadtler

Parties'] motion to dismiss," and (3) add "a tort of wrongful foreclosure." (*Id.* at 4.) As for the fraudulent inducement claims, the Gorrie Parties argue the facts giving rise to the claims "only really became apparent after the filing of the [SAC]." (*Id.* at 4-5.) As for the wrongful foreclosure claim, "that claim only became ripe when the wrongful foreclosure of the property was immediately pending and now completed." (*Id.* at 5.) Finally, the Gorrie Parties argue that "this case remains very much in the early pleading phase, and thus there is ample good cause to ensure that the pleadings contain the most up to date allegations occasioned by this contentious litigation that continues to generate now claims and allegations as the result of the machinations of [the Stadtler Parties]." (*Id.*)

Houchin also opposes amendment. (Doc. 164.) According to Houchin, the proposed new third-party claim is based on representations set forth in the JVA, which was executed in 2021. (*Id.* at 2.) Moreover, Houchin argues that the motion "fails to identify the substance of the[] supposed 'newly taken positions'" in Houchin's third-party counterclaims that drove the Gorrie Parties to seek leave to amend. (*Id.*) Houchin also contends that granting the Gorrie Parties leave to add the proposed fraudulent inducement claim would be futile. (*Id.* at 2-7.)

In reply, the Gorrie Parties reiterate that "the [Case Management Order] is for all intents and purposes a dead letter" and provide several reasons why amending to add the proposed new fraudulent inducement claim would not be futile. (Doc. 183 at 2-4.) The Gorrie Parties also provide more detail as to the new allegations in Houchin's pleading that underlie the motion to amend. (*Id.*)

C.   **Analysis**

The Court has repeatedly clarified throughout this case that "Rule 16(b)'s 'good cause' standard replaces Rule 15(a)(1)(2)'s more liberal standard" when, as here, a motion for leave to amend is filed after the amendment deadline in the scheduling order. (Doc. 115 at 2; Doc. 129 at 5-6.) Despite this, the Gorrie Parties mistakenly focus on the Rule 15 standard. (Doc. 146 at 2-3.)

"Discovery of new information after the deadline for amended pleadings passes is

a potential basis for good cause to modify the scheduling order." *Story v. Midland Funding LLC*, 2016 WL 5868077, *2 (D. Or. 2016).  However, the party seeking amendment must show diligence in seeking amendment after the information was discovered.  *Id.*  To determine whether a party exercised diligence, courts typically consider the amount of time between the discovery of the new information and when the party requested leave to amend.  *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087-88 (9th Cir. 2002).  "Ideally, a party will move to amend within weeks of learning new information."  *Story*, 2016 WL 5868077 at *2-3.  However, "[a] longer delay can still be consistent with diligence, depending on the circumstances of the delay."  *Id.* at *3.

Here, the Gorrie Parties broadly attribute the requested amendments to "the continued investigation of this case which brought to light the new potential claims" and to the facts alleged in the SAC and in Houchin's amended pleading.  (Doc. 146 at 2.)  The Stadtler Parties filed the SAC on December 5, 2022 (Doc. 131) and Houchin filed his amended pleading on December 9, 2022 (Doc. 134).  The Gorrie Parties filed their amendment request on January 6, 2023.  (Doc. 136.)  Thus, if the proposed amendments indeed arose from new information that Gorrie discovered when the SAC and Houchin's amended pleading were filed, the Gorrie Parties' request would likely meet the "good cause" standard.  *See, e.g.*, *Aldan v. World Corp.*, 267 F.R.D. 346, 358 (D. N. Mar. I. 2010) (holding that plaintiff was diligent where there was a delay of a month-and-a-half between discovery of the new information and the motion to amend because that period "included the holiday season").  *But see MiCamp Sols. LLC v. Nat'l Processing LLC*, 2021 WL 289661, *3 (D. Ariz. 2021) ("That Plaintiff filed the motion nearly one month after Ms. Putnam's deposition . . . does not indicate diligence.").

The problem is that nearly all of the proposed changes arise from facts known to Gorrie before this litigation began.  (*See, e.g.*, Doc. 146-1 at 6-7 ¶ 21 [alleging that, in 2020, Dawson knew that "Gorrie had begun to encounter difficulty with her investor consortium as the result of the COVID-19 pandemic and due to internal difficulties within the investor consortium group"]; *id.* at 7 ¶¶ 22-23 [alleging that Gorrie made certain representations to

Dawson and Stadtler in 2020]; *id.* at 7 ¶ 24 [alleging that Dawson made certain representations to Gorrie and some of her investors at the close of escrow on the Farm in 2020]; *id.* at 8-11 ¶¶ 29-41 [alleging that "throughout the remainder of the Hemp Project, Dawson introduced, solicited and attempted to consummate a number of financing ventures all of which did not come to fruition" but "none of the financing ventures were intended to work out" and providing several examples of this behavior during 2020]; *id.* at 11 ¶¶ 44-46 [alleging that Stadtler had certain knowledge in 2020 before the 30-day timeline provided for in the Addendum to the Farm Purchase Agreement]; *id.* at 16-17 ¶ 66 [alleging that Dawson engaged in various misconduct while working at the Farm]; *id.* at 21 ¶¶ 86-87 [alleging the July 1, 2021 default notice "does not recognize any of the agreements between the parties, does not recognize Stadtler's agreement not to charge interest on the $240,000 as represented by Dawson and is therefore an improper default"].)[15]

Because diligence is a fact-specific inquiry, the Court addresses each requested amendment in turn. *See also Cervantes v. Zimmerman*, 2019 WL 1129154, *5 (S.D. Cal. 2019) ("Courts need not find good cause on the whole, but rather may appropriately consider whether the movant has shown good cause for each proposed amendment or group of related amendments.").

### 1. Proposed Amendments To Counterclaims

The Gorrie Parties propose adding four new counterclaims against the Stadtler Parties (three fraudulent inducement claims and a wrongful foreclosure claim), changing their tortious interference with contract counterclaim to a tortious interference with

---

[15] One fact alleged in the proposed amended pleading that does *not* predate this litigation is that "[o]n or about July 11, 2022, Stadtler's counsel emails the Arizona Department of Agriculture regarding concerns that her client has about the hemp plants on the Farm. However, what is important to note is that Stadtler's counsel specifically states that '[w]hen our client retakes possession of the farm tomorrow . . .' indicating clearly that Stadtler and his counsel did not believe that there would be a public auction at which the highest bid would win, but instead a faux sales process that would allow Stadtler to take control of the Farm and reap the equity created by Gorrie." (Doc. 146-1 at 22 ¶ 91.) During the second TRO hearing, the Court noted that the email does not appear "particularly helpful or meaningful or significant." (Doc. 184 at 48.) The Gorrie Parties' filings provide no additional clarity. (Docs. 146, 146-1, 182.) Thus, even if this fact was newly discovered, it does not support a finding of diligence because it did not give rise to the pending motion to amend.

1   business expectancy counterclaim, omitting a claim for negligence per se, and adding a

2   number of factual allegations to support their new counterclaims.  (Doc. 146-1.)

3                   a.   **First Proposed New Counterclaim**

4           The first new counterclaim alleges that the Stadtler Parties fraudulently induced the

5   Gorrie Parties into executing the Farm Purchase Agreement, Promissory Note, Deed of

6   Trust and Purchase Addendum (collectively, the "Farm Purchase Documents") by

7   representing that Stadtler "understood the financial situation prior to the consummation of

8   the Farm purchase transaction and that he would work with [the Gorrie Parties] to ensure

9   the viability and success of the Hemp Project."  (*Id.* at 24 ¶ 107.)  The Gorrie Parties also

10  allege that "Stadtler intentionally failed to disclose that Dawson was not only his broker

11  and representative, but was also his partner in the venture."  (*Id.* at 25 ¶ 108.)  The Gorrie

12  Parties assert that these misrepresentations induced them to enter into the Farm Purchase

13  Documents.  (*Id.* at 24-25 ¶¶ 107-11.)

14          The Gorrie Parties have not established good cause for the untimely assertion of this

15  new counterclaim.  Per the Gorrie Parties' own allegations, the Farm Purchase Documents

16  were executed in 2020 and Gorrie learned in April 2021 that "Dawson was an undisclosed

17  silent partner with Stadtler in the Farm and in the various ventures between the parties."

18  (*Id.* at 4-8 ¶¶ 13-27.)  The Gorrie Parties also allege that Gorrie realized in May 2021 that

19  "Stadtler's plan from the outset" was "to starve the Hemp Project with the aim of taking

20  over the project for himself and reaping the financial reward of the Hemp Project while

21  recovering the Farm and relocating IGD to a new location."  (*Id.* at 21 ¶ 86.)  Waiting more

22  than a year after learning of these "new" events to request permission to amend does not

23  demonstrate diligence.  *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d

24  1393, 1398 (9th Cir. 1986) ("[L]ate amendments to assert new theories are not reviewed

25  favorably when the facts and the theory have been known to the party seeking amendment

26  since the inception of the cause of action.").[16]

27  _____

28  [16]     In reply, the Gorrie Parties contend that this new counterclaim "only really became
    apparent after the filing of the [SAC]," which "demonstrated that Stadtler was now entirely
    disclaiming what had been represented to Gorrie prior to the close of the escrow, namely
    that Stadtler would work with Gorrie and partner with her in order to create a highly

b.  **Second Proposed New Counterclaim**

The second new counterclaim alleges that the Stadtler Parties fraudulently induced the Gorrie Parties into executing the April 2020 RSA by "representing that the [April 2020 RSA] was intended as a forebearance [sic] of the obligations of the Promissory Note, Deed of Trust and [Purchase] Addendum." (Doc. 146-1 at 25-26 ¶ 114.)  According to the Gorrie Parties, at the time this litigation began, they were unaware that "Stadtler and the Trust intended to assert that the [April 2020 RSA] was instead a gift or illusory contract so that Stadtler and the Trust would not be bound thereby" (*id.* at 26 ¶ 116); the Stadtler Parties' intent "only really became apparent after the filing of the [SAC]."  (Doc. 182 at 4.)[17]

This argument fails because it is belied by other allegations in the Gorrie Parties' proposed amended pleading and by the Gorrie Parties' counsel's statements to the Court during the second TRO hearing, why establish that the Gorrie Parties had knowledge of the relevant facts long before the SAC was filed.  (*See, e.g.*, Doc. 146-1 at 26 ¶¶ 118-19 [alleging that "Stadtler and the Trust continued their misrepresentation regarding the [April 2020 RSA] from the execution of the [April 2020 RSA] until Dawson's testimony under oath at the July 7, 2022 hearing before this Court"]; Doc. 184 at 11 ["[T]he fraudulent inducement claims on the [April 2020 RSA] really only came to first awareness when Mr. Dawson sat up there [during the July 2022 TRO hearing] and said, it's a gift. . . .  That's the first time we'd heard about it."].)[18]  A delay of more than five months is not consistent

_____

profitable hemp business."  (Doc. 182 at 4-5.)  However, the Gorrie Parties' proposed amended pleading does not support this argument.

[17]     As noted above, the relevant chronology is that the Stadtler Parties first took the position that the April 2020 RSA was a gift at the July 7, 2022 TRO hearing and then asserted the argument in a motion to dismiss (filed August 10, 2022) and a motion for leave to file a SAC (filed October 24, 2022).  (Docs. 82, 87, 103.)  On November 11, 2022, the Gorrie Parties filed a motion for sanctions premised on the Stadtler Parties' assertion of this position.  (Doc. 118.)  On November 29, 2022, the Court granted the Stadtler Parties leave to file their SAC.  (Doc. 129.)  On December 5, 2022, the SAC was filed.  (Doc. 131.)

[18]     In a related vein, in their reply, the Gorrie Parties spill much ink arguing that the delayed timing of their motion to amend was caused by the Stadtler Parties filing a motion to disqualify counsel.  (Doc. 182 at 1-4.)  Given that the Gorrie Parties managed to file a number of motions while the motion to disqualify counsel was pending, this argument is unconvincing.  (*See, e.g.*, Docs. 118, 136, 158, 161.)  Also, even accepting that the delay of Stadtler's deposition hindered the Gorrie Parties' ability to conduct discovery, it is clear from the record that the Gorrie Parties knew Stadtler's position on the April 2020 RSA

with diligence.  *Cf. Cervantes*, 2019 WL 1129154 at *7 (a delay of four months "simply cannot show the diligence necessary for a finding of good cause").

Second, and in any event, the date that the Gorrie Parties learned that the Stadtler Parties intended to argue that the April 2020 RSA is unenforceable is beside the point—the second new fraudulent inducement counterclaim does not turn on the enforceability of the April 2020 RSA as a whole.  Instead, it arises from the allegation that Stadtler falsely represented to Gorrie that the April 2020 RSA modified the terms of the loan under the Farm Purchase Documents.  (Doc. 146-1 at 25-26 ¶ 114 ["Stadtler and the Trust fraudulently induced NFOF into entering into the [April 2020 RSA] by representing that the [April 2020 RSA] was intended as a forebearance [sic] of the obligations of the Promissory Note, Deed of Trust and [Purchase] Addendum as described above."].)  On May 2, 2022, the Stadtler Parties filed their FAC, alleging: "The [April 2020 RSA] . . . was negotiated and executed after closing on the [Farm] and does not contain any language which modified the terms of the Farm Purchase Agreement, Promissory Note or Deed of Trust."  (Doc. 25 ¶ 61.)  Thus, even if the Gorrie Parties did not know that the Stadtler Parties would argue the April 2020 RSA was a gift until the SAC was filed, they had notice in May 2022 of the facts giving rise to the second proposed new counterclaim.  "Rule 16(b) clearly contemplates that changes in law or newly discovered evidence may justify later amendments to a complaint.  That justification erodes, however, when a Plaintiff delays amending his complaint beyond the time he could have discovered the grounds for amendment through the exercise of reasonable diligence."  *Del Rio v. Virgin Am., Inc.*, 2019 WL 210957, *3 (C.D. Cal. 2019) (quotation marks omitted).

### c. **Third Proposed New Counterclaim**

The third new counterclaim alleges that "Stadtler and the Trust fraudulently induced [the Gorrie Parties] into entering into the [Three Acre RSA] by representing that the [Three Acre RSA] was intended as a further forebearance [sic] of the obligations of the Promissory Note, Deed of Trust and [Purchase] Addendum . . . and that the [Three Acre RSA] would

_____

despite this handicap.  (*See, e.g.*, Doc. 146-1 at 26 ¶¶ 118-19; Doc. 184 at 11.)

provide additional capital to pay Stadtler."  (Doc. 146-1 at 27 ¶ 123.  *See also id.* at 27 ¶ 124 [alleging that Stadtler and the Trust also falsely represented that "Stadtler intended to appropriately fund his obligation under the [Three Acre RSA]"].)

The Gorrie Parties have not established good cause for the untimely assertion of this new counterclaim.  "Pleadings 'cannot be a continuously moving target for obvious reasons.'"  *MiCamp Sols. LLC*, 2021 WL 289661 at *3.  Like the first two amendments, this proposed counterclaim relies entirely on events that occurred before this litigation began.  (*See, e.g.*, Doc. 146-1 at 27 ¶¶ 123-24 [alleging that Stadtler and the Trust made false representations before the Three Acre RSA was executed in January 2021]; *id.* at 21 ¶ 86 [alleging that, by mid-2021, Gorrie understood "Stadtler's plan from the outset" was to "starve the Hemp Project with the aim of taking over the project for himself and reaping the financial reward of the Hemp Project while recovering the Farm and relocating IGD to a new location"]; *id.* [alleging that, in 2021, Stadtler expressed that he would not provide additional funding to the Gorrie Parties regardless of the Three Acre Addendum].)

### d.   **Fourth Proposed New Counterclaim**

Next, the Gorrie Parties seek to add a tort claim against the Stadtler Parties for wrongful foreclosure.  (Doc. 146-1 at 32-33 ¶¶ 161-67.)  The proposed counterclaim alleges that "IGD is not in default of the Promissory Note and Deed of Trust and Addendum" and thus "Stadtler and the Trust have a legal duty not to wrongfully exercise the power to instigate a trustee sale."  (*Id.* at 33 ¶¶ 163-64.)  The trustee sale occurred on January 12, 2023.  (Doc. 179-1.)  In their reply to the Stadtler Parties' opposition brief, the Gorrie Parties argue that they acted diligently as to the wrongful foreclosure claim because it "only became ripe when the wrongful foreclosure of the property was immediately pending and now completed."  (Doc. 182 at 5.)

The diligence analysis here is complicated by the fact that "Arizona . . . has not expressly recognized the tort of wrongful foreclosure."  *In re Mortg. Elec. Registration Sys., Inc.*, 754 F.3d 772, 784 (9th Cir. 2014).  To the extent courts applying Arizona law have recognized such a claim, the case law supports the Gorrie Parties' position that they

acted diligently in terms of the timing of their amendment effort.  *See, e.g.*, *Martinez v. Cenlar FSB*, 2014 WL 4354875, *6 (D. Ariz. 2014) ("Arizona state courts do not recognize the tort of wrongful foreclosure.  However, district courts in Arizona have followed the reasoning of other jurisdictions that do recognize the tort of wrongful foreclosure.  A wrongful foreclosure claim is available only after a foreclosure had occurred . . . .") (internal citations omitted).  *See also Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1043 (9th Cir. 2011) ("Looking to states that have recognized substantive wrongful foreclosure claims, we note that such claims typically are available after foreclosure . . . .").

However, implicit in these decisions is the assumption that a wrongful foreclosure claim is not subject to A.R.S. § 33-811(C)'s waiver provision.  Section § 33-811(C) provides, in relevant part:

> The trustor, its successors or assigns, and all persons to whom the trustee mails a notice of a sale under a trust deed pursuant to § 33-809 shall waive all defenses and objections to the sale not raised in an action that results in the issuance of a court order granting relief pursuant to rule 65, Arizona rules of civil procedure, entered before 5:00 p.m. mountain standard time on the last business day before the scheduled date of the sale.

*Id.*  Generally, pre-2018 decisions recognizing the tort of wrongful disclosure under Arizona law have found that § 33-811(C) waiver does not apply to "post-sale" claims.  *See, e.g.*, *Schrock v. Federal Nat'l Mortgage Assn.*, 2011 WL 3348227, *6 (D. Ariz. 2011) (recognizing the tort of wrongful foreclosure under Arizona law and holding that such a tort is not subject to the waiver provisions of § 33-811(C)); *Christakis v. Mortg. Elec. Registration Sys., Inc.*, 2014 WL 5408424, *4 n.12 (Ariz. Ct. App. 2014) ("Arizona courts have not addressed whether the tort of wrongful foreclosure is a pre-sale claim and thus waived by § 33-811(C), or a post-sale claim, which would remain viable.  We observe, however, that the United States District Court for the District of Arizona has held that the tort ripens only after a foreclosure has occurred.").

A 2018 decision by the Arizona Supreme Court, *Zubia v. Shapiro*, 408 P.3d 1248 (Ariz. 2018), casts doubt on the supposed distinction between "pre-sale" and "post-sale"

claims for purposes of § 33-811(C) waiver.  In *Zubia*, the court clarified that § 33-811(C) waiver applies to any claim for damages that is "*based on* a defective [trustee] sale." *Id.* at 1251.  The court reasoned that "[a]llowing a legal challenge based on the invalidity of the trustee's deed permits an end-run around the § 33-811(C) waiver provision, resulting in legal expense and potential liability arising out of a statutorily valid trustee's sale, undercutting the finality the legislature intended for trustee sales." *Id.*  Addressing the plaintiff's wrongful foreclosure claim, the *Zubia* court stated:

> Although we do not preclude the possibility that Arizona may recognize a cause of action for wrongful foreclosure in the future, we do not do so here. As the court of appeals correctly recognized, Zubia's specific "wrongful foreclosure" allegations would remain subject to the statutory requisites of A.R.S. § 33-811(C), and are waived by her failure to seek and obtain the required injunctive relief.  Even if we chose to recognize a cause of action for wrongful foreclosure . . . , it would not apply here, [in part] because . . . Zubia's claim against Shapiro arises out of the execution and recording of the trustee's deed.  As such, her claim is an objection to the validity of the sale and would, therefore, be precluded by § 33-811(C).

*Id.* at 1253-54 (internal citations and quotation marks omitted).[19]  Accordingly, even if Arizona recognized a cause of action for wrongful foreclosure, such a claim would be waived under § 33-811(C) because the Gorrie Parties did not obtain injunctive relief before the trustee's sale.  (Doc. 184 at 39-49.)[20]

---

[19]      Lower courts have generally interpreted *Zubia* as affirming that wrongful foreclosure is not currently a cognizable claim under Arizona law.  *See, e.g.*, *9540, LLC v. Edmonds trustee of CJE Living Tr. Dated Oct. 1, 2007*, 2021 WL 6143690, *1 (Ariz. Ct. App. 2021), *review denied* (2022) (noting that "the superior court properly recognized [that a wrongful disclosure claim] is not a cognizable claim under Arizona law"); *Novotny v. Citibank, N.A.*, 2019 WL 3208113, *2 (D. Ariz. 2019) ("Plaintiffs allege wrongful foreclosure. . . .  Arizona recognizes no such cause of action.") (citing *Zubia*, 408 P.3d at 1253-54); *Bermudez v. DHI Mortg. Co. Ltd.*, 2018 WL 2008998, *2 (D. Ariz. 2018) ("As other courts have noted, wrongful foreclosure is not a recognized tort in Arizona. . . .  Most recently, in *Zubia v. Shapiro*, the Arizona Supreme Court again declined to recognize the tort of wrongful foreclosure.")

[20]      Several lower courts have found that recognizing the tort of wrongful foreclosure in Arizona would be "futile" as the law currently stands because by the time a wrongful foreclosure claim ripened (*i.e.*, after foreclosure), it would be waived under § 33-811(C). *Grady v. Tri-City Nat'l Bank*, 2013 WL 2147541, *2 (D. Ariz. 2013).  *See also Gray v. Capstone Fin.*, 2022 WL 2985647, *4 (D. Ariz. 2022) ("Arizona courts do not recognize a claim for wrongful foreclosure.  Put simply, 'a person who has defenses or objections to a properly noticed trustee's sale has one avenue for challenging the sale: filing for injunctive relief.'") (internal citation omitted); *Cummings v. Tucker*, 2022 WL 2106014, *3 (D. Ariz. 2022) ("Arizona does not recognize 'wrongful foreclosure' claims.  In fact, under A.R.S. § 33-811(C), Arizona law makes clear that borrowers waive all objections to a trustee's

The Court thus agrees with the Stadtler Parties (Doc. 163 at 2) that the proposed amendment is futile—either Arizona does not recognize the tort or the claim would be waived under § 33-811(C) because it relies on the allegation that IGD was not in default (and thus challenges the validity of the sale).  (Doc. 146-1 at 33 ¶¶ 163-64).  Either way, no set of facts could be proved that would state a valid claim.[21]  Futility is a basis for the Court to decline to allow an amendment under Rule 16(b).  *Sweaney v. Ada Cnty., Idaho*, 119 F.3d 1385, 1392-93 (9th Cir. 1997).

### e.  **Amended Tortious Interference Counterclaim**

Next, the Gorrie Parties propose changing their tortious interference with contract counterclaim to a tortious interference with business expectancy counterclaim.  (Doc. 146-1 at 29.)  The Gorrie Parties first expressed their intent to make this amendment in a filing on September 1, 2022.  (Doc. 90 at 12 ["[The Gorrie Parties] intend to make a claim for tortious interference with business expectancy claim which will more closely align with the facts underpinning the interference with and termination of the Vermont Hemp Processing Contract when [the Gorrie Parties] seek leave (if agreement between the parties is not obtained pursuant to FRCP 15) to file their Second Amended Answer, Counterclaim and Third Party Complaint."].)

The Gorrie Parties have not established good cause for the untimely assertion of this new counterclaim.  The fact that the Gorrie Parties mentioned adding a claim for tortious interference with business expectancy more than four months before requesting leave to do so shows that the Gorrie Parties were not diligent.  *Del Rio*, 2019 WL 210957, at *3 ("[T]he fact that Plaintiff threatened these newly added claims more than eight months before filing the Motion and four months prior to the scheduling order also casts doubt on the reasonable

---

sale not raised in an action that results in an injunction or other relief under Rule 65 of the Arizona Rules of Civil Procedure, prior to the day before the scheduled trustee's sale.  Put simply, 'a person who has defenses or objections to a properly noticed trustee's sale has one avenue for challenging the sale: filing for injunctive relief.'") (internal citations omitted).

[21]    It is undisputed that the Gorrie Parties failed to obtain injunctive relief before the trustee's sale (Doc. 184) and that the sale occurred on January 12, 2023 (Doc. 179-1).

diligence of Plaintiff in seeking to file the Proposed SAC.  Though the Court would find that Plaintiff did not exercise reasonable diligence even without this fact, it weakens even further Plaintiff's argument.").   Moreover, the facts underlying the proposed tortious interference with business expectancy counterclaim are identical to those alleged in relation to the existing tortious interference with contract counterclaim.  (Doc. 146-1 at 29-30 ¶¶ 135-41.)  "Counsel's delayed comprehension of legal theories readily available from the outset of the lawsuit does not establish reasonable diligence."  *Agricola Baja Best, S. De. R.L. de C.V. v. Harris Moran Seed Co.*, 2013 WL 4499118, *2 (S.D. Cal. 2013).

### f.   **Omitted Counterclaim**

Next, the Gorrie Parties propose eliminating their counterclaim for negligence per se.  (Doc. 146-1 at 31.)  Because the Court grants the Stadtler Parties' request to dismiss this counterclaim (as discussed later in this order), this revision is no longer necessary.  Thus, it is unnecessary to address whether the Gorrie Parties were diligent in seeking this amendment—the request is instead denied on mootness grounds.

### 2.   Proposed Amendments To Third-Party Complaint

As for their third-party complaint against Houchin, the Gorrie Parties seek leave to add a claim for fraudulent inducement.  (Doc. 146-1 at 38-39 ¶¶ 41-47.)  Unlike the Stadtler Parties, who correctly note that the Gorrie Parties' amendment request is governed by Rule 16(b) and identify a lack of diligence as one of the reasons why they oppose the request, Houchin does not cite or rely upon Rule 16 and does not seem to offer any objections premised on a lack of diligence—instead, Houchin relies only on futility.  (Doc. 164.)  Accordingly, and in the spirit of "the principle of party presentation," *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020), the Court will limit itself to Houchin's futility-based arguments.[22]

---

[22]   This outcome should not be viewed as tacit agreement with the Gorrie Parties' repeated contention that it was permissible to ignore the deadlines in the scheduling order because the order "is for all intents and purposes a dead letter."  (Doc. 182 at 2; Doc. 183 at 2.)  The scheduling order states in emphatic terms that "The Deadlines Are Real" and explains that "[t]he Court intends to enforce the deadlines set forth in this Order, and the parties should plan their litigation activities accordingly."  (Doc. 69 at 7.)  The Ninth Circuit has provided similar instructions: "A scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'  [A] district

Evaluating the futility of the proposed additional third-party claim is difficult without context.  In 2021, Houchin and IGD entered into the JVA.  (Doc. 77-5.)  Broadly speaking, the JVA governed a joint venture related to the hemp operations on a 20-acre parcel of the Farm.  (*Id.* at 2.)  As relevant here, the JVA included "Representations and Warranties" by both IGD and Houchin.  (*Id.* at 7-10.)  Among other things, IGD represented that it had "full power and authority to own its properties and to carry on its business as now conducted and as proposed to be conducted" and that it was not subject to any pending or threatened legal claims.  (*Id.* at 8.)

On December 9, 2022, Houchin filed third-party counterclaims against the Gorrie Parties, including a fraudulent inducement claim that in large part arises from IGD's representations in the JVA.  (*See* Doc. 134 at 14-15 ¶¶ 40-46, 17-18 ¶¶ 66-83, 22 ¶¶ 117-19.)  In relevant part, Houchin alleges that IGD's representation that its ownership of the Farm was not subject to any legal barriers was false because Stadtler held a security interest in the Farm and IGD had defaulted on the Promissory Note secured by that interest.  (*Id.* at 14-18 ¶¶ 40-46, 17-18 ¶¶ 66-83, 21-22 ¶¶ 116-19.)  Houchin further alleges that he "did not know and did not have reason to know that any of the . . . representations were false."  (*Id.* at 22 ¶ 126.)

Houchin's alleged lack of knowledge forms the basis for the Gorrie Parties' proposed new third-party claim for fraudulent inducement.  According to the Gorrie Parties, if Houchin did not know that IGD had defaulted on its obligations under the Promissory Note, then he "apparently did not engage in even basic conversations with either Dawson or Stadtler."  (Doc. 146-1 at 38 ¶¶ 42-44.)  The Gorrie Parties further contend that Houchin's failure to engage in such conversations demonstrates that he falsely

---

court's decision to honor the terms of its binding scheduling order does not simply exalt procedural technicalities over the merits of [the] case.  Disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier."  *Johnson*, 975 F.2d at 610 (citations omitted).  To be sure, the discovery process in this case took several unexpected turns following the issuance of the scheduling order due to the bankruptcy filing and the disqualification motion, but nobody has (at least to date) sought any modification of the deadlines in the scheduling order based on those developments.

represented in the JVA that "he had the opportunity to evaluate the merits and risks of the investment, that he had access and opportunity to review all relevant materials relating to the Company and had made all of the investigations he deemed appropriate prior to making the investment." (*Id.* at 38 ¶ 42.)

At this point, the Gorrie Parties' proposed new claim becomes somewhat convoluted because the Gorrie Parties seem to assert an alternative theory in which they accuse Houchin of lying in his pleading. Specifically, the Gorrie Parties allege that either Houchin falsely represented the extent of his knowledge in the JVA or, "if it is as suspected," Houchin *did* know about the Farm Purchase Documents and instead entered into the JVA "intend[ing] to falsely pled ignorance and use the alleged made up misrepresentation by Gorrie to assist his uncle in placing [the Gorrie Parties] in an impossible financial condition in order to assist Stadtler in obtaining the trustee sale, seizing the equity in the Farm and taking over the multi-million dollar purchase orders." (*Id.* at 38-39 ¶¶ 44-45.)

On its face, this alternative scenario fails to state a claim for fraudulent inducement because it doesn't include any misrepresentation by Houchin that the Gorrie Parties relied upon to their detriment. Instead, it seems to assert that Houchin made *truthful* representations with the intent to later refute their accuracy. To state a claim of fraudulent inducement, a plaintiff must allege "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; [and] (9) the hearer's consequent and proximate injury." *Duncan v. Pub. Storage, Inc.*, 507 P.3d 509, 514-15 (Ariz. Ct. App. 2022), *review denied* (2022). Because the alternate-scenario theory could not support a valid claim for fraudulent inducement (due to the absence of a false statement), amending the Gorrie Parties' third-party complaint to add a claim based on this theory would be futile. *Sweaney*, 119 F.3d at 1393.

As for the other theory underlying the Gorrie Parties' proposed new claim (*i.e.*, in

the JVA, Houchin falsely represented the extent of his pre-investment investigations and knowledge), Houchin argues that amending to add such a claim would be futile for several reasons, including that the representations underlying the proposed claim constitute opinion or judgment.  (Doc. 164 at 4-5.)[23]

"Representations which give rise to an action of fraud must, of course, be of matters of fact which exist in the present, and not merely an agreement or promise to do something in the future, or an expression of opinion or judgment as to something which has happened or is expected to happen."  *Waddell v. White*, 108 P.2d 565, 569 (Ariz. 1940).[24]  *See also Page Inv. Co. v. Staley*, 468 P.2d 589, 591 (Ariz. 1970) ("Actionable fraud must be based upon a misrepresentation of material fact, and not upon an expression of opinion."). Whether a representation is actionable as fraud requires a "case by case" inquiry.  *Id.*

The Gorrie Parties' proposed claim arises from § 4.02(e) of the JVA, which provides, in relevant part:

> Houchin is capable of evaluating the merits and risks of an investment in the Company, has had access to and an opportunity to review all relevant materials relating to the Company and its investment in the Company, including without limitation the qualifications of IGD, and the tax and financial implications of an investment in the Company, has made such investigation as it has deemed appropriate for such purpose, and is acquiring a Membership Interest for investment and not with a view to the direct or indirect resale or distribution of all or any part thereof. . . .

(Doc. 77-5 at 9-10.)[25]  Although the Gorrie Parties do not directly identify which of the

---

[23]     Houchin also argues that because "Gorrie is not a party to the JVA," the Gorrie Parties' allegation that *Gorrie* relied upon Houchin's representations "does not have any bearing on IGD's purported reliance on any representations."  (Doc. 164 at 6.)  The Court disagrees.  Reading the proposed pleading in the light most favorable to the Gorrie Parties and given that Gorrie is the sole member of IGD, the Gorrie Parties' allegation that Gorrie relied on Houchin's representations allows for a plausible inference that IGD relied upon the representations.

[24]     *But see Waddell*, 108 P.2d at 569 ("To this there is one exception, that when a promise to perform a future act is made with the present intention on the part of the promisor that he will not perform it, it is such a representation as will give rise to an action of fraud.").

[25]     The "Company" means an LLC that, under the JVA, IGD was obligated to form "for the purpose of preparing for cultivation of a plot of land . . . planting and cultivating Industrial Hemp on the Plot and harvesting and drying the same for preparation for sale." (Doc. 77-5 at 2.)  The JVA provided that Houchin and IGD would each own half of the Company's membership shares.  (*Id.*)

representations in § 4.02(e) were false, the accompanying factual allegations focus on Houchin's failure to speak with Stadtler or Dawson about IGD's payments under the Farm Purchase Documents.  (Doc. 146-1 at 38 ¶ 44.)  Thus, the Court interprets the fraudulent inducement claim as arising from the alleged misrepresentations in § 4.02(e) by Houchin that: (1) he had made "such investigation as [he] . . . deemed appropriate" before investing; (2) he was "capable of evaluating the merits and risks of an investment"; and (3) he "had access to and an opportunity to review all relevant materials" before investing.  (*Id.* at 38-39 ¶¶ 43-47.)

As for the first alleged misrepresentation—*i.e.*, Houchin had "made such investigation as [he] deemed appropriate"—Houchin argues that "[r]epresentations that rest entirely on Houchin's opinion or judgment—as these are—cannot constitute actionable fraud."  (Doc. 164 at 5.)  In response, the Gorrie Parties argue that IGD "specifically demanded" that Houchin represent that he had made all of the investigations he "deemed appropriate" before executing the JVA "so that the burden of investigating whether this was a suitable investment for him was solely vested in Houchin."  (Doc. 183 at 3.)

The Gorrie Parties' argument misses the point.  "A fraud claim generally fails where the allegedly false representation pertains to 'matters of estimate or judgment.'"  *IceMOS Tech. Corp. v. Omron Corp.*, 2019 WL 1490104, *6 (D. Ariz. 2019).  Houchin's view of what investigatory efforts were "appropriate" before executing the JVA is a matter of his own judgment.  The fact that Houchin failed to take a specific action (such as asking Stadtler about IGD's ownership of the Farm) does not establish that his subjective belief as to the appropriateness of that action was false.  *Cf. In re Dupree*, 336 B.R. 506, 517 (M.D. Fla. Bankr. 2005) (concluding that the representation "that the investment in the two variable annuities was not . . . 'appropriate' for the Plaintiff" was not actionable fraud because "to be actionable . . . a representation must be one of existing fact, and not merely an expression of opinion or expectation").

For similar reasons, the second alleged misrepresentation—*i.e.*, Houchin "is capable of evaluating the merits and risks of an investment in the Company"—is a statement of

opinion rather than an actionable statement of fact.  At bottom, this statement is an attempt by Houchin to provide a subjective evaluation of his own ability to investigate investment opportunities.  And as courts have recognized, a statement that is "nothing more than a vague, subjective opinion" is not actionable as fraud.  *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, *16 (D. Ariz. 2017).  The Gorrie Parties essentially concede in their reply brief that the challenged statement was a self-assessment by Houchin, albeit while claiming incorrectly that such a self-assessment is a statement of fact.  (Doc. 183 at 3 ["Houchin represented that he was capable of evaluating the merits and risks of the investment.  This statement was not a matter of opinion, but a representation that Houchin actually be capable of the evaluation."].)[26]

As for the third alleged misrepresentation—*i.e.*, Houchin "has had access to and an opportunity to review all relevant materials"—there are several problems with the Gorrie Parties' theory.  For one thing, the proposed pleading is filled with allegations that Houchin possessed such access by virtue of his closeness to Stadtler.  (*See, e.g.*, Doc. 146-1 at 38 ¶ 43 [alleging that Houchin was "close" with Stadtler]; *id.* at 35 ¶ 13 ["Houchin travelled with Stadtler to meetings and that Houchin, Stadtler and Dawson all presented [Houchin] as a sophisticated business who was close with his uncle Stadtler"].)  Indeed, in their reply brief, the Gorrie Parties emphasize "the ease with which [Houchin] could have made his investigation" and fault Houchin for "not tak[ing] advantage of the opportunity to review" the materials that were available to him.  (Doc. 183 at 3.)  Thus, by the Gorrie Parties' own account, Houchin's representations in § 4.02(e) regarding his access and opportunity to investigate were true.  And as noted above, it would be futile to add a fraudulent inducement claim premised on a true statement.  At any rate, the challenged statements

---

[26]     The Court also notes that the Gorrie Parties do not appear to be truly questioning whether Houchin was *capable* of conducting an investigation—they do not, for example, allege that Houchin lacks sentience or lacks the intellectual capacity and training to evaluate an investment opportunity.  Instead, they fault Houchin for failing to have specific conversations with Stadtler and Dawson when evaluating the merits and risks of his investment.  But the failure to engage in such conversations does not go to whether Houchin is "capable" of conducting an investigation—it goes to the quality of the investigation he ended up performing.

regarding access and opportunity are once again non-actionable statements of opinion—they cannot "be measured or quantified" and are "not amenable to general verification or falsification." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 828 (D. Ariz. 2016). *Cf. Seidman v. Weiler*, 2019 WL 2152666, *5 (Ariz. Ct. App. 2019), *as amended* (2019) ("The superior court . . . found that 'newer' is a relative adjective that derives its meaning from comparing two or more items; the term has no concrete meaning standing alone. We agree. As presented, 'newer' has no concrete meaning.").

III.    The Stadtler Parties' Motion To Dismiss Counterclaims

Because the Gorrie Parties' request to file an amended pleading is denied, the Court next turns to the Stadtler Parties' motion to dismiss the counterclaims alleged in the Gorrie Parties' operative pleading.

A.    **Additional Background**

The following additional facts are derived from the Gorrie Parties' operative pleading, the First Amended Answer, Counterclaim, and Third-Party Complaint (Doc. 77), and are presumed true for purposes of the Stadtler Parties' motion to dismiss.

Gorrie is "a Canadian citizen temporarily living in the state of Arizona."[27] (*Id.* at 3 ¶ 1.) "In late 2019, Gorrie had put together a consortium of investors to fund a hemp farming, processing and sale project" and "intended to seek financing and investment for the purchase of a suitable property and the subsequent improvements necessary to grow and process hemp." (*Id.* at 3 ¶¶ 8-9.) "To that end, Gorrie formed the IGD, NFOF and NFF entities . . . ." (*Id.* at 4 ¶ 10.)

In October 2019, Gorrie became interested in the Farm as a locale for the hemp project. (*Id.* at 4 ¶¶ 11-12.) She reached out to Dawson, the "designated broker" for the Farm, and "the parties began a negotiation and due diligence for the purchase of the same." (*Id.* at 4 ¶¶ 12-13.)[28]

---

[27]    The Gorrie Parties allege that Gorrie "is in the process of obtaining permanent residence status" and that "the action[s] of [the Stadtler Parties] in this matter" are "purposefully" interfering with Gorrie's ability to obtain such status. (Doc. 77 at 3 ¶ 1.)

[28]    Up until January 2021, "Gorrie communicated with Stadtler through Dawson" and

In January 2020, Gorrie and Stadtler signed the Farm Purchase Agreement, under which IGD agreed to buy the Farm from the Trust for $1.4 million.  (*Id.* at 4 ¶¶ 14-15.) The Farm Purchase Agreement required IGD to "put down a $20,000 earnest money deposit and pay a further $280,000 towards the purchase price at the time of close of escrow."  (*Id.* at 4 ¶ 16.)  The Trust would then "provide seller carryback financing" for the remaining $1.1 million for 18 months.  (*Id.* at 4 ¶ 17.)  The unpaid balance would "carry a simple interest rate of 8%," amortized over 20 years.  (*Id.*)  The Farm Purchase Agreement also included a payment schedule.  (*Id.* at 4-5 ¶ 17.)

On February 4, 2020, pursuant to the Farm Purchase Agreement, IGD and the Trust executed a Promissory Note for $1.34 million.  (*Id.* at 5 ¶ 19.)  Under the terms of the Promissory Note, IGD agreed to make "[a] onetime payment of $240,000 (in full or in part)" to the Trust within "30 days from the close of escrow."  (*Id.*)  The Promissory Note also "had a final balloon payment mandating payment of the entire unpaid principal and accrued interest be paid on or before August 7, 2021" and "provided for a default interest rate . . . in the event of a declared default."  (*Id.* at 6 ¶ 19.)

On February 11, 2020, IGD and the Trust executed the Deed of Trust, with the Trust as the beneficiary.  (*Id.* at 6 ¶ 20.)

The same day, IGD and the Trust also executed the Purchase Addendum (*i.e.*, an addendum to the Farm Purchase Agreement), which lowered the amount due at closing to $60,000.  (*Id.* at 6 ¶ 21.)  Like the Promissory Note, the Purchase Addendum required IGD to pay an additional $240,000 within 30 days of the close of escrow.  (*Id.* at 5-6 ¶¶ 19, 21.)[29]  If IGD failed to meet the 30-day deadline, "the Trust had the right to cancel the sale."  (*Id.* at 6 ¶ 21.)  According to the Gorrie Parties, "Stadtler and Gorrie both understood quite clearly that funding for the Hemp Project would follow the close of escrow"—*i.e.*,

---

did not have any direct interactions with Stadtler.  (*Id.* at 4 ¶ 13.)

[29]     Additionally, the Purchase Addendum included "a pre-payment penalty provision that required that IGD pay the entirety of the interest due under the [Promissory] Note, even if IGD prepaid the balance of the Note prior to when that balance was due."  (*Id.* at 6 ¶ 21.)

that "IGD would not have the $280,000 to close the transaction on February 27, 2020 as Gorrie was still working with various lenders and investors to obtain the funding to capitalize" the project.  (*Id.* at 6-7 ¶ 22.)

On February 27, 2020, escrow closed on the Farm and title was conveyed to IGD. (*Id.* at 7 ¶ 23.)

In early 2020, the COVID-19 pandemic hit.  (*Id.* at 7 ¶ 24.)  In March 2020, Canada "severely restrict[ed] entry and exit" of the country, causing the hemp project, "which is funded by Canadian investors," to "come under stress."  (*Id.*)  "American investment and sources of capital had also been severely hampered by the onset of the COVID-19 pandemic . . . ."  (*Id.* at 7 ¶ 25.)  "As a result of this unfortunate timing, Gorrie communicated to Dawson that IGD would be unable to pay the $240,000 within the 30 day timeframe."  (*Id.* at 7 ¶ 26.)  After Dawson relayed this information to Stadtler, Stadtler did not exercise his right, under the Purchase Addendum, to cancel the sale of the Farm.  (*Id.* at 7 ¶ 27.)

Instead, in April 2020, the parties began discussing the possibility of "a revenue share agreement."  (*Id.* at 7-8 ¶¶ 27, 29.)  On April 14, 2020, Dawson and Gorrie met at Dawson's home in Vail, Arizona.  (*Id.* at 9 ¶ 30.)[30]  During that meeting, "Dawson represent[ed] that Stadtler [would] not rescind the sale of the Farm and take it back if Gorrie sign[ed]" the proposed revenue sharing agreement.  (*Id.*)  Based on Dawson's representation, Gorrie believed the agreement was intended to modify the Promissory Note and the Deed of Trust.  (*Id.*)

The same day, with this understanding in mind, Gorrie signed the April 2020 RSA. (*Id.* at 8 ¶ 29.)[31]  At that time, NFOF was the "primary source of funds" for the hemp project and was leasing the Farm from IGD.  (*Id.* at 7-8 ¶ 28.)  Thus, April 2020 RSA was between NFOF and the Trust.  (*Id.* at 7-8 ¶¶ 28-29 ["[I]t would make little sense for the revenue

---

[30]     Angela Dimitriou-Curry was also present at the April 14, 2020 meeting.  (*Id.* at 9 ¶ 30)

[31]     The April 2020 RSA is dated April 10, 2020; the Gorrie Parties allege that Dawson backdated the agreement.  (*Id.* at 8 ¶ 29.)

share to attach to IGD and thwart the parties [sic] intent that Stadler would get a revenue share on the entire business.  Dawson is well aware of this because he has participated in numerous discussions where the structure of the entire business [was] discussed at length.”].)[32]

Under the April 2020 RSA, “[t]he Trust was to receive 1% of net revenue from the harvest, processing and sale of hemp products from the operation of the Farm” paid yearly, up to a maximum allocation of $1 million per year, for “a period not to exceed 5 years.” (*Id.* at 8 ¶ 29.)[33]  “[T]he only consideration given by the Trust” in return for the revenue share was “forbearance of the Trust’s legal rights to rescind the contract or initiate a deed of trust or judicial foreclosure, and the written extension of IGD’s payment obligations and the conversion of the same to the outcome of IDG’s Hemp Operation.” (*Id.  See also id.* at 9 ¶ 31 [under the April 2020 RSA, the Trust “trad[ed] its payment schedule with 8% interest for an opportunity to participate in the Hemp Project and potentially reap $5 million from the sale, far more return than would have been possible from the sale”].)  Finally, “[a]ny action commenced under the [April 2020 RSA] had to be filed in the Superior Courts in Maricopa County” and “[t]he parties were required to participate in non-binding mediation that had to occur prior to litigation being commenced.” (*Id.* at 9 ¶ 29.)

“IGD spen[t] the remainder of 2020 seeking funding for the Hemp Project,” ultimately raising about $250,000, which IGD used “to substantially improve the Farm by preparing the land for growing and readying one of the wells by improving it and purchasing the appropriate infrastructure for it to irrigate the Farm.” (*Id.* at 9 ¶ 32. *See also id.* at 9-10 ¶ 32 [“Indeed, the Farm has potentially increased in value from $2,160,000 to $4,158,000 as the result of the efforts of IGD and the capital expenditure of its investors and the efforts of [the Gorrie Parties].”].)  During this time, there were “no net revenues to

---

[32]     The Gorrie Parties also note that “the factual background that IGD purchased the Farm from the Trust and was leasing the Farm to NFOF” is explained in the April 2020 RSA’s recitals.  (*Id.* at 9 ¶ 29.)

[33]     “Net revenue was calculated as gross revenue less all necessary expenses paid for the normal operation of the Farm as determined by . . . NFF.”  (*Id.* at 9 ¶ 29.)

pay out under the [April 2020 RSA] because no funding ha[d] been obtained to begin farming operations." (*Id.* at 10 ¶ 33. *See also id.* ["The issue, of course, was COVID."].)

"However, towards the end of 2020 and the beginning of 2021, IGD . . . enter[ed] into a purchase order for over $20 million dollars of hemp from Vermont Hemp Processing Inc., one of the largest wholesale purchasers in the United States." (*Id.* at 10 ¶ 34.) "With this purchase order in hand, IGD [could] . . . obtain the requisite funding to capitalize the Hemp Project." (*Id.*)

After learning of the purchase order, Stadtler "bec[ame] interested in participating in a joint venture to share in more profits than the 1% under the [April 2020 RSA]." (*Id.* at 10 ¶ 35.) Accordingly, Dawson (on behalf of Stadtler) began negotiating a "new joint venture" between IGD and Stadtler and, in January 2021, IGD and Stadtler entered into the Three Acre RSA. (*Id.* at 10 ¶¶ 36-37.)[34]

As its name suggests, the Three Acre RSA was intended to facilitate hemp operations on a three-acre parcel of the Farm. (*Id.* at 10-11 ¶ 39.) Under the Three Acre RSA, Stadtler agreed to provide $75,000 of funding "to plant, grow, process and sell on the retail market the output of 3 acres of smokable hemp crop and retail CBD items." (*Id.*)[35] "The invested funds were to be available to IGD on a draw basis from a book keeping service selected by Stadtler." (*Id.* at 11 ¶ 39.) In return, "IGD [was] responsible for furnishing the Farm to grow the crop on . . . [and] for the cultivation and processing of both the smokable and bio mass portions of the harvested crop." (*Id.*) "The proceeds from the sale were first to be paid back to Stadtler and IGD for any monies expended to grow the crop" and "[a]ny additional proceeds were to be split equally between the parties." (*Id.*)[36]

"Stadtler insisted that both Dawson and Gorrie sign personally" the Three Acre

---

[34]    The Three Acre RSA was "drawn up by Dawson." (*Id.* at 10 ¶ 37.)

[35]    In paragraph 39, the Gorrie Parties describe the investment as totaling "$75,0000." (*Id.* at 10 ¶ 39.) The Court assumes the extra zero is a clerical error. To the extent it was not, the distinction is not material to the Court's analysis.

[36]    The Gorrie Parties allege that "[n]o interest was to be due on the invested funds during the growing season." (*Id.* at 11 ¶ 39.)

RSA, "although the personal guarantee was on a limited basis and only available in the event that the hemp crop failed to repay the loan."  (*Id.* at 11 ¶ 40.)  Thus, the parties executed the "Personal Loan and Agreement."  (*Id.* at 11 ¶¶ 40-41.)  Under the terms of the Personal Loan, when IGD forwarded invoices to the bookkeeping service, the service "would forward payment within one week or the following Friday to ensure that IGD always had funds available to pay expenses as needed."  (*Id.* at 11 ¶ 41.)

Between January 27, 2021 and April 26, 2021, pursuant to the Three Acre RSA, "Stadtler made payments to IGD's bank account of approximately $62,075."  (*Id.* at 12 ¶ 44.)  "However, Stadtler also insisted that Dawson control the expenditure of the funds and that Dawson assume managerial responsibilities at the Farm even though Dawson remained Stadtler's agent."  (*Id.* at 12 ¶ 45.)  Accordingly, Dawson controlled the bank card for the IGD account that Stadtler was funding.  (*Id.* at 13 ¶ 53.)

"In the interim, Stadtler spent considerable time at the Farm."  (*Id.* at 12 ¶ 47.)  During this period, "Stadtler began to make sexually suggestive comments of a personal nature" toward Gorrie, "suggest[ing] that his interest in the joint ventures exceeds a purely business relationship."  (*Id.* at 12 ¶ 48.)

On March 22, 2021, "Stadtler arranged for Gorrie to meet with . . . Houchin, his nephew, suggesting that Houchin [was] interested in investing in another joint venture which could supply the Vermont Purchase Orders."  (*Id.* at 12 ¶ 49.)  At Stadtler's request, Houchin, Stadtler, and Gorrie planned to meet in Blythe, California to discuss this potential venture.  (*Id.* at 12 ¶ 50.)  However, Gorrie was not told the exact location of the meeting until she arrived in Blythe, at which point she was directed to a "rundown motel," which she thought was odd because Stadtler and Houchin are "wealthy individuals."  (*Id.* at 13 ¶ 51.)  When she arrived at the motel room, "both men appear[ed] disappointed that Gorrie [was] accompanied by her son" and "requested that Gorrie instruct her son to wait for her in the car."  (*Id.*)  "Perturbed and disturbed by Stadtler and Houchin's conduct Gorrie insist[ed] that the door be left open while an hour long meeting is conducted . . . ."  (*Id.* at 13 ¶ 52.)

Meanwhile, "[t]he relationship between Gorrie and Dawson became increasingly strained." (*Id.* at 13 ¶ 53.) "[I]nstead of working towards the success of the joint venture, Dawson undermined IGD at each turn at Stadtler's express direction." (*Id.* at 12 ¶ 46.) Dawson "intentionally poisoned the hemp plants," "created a fuel spill on the property," and "verbally abused workers and refused to pay workers resulting in litigation being filed against the IGD." (*Id.*) "[I]t became increasingly clear to Gorrie that Dawson had utterly misrepresented his farming expertise and that he lacks even basic knowledge of farming practices." (*Id.* at 13 ¶ 55.) Dawson also "refused to provide invoices showing expenditures that he is making purportedly on behalf of the venture even though he was receiving the money from Stadtler" and "refused to pay . . . venture expenses." (*Id.* at 13 ¶ 53 ["Indeed, the vast majority of the funds appeared to be expended on the personal expenses of Dawson . . . ."].) After becoming concerned with "Dawson's practice of withdrawing cash from the account and not providing invoices or receipts to substantiate the expenditures," on April 20, 2021, "Gorrie [took] back the sole bank card from Dawson." (*Id.*)

"Following Gorrie's recovery of the bank card from Dawson, Stadtler made a final payment to the IDG bank account of $3,000 and then [made] no further payments." (*Id.* at 13 ¶ 54.)

The hemp operation continued to experience "setbacks and crop failures" due to "Dawson's intentional sabotage or incompetence" and "IGD [was] unable to complete the project and . . . indebted to Stadtler for additional monies." (*Id.* at 13-14 ¶¶ 56-57.) However, "Stadtler indicated that he was willing to provide additional funding," on the condition that IGD enter a joint venture with Houchin and "continue to allow Dawson to control the funding." (*Id.* at 14 ¶ 57.) On May 11, 2021, Gorrie, "[p]laced into a desperate situation by her lender" but still believing that Stadtler wanted the project to succeed, signed the Three Acre Addendum on behalf of IGD. (*Id.* at 14 ¶¶ 57-58.) In doing so, Gorrie relied on Dawson's representation that Stadtler "understood the need for immediate funding due to the fact that the IGD needed to plant the crop as quickly as possible because

the growing season was coming to a close" and would immediately provide $60,000 in funding.  (*Id.* at 14 ¶ 59.)

Under the Three Acre Addendum, the three-acre parcel was increased to six acres ("because IGD had the necessary seed") and Stadtler agreed to provide an additional $60,000 in funding.  (*Id.* at 14 ¶ 60.)  "[T]he additional $60,000 would be distributed on a draw basis with Dawson as Stadtler's representative to work with Gorrie and Stadtler to furnish the funding in a timely manner needed to finish the crop."  (*Id.* at 15 ¶ 60.)  The Three Acre Addendum also "specifically stated that any prior crop failures were not the fault of IGD due to abnormally high weather temperatures and issues with the greenhouse." (*Id.*)  Under the terms of the agreement, the proceeds from the six-acre crop would first go Stadtler to repay "the loan";[37] the remaining proceeds would be distributed between Stadtler (25%), Gorrie (50%), and the outstanding balance on the promissory note related to the Farm (25%).  (*Id.*)  Finally, the Three Acre Addendum "mandated that IGD would have to work with Stadtler for the next 3 years."  (*Id.*)

"In the intervening timeframe, Stadtler's nephew, Houchin also entered into a joint venture with IGD to fund another hemp crop to provide product for the Vermont Purchase Orders."  (*Id.* at 15 ¶ 61.)

Meanwhile, the Gorrie Parties were "approached with a number of offers of capital to fund the Hemp Project as the result of the Vermont Purchase Orders."  (*Id.* at 15 ¶ 62.) However, all of the potential investors were "either dissuaded from investment via the actions of Dawson who sabotage[d] investment calls or by the insistence by Stadtler that Houchin would be the sole investor in the property."  (*Id.*)  Thus, the Gorrie Parties became "reliant upon Stadtler and Houchin's performance of their respective contractual obligations."  (*Id.*)

However, Stadtler did not provide the additional $60,000 and "refuse[d] to put any further funds into the hemp project."  (*Id.* at 15 ¶ 63.)  Dawson likewise refused to "meaningfully participate" in any accounting.  (*Id.* at 15-16 ¶ 63.)

---

[37]      Paragraph 60 does not specify which loan was to be repaid.

In late May 2021, Dawson "purportedly conducted a water analysis and informed IGD that it was not possible to farm hemp at the farm because of the water chemistry." (*Id.* at 16 ¶ 64.)[38] "Shortly thereafter, . . . Dawson informed IGD that Stadtler [was] insisting that IGD remove all of the improvements at the Farm and move the entirety of the Stadtler and Houchin operations to Stadtler's farm in Benson, Arizona.  In addition, . . . Dawson stated that Stadtler insist[ed] that Gorrie surrender the Farm to Stadtler without recognizing the substantial equity available in the Farm." (*Id.* at 16 ¶ 65.)  When Gorrie called Stadtler, he reiterated the demands and then asked Gorrie to "turn over IGD's $7.7 million dollar Vermont Purchase Orders to Stadtler via . . . Dawson so that Stadtler, Dawson and Houchin [could] begin operations to supply the product on this contract." (*Id.* at 16 ¶ 66.)  Gorrie then "realize[d] Stadtler's plan from the outset"—"to starve the Hemp Project with the aim of taking over the project for himself and reaping the financial reward of the Hemp Project while recovering the [Property] and relocating IGD to a new location." (*Id.*)

On July 1, 2021, "Stadtler sent a default notice to IGD." (*Id.* at 16 ¶ 67.)  He also "refused to further fund" the Three Acre RSA and the Three Acre Addendum. (*Id.* at 17 ¶ 70.)[39]

Based on these facts, the Gorrie Parties assert ten counterclaims against the Stadtler Parties: (1) breach of the April 2020 RSA, Deed of Trust, Promissory Note, and Purchase Addendum; (2) declaratory judgment that the April 2020 RSA modified the terms of the Promissory Note, Deed of Trust, and Purchase Addendum; (3) breach of the Three Acre RSA; (4) fraudulent inducement; (5) tortious interference with contract; (6) breach of the implied covenant of good faith and fair dealing; (7) injunctive relief; (8) negligence per se; (9) estoppel; and (10) breach of fiduciary duty. (*Id.* at 17-23 ¶¶ 72-121.)

…

---

[38]    The Gorrie Parties believe this information was also shared with Houchin. (*Id.* at 16 ¶ 64.)

[39]    "During the same period, Houchin refuse[d] to finish funding IDG's first draw request taking the position that due to Stadtler's default notice, he is excused from further performance under the [JVA]." (*Id.* at 17 ¶¶ 69-70.)

B. **Legal Standard**

"[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-680. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

C. **The Parties' Arguments**

The Stadtler Parties move to dismiss all 10 of the Gorrie Parties' counterclaims. (Doc. 87.) The Gorrie Parties generally oppose the motion. (Doc. 90.)

The parties' arguments regarding each disputed counterclaim are summarized on a claim-by-claim basis in Part III.D below, so there is no need to provide a further summary here.[40] However, with respect to several counterclaims, there is no dispute that dismissal is warranted.

First, the Stadtler Parties contend that Count Five (tortious interference with contract) fails because the underlying contract is "an unenforceable indefinite quantities contract" and because the claim doesn't allege damages or that Vermont Processing failed to perform under the contract. (Doc. 87 at 11-12.) In response, the Gorrie Parties agree to

---

[40] The Gorrie Parties also argue that the Court should deny the motion summarily because "all of the citation references . . . to the relevant pleading were to . . . the prior and now superseded answer, counterclaims, and third party complaint." (Doc. 90 at 7.) The Court declines this invitation.

withdraw the claim (albeit while noting their intent to seek leave to assert a new, related claim). (Doc. 90 at 12.) Accordingly, Count Five is dismissed and is not discussed further below.

Next, the Stadtler Parties argue that Count Seven, which requests injunctive relief enjoining a trustee sale of the Farm, is mooted by the Court's decision at the July 7, 2022 TRO hearing. (Doc. 87 at 13.) The Gorrie Parties appear to agree, as they do not mention Count Seven in their response. (*See generally* Doc. 90.) At any rate, it is undisputed that the trustee's sale has now occurred. Accordingly, Count Seven is dismissed and is not discussed further below.

Third, the Stadtler Parties contend that Count Eight (negligence per se) fails because the Gorrie Parties "fail to identify any law or an ordinance or requirement thereof that [the Stadtler Parties] allegedly breached." (Doc. 87 at 13.) In response, the Gorrie Parties withdraw their negligence per se claim but note they "intend to make a claim for negligent performance of an undertaking" in an amended pleading. (Doc. 90 at 12.) Accordingly, Count Eight is dismissed and is not discussed further below.

One final observation is necessary before moving to the disputed counterclaims. The Gorrie Parties' response brief, although 14 pages long, contains only three case citations. (Doc. 90.)[41] This unusual approach was particularly unhelpful here, where the

---

[41] Also, the first citation is wrong. The Gorrie Parties begin by citing *Mattis v. Johnson*, 730 P.2d 286 (Ariz. Ct. App. 1986), for the proposition that "the standard of review for grant of a motion to dismiss" is that the Court may "only dismiss if the non-moving party would not be entitled to relief under any facts susceptible to proof of the relevant claim." (Doc. 90 at 7.) But this is federal court, not state court, and the relevant pleading standard in federal court—which was established by the *Iqbal/Twombly* line of cases and has been in place for nearly two decades—is more demanding than the standard urged by the Gorrie Parties. *See, e.g., Taylor v. AFS Techs., Inc.*, 2010 WL 1250733, *1 (D. Ariz. 2010) ("Plaintiff asserts that a motion to dismiss under Rule 12(b)(6) should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.' That is the wrong legal standard. The Supreme Court made clear in [*Twombly*] that the 'no set of facts' language 'is best forgotten as an incomplete, negative gloss on an accepted pleading standard.' To survive dismissal, the complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' The plausibility standard 'asks for more than a sheer possibility that a defendant has acted unlawfully,' demanding instead sufficient factual allegations to allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'") (citations omitted).

1  dismissal analysis often turns on nuances of Arizona law that the Court was largely
2  required to discern through its own research.  This is not the way motion practice is
3  supposed to work.

D.  **Analysis**

5      "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers
6  evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule
7  56 motion for summary judgment, and it must give the nonmoving party an opportunity to
8  respond."  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  "A court may,
9  however, consider certain materials—documents attached to the complaint, documents
10  incorporated by reference in the complaint, or matters of judicial notice—without
11  converting the motion to dismiss into a motion for summary judgment."  *Id.* at 908.  As
12  relevant here, the Farm Purchase Documents, the April 2020 RSA, the Three Acre RSA
13  (and related the Personal Loan), and the Three Acre Addendum are incorporated by
14  reference throughout the Gorrie Parties' pleading.  (*See, e.g.*, Doc. 77 at 4 ¶ 14, 5 ¶ 18, 6
15  ¶¶ 20-21, 7 ¶ 27, 10 ¶ 37, 11 ¶ 40, 14 ¶ 58.)[42]  Accordingly, the Court may consider these
16  materials without converting the Stadtler Parties' motion into a motion for summary
17  judgment.

1.  Counts One And Two

19      In Count One, the Gorrie Parties allege that "Stadtler and the Trust modified the
20  payment obligations of the Promissory Note, Deed of Trust, and the [Purchase] Addendum
21  . . . with the negotiation and execution of the [April 2020 RSA]."  (Doc. 77 at 17 ¶ 73.)
22  The Gorrie Parties further allege that, "by asserting a default of the Promissory Note and
23  Deed of Trust and proceeding forward with trustee's sale even though there is no default
24  of the same," the Stadtler Parties breached the April 2020 RSA.  (*Id.* at 18 ¶¶ 74-75.  *See*

---

26  [42]    Specifically, the Gorrie Parties cite Docs. 17-1 [Farm Purchase Agreement], 17-2
   [Promissory Note and Deed of Trust], 17-3 [Purchase Addendum], 17-4 [April 2020 RSA],
27  17-5 [Three Acre RSA and Personal Loan], and 17-7 [Three Acre RSA].  (Doc. 77 at 4
   ¶ 14, 5 ¶ 18, 6 ¶¶ 20-21, 7 ¶ 27, 10 ¶ 37, 11 ¶ 40, 14 ¶ 58.)  These documents were attached
28  to the Gorrie Parties' partial motion to dismiss the Stadtler Parties' initial complaint.  (Doc.
   17.)

*also id.* at 18 ¶ 76 ["Stadtler and the Trust have breached the [April 2020 RSA] by filing litigation in La Paz County even though the [April 2020 RSA] calls for mandatory mediation prior to the inception of litigation and that any litigation must be filed in Maricopa County."].)   In a related vein, in Count Two, the Gorrie Parties request a declaratory judgment that the April 2020 RSA operated as an accord that "discharged any preexisting duty between them under the Promissory Note." (*Id.* at 18-19 ¶¶ 78-82. *See also id.* at 18 ¶ 80 [alleging the April 2020 RSA was "an acceptance by the Trust and Stadtler to receive alternate performance"].)

The Stadtler Parties contend that Count One fails because it "relies on an alleged *unwritten* modification of a $1.34 million loan," which is prohibited by A.R.S. § 44-101(9). (Doc. 87 at 7-8.)   Alternatively, the Stadtler Parties argue that the April 2020 RSA is "illusory and enforceable" for lack of consideration. (*Id.* at 8.)   Further alternatively, the Stadtler Parties argue that IGD lacks privity to enforce the April 2020 RSA because IGD is neither party to nor a third-party beneficiary of the agreement. (*Id.* at 8-9.)   The Stadtler Parties assert the same challenges in relation to Count Two. (*Id.* at 9.)

### a.   Consideration For April 2020 RSA

The Stadtler Parties contend the April 2020 RSA is illusory and unenforceable because neither the Trust nor NFOF had any enforceable obligations—instead, the agreement "is purely to give the Trust 1% of future net revenue which is not guaranteed." (Doc. 87 at 8, emphasis omitted.)

"Mutuality of obligation is a requirement for a valid contract . . . [and] mutuality is absent when only one of the contracting parties is bound to." *Carroll v. Lee*, 712 P.2d 923, 926 (Ariz. 1986).   "[I]t is of no consequence that the parties exchanged 'unlike services.' Any performance which is bargained for is consideration, and courts do not ordinarily inquire into the adequacy of consideration." *Id.* (internal citation omitted).   One way a contract may be rendered unenforceable due to a lack of mutuality is when one party's obligation is illusory. *Shattuck v. Precision-Toyota, Inc.*, 566 P.2d 1332, 1334 (Ariz. 1977) ("[A]n illusory contract is unenforceable for lack of mutuality.").

To start, the fact that the Trust was not *guaranteed* to receive net-revenue payments from NFOF—instead, payment was contingent on NFOF earning a net profit—does not establish that NFOF's obligations under the April 2020 RSA were illusory.  If the hemp operation generated net revenue, NFOF was obligated to share a percentage of that revenue with the Trust.  (Doc. 17-4 at 2 [April 2020 RSA].)  The right to receive a benefit in a specified circumstance (*i.e.*, if the hemp operation generated net revenue) has value and is not illusory.  *See, e.g.*, *Havasu Heights Ranch & Dev. Corp. v. State Land Dep't of State of Ariz.*, 764 P.2d 37, 45-46 (Ariz. Ct. App.), *opinion amended on reconsideration sub nom.*, 840 P.2d 1024 (Ariz. Ct. App. 1988) (the "preferred right" to renew a lease if the lands are ever reclassified for development, although speculative, is not illusory and constitutes consideration because it has value); *Elec. Const. & Maint. Co. v. Maeda Pac. Corp.*, 764 F.2d 619, 621 (9th Cir. 1985) ("[W]here a subcontractor allegedly agreed to bid only after receiving the general contractor's promise to accept the bid if it were the low bid and if the general contractor were awarded the prime contract, there is consideration for the general contractor's promise.").  *See also King Cty. v. Taxpayers of King Cty.*, 989 P.2d 1260, 1268 (Wash. 1997) ("[T]he mere possibility the Mariners may breach its promise in the future on its obligation to share profits with the County does not make this provision of the lease illusory. . . .  The Mariners made an enforceable promise to share profits.  The promise is not illusory."); *Dimension Serv. Corp. v. Don Jacobs, Inc.*, 2014 WL 97465 (Ky. Ct. App. 2014) ("Well-established rules of contract construction prohibit this Court from construing payments to DJ Entities under the profit share agreements as unenforceable 'illusory promises.'").

As for "the consideration given by the Trust," the Gorrie Parties allege it "was forbearance of the Trust's legal rights to rescind the contract or initiate a deed of trust or judicial foreclosure, and the written extension of IGD's payment obligations and the conversion of the same to the outcome of IDG's Hemp Operation."  (Doc. 77 at 8 ¶ 29. *See also id.* at 9 ¶ 30 [alleging that, on April 14, 2020, Dawson orally represented "that Stadtler will not rescind the sale of the Farm and take it back if Gorrie signs the [April 2020

RSA]"].)  In other words, the Gorrie Parties' theory is that under the April 2020 RSA, the Trust "trad[ed] its payment schedule with 8% interest for an opportunity to participate in the Hemp Project and potentially reap $5 million . . . ."  (*Id.* at 9 ¶ 31.)  These allegations, assumed true, are sufficient to establish that the Trust provided consideration under the April 2020 RSA.  *Gill v. Kreutzberg*, 537 P.2d 44, 46 (Ariz. Ct. App. 1975) ("Forbearance to assert a legal claim is valid consideration for a contract.").

Although the Stadtler Parties are correct that the April 2020 RSA itself makes no reference to such a promise (*see generally* Doc. 17-4), in Arizona parol evidence may be used to show consideration or lack thereof.  *Yuma Nat'l Bank v. Balsz*, 237 P. 198, 202 (Ariz. 1925) (clarifying that although testimony of conversations may not be introduced to vary the terms of a promissory note, "the parol evidence rule certainly does not exclude evidence having a legitimate bearing on the question of consideration, without which there is no contract to vary"); *Solarium Enterprises, LLC v. JW Ranch, Inc.*, 2022 WL 17685260, *2 (Ariz. Ct. App. 2022) ("The court may consider parol evidence to evaluate a failure of consideration defense to a promissory note.").  *See generally Equitable Trust Co. v. Gallagher*, 102 A.2d 538, 542 (Del. 1954) ("Experience . . . produces a multitude of instances in which, without a relaxation of the parol evidence rule to let in accompanying oral covenants, perfectly sound agreements, entered into by both parties in good faith, would be defeated by a legal technicality.  Hence, from the very inception of the practice of reporting decisions of the courts, it has consistently been held that parol evidence can be let in to prove that there was consideration for a deed, even though the deed may contain no mention of any consideration, and consequently may appear, so far as the text of the instrument is concerned, to effect a gift.  Nor has this wholesome principle lost any of its vigor with the passing of the years.") (citations omitted).  Accordingly, at this stage of the litigation, the Gorrie Parties' allegations are sufficient to demonstrate mutual consideration.  *Shattuck*, 566 P.2d at 1335 ("It is a long-standing policy of the law to interpret a contract whenever reasonable and possible in such a way as to uphold the contract.").

1

**b.**    **Statute Of Frauds**

Next, the Stadtler Parties contend that, to the extent the Gorrie Parties allege that the terms of the Promissory Note and Deed of Trust were modified, this argument fails under A.R.S. § 44-101(9) because the alleged modification was not in writing.  (Doc. 87 at 7-8.)

Section 44-101(9), Arizona's statute of frauds, provides:

> No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized . . . [u]pon a contract, promise, undertaking or commitment to loan money or to grant or extend credit, or a contract, promise, undertaking or commitment to extend, renew or modify a loan or other extension of credit involving both an amount greater than two hundred fifty thousand dollars and not made or extended primarily for personal, family or household purposes.

*Id.*  An agreement governed by § 44-101 may not be orally modified.  *See, e.g.*, *Snyder v. HSBC Bank, USA, N.A.*, 873 F. Supp. 2d 1139, 1149 (D. Ariz. 2012) ("A loan modification agreement and deed of trust agreement must be in writing and signed by the party to be charged to be enforceable.  Thus, '[a] modification to the material terms of a mortgage loan [or loan secured by a deed of trust] must also be in writing and signed.'") (citation omitted); *Exec. Towers v. Leonard*, 439 P.2d 303, 305 (Ariz. App. Ct. 1968) ("[W]here an original agreement comes within provisions of the statute of frauds requiring certain agreements to be in writing, the statute of frauds renders invalid and ineffectual a subsequent oral agreement changing the terms of the written contract.").

With the acknowledgement that the parties have not comprehensively briefed the issue—and, thus, the Court may reach a different conclusion at a future stage of the case if presented with more developed arguments—the statute of frauds does not compel dismissal of Counts One and Two because the Gorrie Parties allege that the April 2020 RSA itself, which is "in writing and signed by the party to be charged,"[43] was the mechanism for

---

[43]    The parties' briefing does not focus on the "signed by the party to be charged" requirement of § 44-101.  With that said, it appears the requirement is satisfied here.  In Arizona, "[t]he 'party to be charged' is generally defined as the party against whom the contract is sought to be enforced."  *Passey v. Great Western Associates II*, 850 P.2d 133, 137-38 (Ariz. Ct. App. 1993).  Here, the Gorrie Parties seek to enforce the April 2020 RSA

modifying the terms of the Promissory Note and Deed of Trust.  (*See, e.g.*, Doc. 77 at 18 ¶ 74 ["Stadler and the Trust have breached the [April 2020 RSA] as the result of their failure to abide by the terms of the [April 2020 RSA] which converted the Promissory Note payments to the [April 2020 RSA] payments."]; *id.* at 18 ¶ 79 ["Stadler and the Trust accepted modified payment obligations of the Promissory Note, Deed of Trust, and the [Purchase] Addendum . . . with the negotiation and execution of the [April 2020 RSA]"].).  Although the Gorrie Parties seek to rely on oral statements as parol evidence of the *consideration* underlying this writing, the writing itself is (at least according to the allegations in the Gorrie Parties' pleading) the ultimate source of the modification.

Before turning to other issues, it should be noted that the parties' briefing related to the statute of frauds is particularly bare-bones.  (Doc. 87 at 7-8; Doc. 90 at 7-10; Doc. 95 at 2-3.)  Neither side attempts to identify a case from Arizona (or elsewhere) evaluating whether a loan agreement may be modified by a subsequent signed writing that does not expressly mention the earlier loan agreement (but which may, via the use of parol evidence, be viewed as modifying the earlier agreement).  In a related vein, neither side addresses whether the substance of the April 2020 RSA was sufficiently clear and certain to effectuate a valid modification for purposes of the statute of frauds.[44]  *See generally Custis v. Valley Nat'l Bank of Phoenix*, 375 P.2d 558, 561 (Ariz. 1962) ("A memorandum sufficient to satisfy the requirements of the Statute of Frauds need not be a writing intended by the parties to be the integration of their agreement . . . [but] must . . . state with reasonable certainty the subject matter to which the contract relates and the terms and conditions of all of the promises constituting the contract.").  Separately, neither side addresses whether the claim for a "declaratory judgment" in Count Two is properly a

---

against the Trust, under the theory that the Trust agreed via the April 2020 RSA to modify the Trust's rights under certain other contracts.  Thus, the Trust seems to qualify as "the party to be charged" for purposes of § 44-101, and it is undisputed that the Trust signed the April 2020 RSA.  (Doc. 17-4 at 5.)

[44]      To the extent the Stadler Parties raise arguments about the sufficiency and substance of the April 2020 RSA, they do so only in relation to their third-party beneficiary arguments, which are addressed *infra*.

standalone claim, as opposed to simply one of the remedies the Gorrie Parties might obtain if they prevailed on Count One.  *See, e.g.*, *Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 770 (D. Ariz. 2012) ("A declaratory judgment action is a remedy for an underlying cause of action; it is not a separate cause of action as Plaintiff alleges.").  Thus, the Court's analysis here should not be viewed as prejudging any of those issues.  Harkening back once again to "the principle of party presentation," *Sineneng-Smith*, 140 S. Ct. at 1579, the Court limits itself to the dismissal argument actually raised in the Stadtler Parties' motion, which is that the statute of frauds compels dismissal of Counts One and Two because "[i]t is undisputed that the Note and DOT were **not** modified in writing."  (Doc. 87 at 7-8.)  As discussed above, this argument fails because the point is very much disputed—the Gorrie Parties argue that the April 2020 RSA, which is a writing, was the source of the modification.  Whether the April 2020 RSA was a *sufficient* writing to achieve such a modification is not fairly raised by the Stadtler Parties' motion and is thus a different question for a different day.

### c.   **Third-Party Beneficiary**

The Stadtler Parties next argue that, to the extent IGD is attempting to enforce the April 2020 RSA as a modification to the Promissory Note and Deed of Trust, "IGD lacks privity to do so."  (Doc. 87 at 8.)  They continue: "[F]or IGD to recover as a third-party beneficiary to the [April 2020 RSA], the Trust and NFOF must have indicated that intention in the [April 2020 RSA] itself.  But the [April 2020 RSA] does not even mention IGD, except to say it is the owner of the Farm, nor does it mention the Note or DOT."  (*Id.*)  In response, the Gorrie Parties argue that not only is "IGD is explicitly listed as both the owner of the Farm as well as the lessor to NFOF" in the April 2020 RSA, but it would directly benefit IGD to "extend or vary the terms of repayment of the Promissory Note."  (Doc. 90 at 9.)

This dispute arises from the fact that IGD and the Trust are the parties to the Farm Purchase Documents, whereas NFOF and the Trust are the parties to the April 2020 RSA.  "[A]s a general rule only the parties and privies to a contract may enforce it."  *Treadway*

*v. W. Cotton Oil & Ginning Co.*, 10 P.2d 371, 375 (Ariz. 1932).  *See also Lofts at Fillmore Condo. Ass'n v. Reliance Com. Const., Inc.*, 190 P.3d 733, 734 (Ariz. 2008) (same).  However, "where one person agrees with another, on a sufficient consideration, to do a thing for the benefit of a third person, the third person may enforce the agreement."  *Treadway*, 10 P.2d at 375.  "For a person to recover as a third-party beneficiary in Arizona, the contracting parties must intend to directly benefit that person and must indicate that intention in the contract itself."  *Sherman v. First Am. Title Ins. Co.*, 38 P.3d 1229, 1232 (Ariz. Ct. App. 2002).  "[T]he third person must be the real promisee.  The promise must be made to him in fact . . . and it is not enough that the contract may operate to his benefit but it must appear that the parties intended to recognize him as the primary party in interest and as privy to the promise."  *Id.* (citation omitted).  "Whether a third party is an intended or incidental beneficiary of a contract is a question of law."  *Brock Fam. P'ship, LLP v. Tellurian Dev. Co.*, 2022 WL 678040, *3 (Ariz. Ct. App. 2022).  "[I]n order to allege the right to recover as a third-party beneficiary, a complaint must include a factual allegation that the parties intended to directly benefit the plaintiff, and so indicated in the contract itself."  *Nails v. Guilbault*, 2022 WL 2132270, *3 (D. Ariz. 2022) (citations omitted).

Here, the Gorrie Parties allege that the April 2020 RSA was intended to directly benefit IGD because the only consideration given by the Trust under the agreement was "forbearance of the Trust's legal rights to rescind the contract or initiate a deed of trust or judicial foreclosure, and the written extension of IGD's payment obligations and the conversion of the same to the outcome of IDG's Hemp Operation."  (Doc. 77 at 8 ¶ 29.)  Assuming this is true, IGD was not "merely an incidental beneficiary" but the primary beneficiary of the agreement, "for whose express benefit the contract was entered into and therefore one who can maintain an action on the contract."  *Basurto v. Utah Const. & Min. Co.*, 485 P.2d 859, 863 (Ariz. App. Ct. 1971).

Whether the parties identified IGD as such in the April 2020 RSA itself is less clear.  The April 2020 RSA does not explicitly identify IGD as a third-party beneficiary.  (Doc. 17-4.)  However, it does describe the relationship between NFOF and IGD:

1

2

3

> "Natural Footprints Organic Farms . . . Leases the Farm from Innovative Global Distributions, LLC ("Farm Owner") . . . .  The Farm owner purchased the Farm from D. Stadtler 2015 Trust . . . .  [T]he Company and the Trust have agreed to share the net revenue of the Farm in accordance with Article 2 of this Revenue Sharing Agreement . . . ."

4

5

6

7

8

9

10

11

(*Id.* at 2.)  This language, viewed in the light most favorable to the Gorrie Parties, could be interpreted as demonstrating the parties' intent that IGD be the primary beneficiary of the April 2020 RSA.  It is consistent with the Gorrie Parties' explanation of why NFOF (rather than IGD) was the contracting party—specifically, that "[i]n order for the [April 2020 RSA] to make sense it ha[d] to attach the revenue share to NFOF rather than IGD because NFOF [was] the primary source of funds for the entirety of the business."  (Doc. 77 at 7-8 ¶ 28.)  Accordingly, the Stadtler Parties have not established that Counts One and Two are subject to dismissal at this stage of the proceedings.

12

### 2.    Count Three

13

14

15

In Count Three, the Gorrie Parties allege that "Stadtler and the Trust breached the [Three Acre Addendum] by failing to fund the $60,000 called for under the agreement."  (Doc. 77 at 19 ¶ 84.)

16

17

18

19

20

21

The Stadtler Parties contend that Count Three fails because the Three Acre Addendum required Stadtler to provided IGD with additional funds only if Stadtler "was provided with an accounting justifying the extra funding" and agreed that the additional funding was needed to "finish this crop."  (Doc. 87 at 9-10.)  The Stadtler Parties thus contend that by merely pleading that Stadtler failed to provide the funding, the Gorrie Parties have not alleged a breach of the Three Acre Addendum.  (*Id.* at 10.)

22

23

24

25

26

27

28

In response, the Gorrie Parties contend that Count Three does not allege that Stadtler breached the Three Acre Addendum merely by failing to provide the funding—it also alleges that Dawson (acting as Stadtler's representative) "refused to provide invoices and . . . refused to meaningfully participate in any accounting under the [Three Acre Addendum] which all parties agreed had to be conducted in a meaningful manner."  (Doc. 90 at 10.)  Also, the Gorrie Parties assert that "Stadtler told Gorrie that he would not fund irrespective of the [Three Acre Addendum] meaning that an accounting would be futile

1    because Stadtler had elected to cut off funding irrespective of an accounting." (*Id.* at

2    10-11.)[45]

3           The Court agrees that the Stadtler Parties' argument misconstrues the allegations

4    giving rise to Count Three.  Although Count Three itself alleges only that the Stadtler

5    Parties breached the Three Acre Addendum by failing to provide funding, it also

6    incorporates "all prior factual and legal allegations as if those are fully set out herein."

7    (Doc. 77 at 19 ¶¶ 83-84.)  Earlier in the pleading, the Gorrie Parties allege that Stadtler

8    violated the Three Acre Addendum by refusing to "meaningfully participate" in any

9    accounting and refusing to provide funding regardless of whether it was needed. (*Id.* at

10   15-16 ¶¶ 63, 66.)[46]  Thus, even if the Three Acre Addendum only required Stadtler to

11   provide funding when certain conditions were met (*e.g.*, when he agreed funding was

12   needed), the Gorrie Parties have adequately alleged that Stadtler breached the agreement.

13                      3.    Count Four

14          Count Four alleges that the Stadtler Parties fraudulently induced the Gorrie Parties

15   to enter into the Three Acre Addendum by making various material misrepresentations.

16   (*Id.* at 19-20 ¶¶ 86-91.)

17          The Stadtler Parties argue that Count Four should be dismissed because it is "barred

18   by the economic loss rule" and because the Gorrie Parties "failed to adequately allege . . .

19   the nine elements of fraud" with particularity.  (Doc. 87 at 10-11.)

20          …

21          …

22   _____

23   [45]       In the portion of their reply addressing Counts Three and Four, both of which arise
     from the Three Acre RSA and Three Acre Addendum, the Stadtler Parties reiterate that the
     plain language of the agreements establishes that Stadtler was not required to provide funds
24   unless he agreed they were needed (which he did not).  (Doc. 95 at 3.)

25   [46]       The Stadtler Parties also assert that the Gorrie Parties cannot plausibly allege that
     Stadtler breached the Three Acre Addendum because the Gorrie Parties' other allegations
26   establish that "a water analysis at the Farm revealed that it would not be possible to grow
     hemp at the Farm."  (Doc. 87 at 10.)  This argument mischaracterizes the Gorrie Parties'
27   allegations. (*See, e.g.*, Doc. 77 at 16 ¶ 64 ["Dawson purportedly conducted a water analysis
     and informed IGD that it was not possible to farm hemp at the farm because of the water
     chemistry."]; *id.* at 19-20 ¶ 88 ["Stadtler and the Trust . . . concocted a false narrative that
28   the water on the Farm could not support the Hemp Project . . . ."].)

a. **Economic Loss Rule**

The economic loss rule ("ELR") "limit[s] a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010). The doctrine is not applied mechanically and instead requires the court to consider the "relevant policy concerns" presented by the individual factual situation. *Id.* at 673. A federal court adjudicating state-law claims should "approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Ticknor v. Choice Hotels Int'l., Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (quoting *Gee v. Tenneco*, 615 F.2d 857, 861 (9th Cir. 1980)). "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Id.* (citation omitted). "Federal courts are not free to expand the existing scope of state law without clear guidance from the state's highest court." *Van Go LLC v. Potts*, 2016 WL 4974968, *4 (D. Ariz. 2016).

The Arizona Supreme Court has not decided whether the ELR applies to fraudulent inducement claims. "In assessing how a state's highest court would resolve a state law question—absent controlling state authority—federal courts look to existing state law without predicting potential changes in that law." *Ticknor*, 265 F.3d at 939. In *Flagstaff Affordable Housing*, the Arizona Supreme Court analyzed the scope of the ELR in the context of construction contracts and emphasized that the "principal function" of the ELR is "to encourage private ordering of economic relationships and to uphold the expectations of the parties by limiting a plaintiff to contractual remedies for loss of the benefit of the bargain." *Id.* at 669-71. Initially, lower courts in Arizona reached varying conclusions as to how the Arizona Supreme Court's view of the ELR, as enunciated in *Flagstaff Affordable Housing*, applies to fraud claims. In 2011, the Arizona Court of Appeals applied the ELR to dismiss a fraud claim based on defendants' "alleged failure to adequately perform its promises under the Agreement." *Cook v. Orkin Exterminating Co.*, 258 P.3d

149, 153 (Ariz. Ct. App. 2011).  In a footnote, the court also "reject[ed] the Cooks' argument that the ELR does not apply to their fraud and misrepresentation claims," reasoning that "a contracting party is limited wholly to its contractual remedies for purely economic loss related to the subject of the parties' contract."  *Id.* at 153 n.6.  However, in 2013, the Arizona Court of Appeals held that *Cook* "did not explicitly address the viability of a claim for fraudulent inducement under the economic loss rule."  *Shaw v. CTVT Motors, Inc.*, 300 P.3d 907, 909 (Ariz. Ct. App. 2013), *as amended* (Mar. 29, 2013).[47]  Subsequent decisions by lower courts applying Arizona law have criticized the application of the ELR to bar fraudulent inducement claims as "a misreading of [*Cook*] that the Arizona Court of Appeals clarified in *Shaw*."  *Barrett-Jackson Auction Co. LLC v. Mountain Sports Int'l Inc.*, 2020 WL 9349176, *3-4 (D. Ariz. 2020) ("If the primary function of the doctrine is 'to encourage private ordering of economic relationships and to uphold the expectations of the parties,' then certainly it would seem inapposite to hold innocent parties to limited contractual remedies when those contractual remedies were based on intentional misrepresentations made by the other party."); *Jes Solar Co. v. Matinee Energy, Inc.*, 2015 WL 10943562, *3 (D. Ariz. 2015) (arguing that the footnote in *Cook* "suggest[s] an overly broad per se ELR, which was expressly rejected in *Flagstaff*").  *See also Munderloh v. Biegler GmbH*, 2022 WL 901408, *13 (D. Ariz. 2022), *reconsideration denied in part*, 2022 WL 1122173 (D. Ariz. 2022), *and reconsideration denied*, 2022 WL 1719685 (D. Ariz. 2022) ("[T]he economic loss doctrine should not apply to claims for fraudulent inducement.").  This Court has made similar observations in earlier cases.  *BMO Harris Bank NA v. Corley*, 2022 WL 4781944, *12 (D. Ariz. 2022) (applying the ELR to bar a tortious inference claim but noting that the analysis would be different if "potential fraud related to the formation of the underlying contracts [were] alleged here").

Here, acknowledging that "[t]he borders of the rule are hazy because courts are struggling to determine precisely which tort claims are barred," *Firetrace USA, LLC v.*

---

[47]     *Shaw* addressed whether the ELR barred claims under the Consumer Fraud Act. 300 P.3d at 908.

*Jesclard*, 800 F. Supp. 2d 1042, 1050 (D. Ariz. 2010), the Court concludes the Arizona Supreme Court likely would not apply the ELR to bar the Gorrie Parties' fraudulent inducement claim. In Count Four, the Gorrie Parties allege that Stadtler and the Trust fraudulently induced the Gorrie Parties to execute the Three Acre Addendum by promising that they would "immediately fund the venture," that "the proceeds of the funds would be utilized to pay a portion of the outstanding amounts due under the Promissory Note," and that "Stadtler would act in good faith with respect to the continuation of the [Three Acre RSA] as amended by the [Three Acre Addendum]." (Doc. 77 at 19 ¶ 87.) The Gorrie Parties allege that they relied on these promises and that such reliance caused them to lose the value of the Vermont Purchase Orders. (*Id.* at 20 ¶¶ 89-90.) The Gorrie Parties further allege that "Stadtler and the Trust had no intention of ever performing under the [Three Acre Addendum]" and instead acted to "impoverish[] [the Gorrie Parties] and seiz[e] their corporate opportunity." (*Id.* at 20 ¶¶ 88, 91.)

Given these allegations, Count Four is distinguishable from the fraud claim in *Cook* in several ways. First, the Gorrie Parties' alleged injuries are not limited to the subject of the Three Acre Addendum. Thus, the *Cook* court's reasoning that, under *Flagstaff Affordable Housing*, a contracting party is limited to its contractual remedies for "purely economic loss related to the subject of the parties' contract," *see* 258 P.3d at 153 n.6, is less applicable here. Also, the Gorrie Parties allege that the Stadtler Parties, with the intent of sabotaging the hemp operation, induced the Gorrie Parties to rely on funding that the Stadtler Parties never intended to provide. (Doc. 77 at 19-20 ¶¶ 87-91.) These facts, assumed true, implicate the *Shaw* court's "concerns about applying the ELR, which exists 'to encourage private ordering of economic relationships and to uphold the expectations of the parties' to any claim of fraud in the inducement, in which it is alleged that the 'private ordering' lauded in *Flagstaff* was based on misinformation intentionally provided by one contracting party to another." 300 P.3d at 910 n.4. *See also Munderloh*, 2022 WL 901408 at *13 ("[T]he public policy behind the economic loss doctrine is not furthered when the underlying contract is procured by fraud, like it is alleged to be in this case.");

1    *Barrett-Jackson Auction*, 2020 WL 9349176 at *4 ("[T]he contract law policy of upholding

2    parties' expectations is not furthered by limiting parties to contractual remedies created as

3    a result of fraud."); *Jes Solar*, 2015 WL 10943562 at *5 ("The tort of fraudulent

4    inducement serves the purpose of ensuring the integrity of the contract negotiating process.

5    Fraud is not a loss to be bargained for by contracting parties, and the ELR has no place in

6    fraud cases simply because, as a matter of necessity, damages related to fraud will always

7    be economic.").  Accordingly, Count Four is not subject to dismissal pursuant to the ELR.

8                    b.      **Elements Of Fraud**

9           Next, the Stadtler Parties contend that Count Four fails to state a claim for fraudulent

10   inducement because it "does not allege what Mr. Stadtler misrepresented" and because

11   "IGD's alleged damages as a result of the alleged misrepresentation are not credible."

12   (Doc. 87 at 10-11.)  In response, the Gorrie Parties argue that Count Four pleads fraud with

13   adequate specificity by alleging that Stadtler falsely represented "that he would

14   immediately and timely fund the venture and that he would act in good faith" and that

15   Gorrie relied on that representation in executing the Three Acre Addendum.  (Doc. 90 at

16   11-12.)

17          To state a claim of fraudulent inducement, a plaintiff must allege "(1) a

18   representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity

19   or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the

20   manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's

21   reliance on its truth; (8) the hearer's right to rely on it; [and] (9) the hearer's consequent

22   and proximate injury." *Duncan*, 507 P.3d at 514-15.

23          Count Four states a plausible claim for fraudulent inducement.  The Gorrie Parties

24   allege that Gorrie entered into the Three Acre Addendum because Dawson "represented

25   that Stadtler would immediately fund the $60,000" and that Dawson would collaborate

26   with Gorrie to "furnish the funding in a timely manner needed to finish the crop."  (Doc.

27   77 at 14 ¶¶ 59-60.)  The Gorrie Parties further allege that these representations were false

28   and that "Stadtler's plan from the outset" was "to starve the Hemp Project with the aim of

1   taking over the project for himself and reaping the financial reward of the Hemp Project

2   while recovering the Farm and relocating IGD to a new location."  (*Id.* at 16 ¶ 66.)  These

3   factual allegations sufficiently identify the alleged misrepresentations upon which the

4   Gorrie Parties relied.[48]

5          As for damages, Count Four alleges that as a result of the Gorrie Parties' reliance

6   on the alleged misrepresentations, the hemp growing operation was unable to "provide

7   product" for the Vermont Purchase Orders, resulting in a loss of value of $7.7 million.

8   (Doc. 77 at 20 ¶¶ 90-91.)  In a conclusory sentence, the Stadtler Parties contend these

9   damages are "not credible."  (Doc. 87 at 11.)[49]

10          Given the procedural posture and the Stadtler Parties' undeveloped briefing on the

11   issue, the Court is satisfied that the Gorrie Parties have provided enough factual content to

12   state a plausible claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (a

13   complaint may survive dismissal under Rule 12(b)(6) even where "recovery is very remote

14   and unlikely").

15                    4.    Count Six

16          In Count Six, the Gorrie Parties allege that the Stadtler Parties breached the

17   covenant of good faith and fair dealing as to all of the contracts between the parties.  (Doc.

18   77 at 21 ¶¶ 99-104.)

19          The Stadtler Parties contend that Count Six fails because there is "no credible

20   allegation" that the Stadtler Parties impaired the Gorrie Parties' right to receive benefits

21

22   [48]      In their reply, the Stadtler Parties suggest that Count Four does not adequately allege
         "IGD's *reasonable* and detrimental reliance in signing" the Three Acre RSA.  (Doc. 95 at
23   3, emphasis added.)  Because this argument was not raised in their motion, the Court
         declines to address it.  *Zamani*, 491 F.3d at 997.  In any event, the Court notes that the
24   Gorrie Parties allege that their reliance on the Stadtler Parties' representations was
         reasonable "because Stadtler and the Trust appeared to want to complete the Hemp Project
25   and mutually reap the benefits, Stadtler had previously funded the project, and [the Gorrie
         Parties] could not anticipate that Stadtler and the Trust never intended to perform."  (Doc.
26   77 at 20 ¶ 89.)

27   [49]      In their reply, the Stadtler Parties belatedly attempt to provide more detail: "It is not
         credible that both NFOF and IGD were [not] free to seek funding for the Hemp Operation
28   elsewhere, including from the investors they had earlier asserted were ready to fund the
         Hemp Operation."  (Doc. 95 at 4.)  Once again, this approach is improper under *Zamani*.

from their contractual relationships.  (Doc. 87 at 12-13 ["It strains the straight face test."]; Doc. 95 at 4 [noting it is undisputed that the Gorrie Parties occupied the Farm for two years without making any payments toward the purchase price or pursuant to any of the revenue sharing agreements while receiving "well over $100,000 in additional funding from Mr. Stadtler"].)  In response, the Gorrie Parties argue their allegations "provide ample showing of a breach of the covenant and fair dealing in the respective contracts"—specifically, they allege that Stadtler never intended to perform and that Dawson (Stadtler's agent) "sabotaged the venture at every turn at Stadtler's express direction."  (Doc. 90 at 12.)

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 28 (Ariz. 2002).  "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement."  *Id.*  A party breaches the covenant "by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain."  *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 435 (Ariz. Ct. App. 2002). "Whether a party breached the covenant is a question of fact for the jury."  *Cnty. Of La Paz v. Yakima Compost Co., Inc.*, 233 P.3d 1169, 1183 (Ariz. Ct. App. 2010).

Here, the facts alleged are sufficient to state a claim for breach of the covenant of good faith and fair dealing.  True, the Gorrie Parties occupied the Farm without making payments toward the purchase price, but such conduct is not inherently inconsistent with an affirmative claim that the Stadtler Parties breached the covenant of good faith and fair dealing.  The Gorrie Parties' pleading contains numerous allegations that Stadtler acted to prevent the Gorrie Parties "from receiving the benefits and entitlements" of the various agreements underlying this litigation, including the following: (1) "at Stadtler's express direction," "Dawson undermined IGD" by "intentionally poison[ing] the hemp plants," "creat[ing] a fuel spill on the property," and verbally abusing and refusing to pay workers,

"resulting in litigation being filed against the IGD" (Doc. 77 at 12 ¶¶ 45-46); (2) as Stadtler's representative, "Dawson spent almost the entirety of the funding [provided by Stadtler to fund the hemp operations] on items for which he provided no farm related receipts . . . [or] on gas, salary and accommodations for himself" (*id.*); (3) as Stadtler's representative, Dawson "refused to meaningfully participate . . . in any accounting" to facilitate funding under the Three Acre Addendum (*id.* at 15-16 ¶ 63); and (4) the Stadtler Parties "concocted a false narrative that the water on the Farm could not support the Hemp Project" (*id.* at 19-20 ¶ 88).

### 5.   Count Nine

In Count Nine, the Gorrie Parties request that the Stadtler Parties be "estopped" from arguing that the April 2020 RSA didn't modify the Promissory Note and Purchase Addendum.  (Doc. 77 at 23 ¶¶ 114-16.)

The Stadtler Parties contend Count Nine fails because "neither the law nor the clear language of the written contracts [the Gorrie Parties] rel[y] on supports their claim that the unenforceable [April 2020 RSA] obviated IGD's contractual obligation to make payments on the [Promissory] Note" and because the Gorrie Parties are unable to show that the Promissory Note and the Deed of Trust are "unenforceable." (Doc. 87 at 13.)  In response, the Gorrie Parties contend the facts alleged establish that Stadtler's conduct caused the Gorrie Parties to refrain from seeking other financing options and to enter into the April 2020 RSA; thus, the Stadtler Parties should be estopped from arguing that the April 2020 RSA did not modify the Promissory Note and Purchase Addendum.  (Doc. 90 at 13.)[50]

As an initial matter, the Court interprets Count Nine as a claim for promissory estoppel.  *See, e.g.*, *Tiffany Inc. v. W. M. K. Transit Mix, Inc.*, 493 P.2d 1220, 1224 (Ariz. Ct. App. 1972) (although two kinds of estoppel exist, equitable estoppel and promissory

---

[50]     In their reply, the Stadtler Parties contend that the facts alleged do not establish "injury to [the Gorrie Parties] based on conduct by Mr. Stadtler and the Trust."  (Doc. 95 at 4-5 ["[I]ndeed, as stated above, [the Gorrie Parties] are the ones who have greatly benefited from [the Stadtler Parties'] conduct . . . ."].)  Because this argument was not raised in the Stadtler Parties' motion to dismiss (*see generally* Doc. 87), the Court does not address it.  *Zamani*, 491 F.3d at 997.

estoppel, only promissory estoppel is available as a cause of action for damages; "equitable estoppel is available only as a defense").[51]   "The elements of promissory estoppel are a promise, which the promissor should reasonably foresee would cause the promisee to rely, upon which the promisee actually relies to his detriment."   *Contempo Const. Co. v. Mountain States Tel. & Tel. Co.*, 736 P.2d 13, 16 (Ariz. Ct. App. 1987).   To be actionable, the alleged promise must relate "to a situation which one party promises will be true in the future" and not merely to "a past or presently existing state of facts."   *Tiffany*, 493 P.2d at 1224.   "To prove promissory estoppel, [a claimant] must show that the defendants made a promise and should have reasonably foreseen that he would rely on that promise; [the claimant] must also show that he actually relied on the promise to his detriment."   *Higginbottom v. State*, 51 P.3d 972, 977 (Ariz. Ct. App. 2002).   Additionally, the claimant must have had "a 'justifiable right to rely' on the alleged promise. 'Reliance is justified when it is reasonable, but is not justified when knowledge to the contrary exists.'"   *Id.* (internal citation omitted).

The Stadtler Parties' arguments for dismissal of Count Nine are somewhat conclusory.   After stating the elements of estoppel generally, they argue that Count Nine should be dismissed because the April 2020 RSA is either unenforceable or did not modify IGD's obligations under the Promissory Note.   (Doc. 87 at 13.)   On their face, these arguments are identical to those raised in relation to Counts One and Two and fail for the same reasons.   Also, as to the first argument, promissory estoppel is "not a theory of contract liability" and thus "may afford relief if 'some element necessary to the creation of an enforceable contract, such as consideration, is not present.'"   *Double AA Builders, Ltd. v. Grand State Const. L.L.C.*, 114 P.3d 835, 843-44 (Ariz. Ct. App. 2005).

Nevertheless, the Stadtler Parties' arguments could be generously interpreted as asserting that the factual allegations underlying Count Nine do not demonstrate that

---

[51]   The Gorrie Parties' failure to identify Count Nine as such is not fatal.   *Moreno v. Minnesota Life Ins. Co.*, 2015 WL 1457419, *9 (D. Ariz. 2015) ("Arizona courts have acknowledged that there is no Arizona authority for the proposition that estoppel must be specifically plead as equitable or promissory estoppel.") (internal quotation marks omitted).

Stadtler made a promise that reasonably justified IGD's failure to make payments on the Promissory Note. (*See* Doc. 87 at 13.)[52] Count Nine alleges that the Stadtler Parties induced the Gorrie Parties to execute the April 2020 RSA (under which the Trust was entitled to a certain percentage of the hemp operation's revenue) by promising to refrain from enforcing the payment terms of the Promissory Note and Purchase Addendum. (Doc. 77 at 23 ¶¶ 114-16.) According to the Gorrie Parties, their reliance on this promise was reasonable because the Stadtler Parties chose to refrain from cancelling the sale of the Farm (despite having the right to do so under the Purchase Addendum) when IGD did not timely make the $240,000 payment; instead, the Stadtler Parties agreed to the April 2020 RSA. (*Id.* at 7-9 ¶¶ 26-29, 23 ¶¶ 114-15.)[53] This reliance was to their detriment because Stadtler sent a default notice to IGD on July 1, 2021. (*Id.* at 16-17 ¶¶ 67-68.)

Taking these allegations as true, Count Nine states a plausible claim for promissory estoppel by pleading a promise related to future conduct (*i.e.*, the promise to refrain from enforcing the original payment schedule) that caused the Gorrie Parties to halt their search for additional financing sources for the Farm, which proved detrimental to the Gorrie Parties when Stadtler issued the notice of default. *Cf. Tiffany*, 493 P.2d at 1225 (finding the elements of promissory estoppel were met where the "defendant promised to supply class C sealcoat chips at a price of $3.50 per ton," the plaintiff "relied to his detriment on this promise in that it subsequently used the quote to secure its successful bid from the Highway Department," and "the defendant should reasonably have foreseen that plaintiff would rely on the quote and use it in its bid, if the quote were the lowest").

The Stadtler Parties also argue that Count Nine fails because the Gorrie Parties do not allege that the Promissory Note and the Deed of Trust are "unenforceable." (Doc. 87

---

[52] Although generous, the Court views this interpretation as a reasonable understanding of the Stadtler Parties' briefing on the issue, particularly given the elements of a promissory estoppel claim.

[53] The Court acknowledges that this is a liberal interpretation of Count Nine, which neither states for what the "additional financing options" would have been used nor why the reliance was "to their detriment." (*See* Doc. 77 at 23 ¶¶ 114-16.) However, given the procedural posture and that Count Nine incorporates all prior allegations (*Id.* at 23 ¶ 114), the Gorrie Parties have pleaded sufficient facts to support a cognizable claim for relief.

at 13.)  However, the Stadtler Parties do not provide, nor can this Court find, any authority indicating that the Gorrie Parties must plead the existence of an unenforceable contract to state a cognizable claim for promissory estoppel.  The Federal Rules of Civil Procedure "explicitly authorize litigants to present alternative and inconsistent pleadings." *Molsbergen v. United States*, 757 F.2d 1016, 1018 (9th Cir. 1985).  *See also* Fed. R. Civ. P. 8(d)(1), (2).  In Arizona, promissory estoppel may be pleaded as an alternative to a breach of contract claim.  *AROK Const. Co. v. Indian Const. Servs.*, 848 P.2d 870, 878-79 (Ariz. Ct. App. 1993) ("AROK also claims that it is entitled to relief based upon promissory estoppel.  We hold that this is a proper claim for relief as an alternative to the contract claim.").  Here, the Gorrie Parties' allegations suggest they are asserting promissory estoppel as an alternative theory of recovery if the Court determines that the April 2020 RSA (or perhaps the alleged conversations with Dawson, *i.e.*, an oral agreement) is unenforceable.

### 6. Count Ten

Count Ten alleges that the Stadtler Parties breached the fiduciary duties they owed the Gorrie Parties as joint venturers.  (Doc. 77 at 23 ¶¶ 117-21.)

The Stadtler Parties contend that Count Ten should be dismissed because the parties were not joint venturers.  (Doc. 87 at 13-14.)  Instead, the Stadtler Parties argue that as mere "parties to a series of commercial transactions," they did not owe any fiduciary duties to the Gorrie Parties.  (*Id.* at 14.)  Alternatively, "even if there was such a duty, . . . [the Gorrie Parties] do not adequately explain how Mr. Stadtler or the Trust would have breached it."  (*Id.*)

### a. **Joint Venture**

The Gorrie Parties allege that the parties were joint venturers "as the result of the joint ventures as provided through the respective contracts."  (Doc. 77 at 23 ¶ 118.)  The Stadtler Parties challenge this assertion, focusing on the draft joint venture agreement, which the parties agree was never executed.  (Doc. 87 at 13-14.)  In response, the Gorrie Parties clarify that Count Ten is based on all of the various contracts executed among the

parties, not "an unsigned draft document."  (Doc. 90 at 13.  *See also id.* ["[T]he parties had contracts, a common purpose of growing hemp for profit and for paying off the Farm, a community of interest in seeing the venture succeed, and an equal right of control as Stadtler insisted that Mr. Dawson act as a farm manager on the project and control the funding."].)

"A joint venture (or as sometimes called, adventure) is a special relationship between two or more parties to engage in and carry out a single business venture for joint profit without any actual partnership or corporation designation." *Helfenbein v. Barae Inv. Co.*, 508 P.2d 101, 104 (Ariz. Appt. Ct. 1973).  "Such relationship which arises out of express or implied contract is founded upon mutual understanding and agreement between the adventurers . . . and arises only where they intend to associate themselves as such.  Such intent may be inferred from the acts and conduct of the parties." *Id.* (internal citations omitted).  "The elements of a business joint venture generally include: (1) an agreement, (2) a common purpose, (3) a community of interest, (4) an equal right of control, and (5) participation in profits and losses." *Est. of Hernandez by Hernandez-Wheeler v. Flavio*, 930 P.2d 1309, 1312 (Ariz. 1997).[54]

Here, as for the first element, the Gorrie Parties allege that the parties executed several contracts, including the April 2020 RSA (Doc. 77 at 7-9 ¶¶ 27-29), the Three Acre RSA and Personal Loan (*id.* at 10-11 ¶¶ 37-41), and the Three Acre Addendum (*id.* at 14-15 ¶¶ 58-60).

As for the second element, the Gorrie Parties allege that the parties had a common purpose of creating and reaping profits from a successful hemp growing operation on the Farm.  (*See, e.g.*, Doc. 77 at 7 ¶ 27 [alleging that instead of cancelling the Farm sale, Stadtler "decide[d] to enter into a revenue share agreement that transformed the arrangement between the parties of simply lender and borrower to joint venturers, and extended the timeframe for payment out to 5 years"]; *id.* at 11 ¶ 43 ["In late February of

---

[54]      In contrast, a social joint venture requires only the first four elements.  *Est. of Hernandez*, 930 P.2d at 1312.

2021, Stadtler flew into Phoenix to meet with Gorrie, tour the Farm and review the progress of the new joint venture."].)

As for the third element, the Gorrie Parties allege that the parties would mutually benefit if the hemp operation succeeded.  (*See, e.g.*, Doc. 77 at 9 ¶ 31 [under the April 2020 RSA, the Trust would "trading its payment schedule with 8% interest for an opportunity to participate in the Hemp Project and potentially reap $5 million from the sale [of hemp products]"]; *id.* at 10-11 ¶ 39 [under the Three Acre RSA, profits from the hemp operation (above the amounts invested by the parties) "were to be split equally between the parties"]; *id.* at 14-15 ¶ 60 [under Three Acre Addendum, "after the loan from Stadtler had been repaid," the remaining proceeds from hemp sales would be divided between Stadtler, Gorrie, and the outstanding balance due on the Farm].)  Thus, the Gorrie Parties have pleaded a community of interest in the object of the enterprise.

As for the fourth element, "[t]he test is whether there is a right of mutual control over the subject matter of the venture, that is, the means by which the parties intend to obtain their objective." *Ellingson v. Sloan*, 527 P.2d 1100, 1103-04 (Ariz. App. Ct. 1974). The Stadtler Parties contend that the parties' relationship was that of lender-borrower, not joint venturers, because the parties did not have "equality of control."  (Doc. 95 at 5.)[55]

---

[55]    The Stadtler Parties raise the "lender-borrower" argument for the first time in their reply, and thus the Court need not address it.  *Zamani*, 491 F.3d at 997.  Nevertheless, even properly raised, this argument would not change the Court's decision.  Although Arizona courts have generally been reluctant to find a fiduciary relationship between a lender and borrower, one may exist where "the lender's activities clearly exceed those of a normal money lender."  *Murry v. W. Am. Mortg. Co.*, 604 P.2d 651, 653 (Ariz. Ct. App. 1979). For example, in *Murry*, the Arizona Court of Appeals discussed a decision by the California Supreme Court, *Connor v. Great Western Savings & Loan Assoc.*, 447 P.2d 609 (Cal. 1968), which held a lender can be liable to home buyers for damages caused by defective construction.  604 P.2d at 653.  *Murry* noted that *Connor* had involved a lender that was "more than a lender content to lend money" and instead "an active participant in a home construction enterprise" with "substantial control over the development."  *Id.* ("Subsequent cases have rejected a broad reading of *Connor* . . . .").  Here, the counterclaims describe the Stadtler Parties' role in the hemp growing operation as far more substantial than that of a "normal money lender."  (*See, e.g.*, Doc. 77 at 7-8 ¶ 28 [describing "the parties intent that Stadtler would get a revenue share on the entire business"]; *id.* at 8-9 ¶¶ 29-31 [alleging that, under the April 2020 RSA, "the Trust . . . trad[ed] its payment schedule . . . for an opportunity to participate in the Hemp Project"]; *id.* at 10-11 ¶¶ 38-41 [alleging that the Three Acre RSA required IGD to forward its receipts to a bookkeeping service selected by Stadtler and that "Dawson maintain full control over all funds allocated to the project"]; *id.* at 12-13 ¶¶ 49-52 [describing a meeting, arranged by Stadtler, about

However, the mutual control element does not require that "each venturer must have an equivalent amount of control over the venture's operation," but instead that "each joint venturer must share, to some extent, in the control of the venture." *Hernandez-Wheeler*, 930 P.2d at 1313. Additionally, "[t]he rights of the parties with respect to the management and control of the enterprises may be fixed by agreement so as to effectively place control in the hands of one of the joint venturers." *James Weller, Inc. v. Hansen*, 517 P.2d 1110, 1116 (Ariz. Ct. App. 1973) (citation omitted). Here, the facts alleged are sufficient to demonstrate joint control of the hemp operation. The Gorrie Parties held title to the Farm (Doc. 77 at 7 ¶ 23), sought other funding for the project (*id.* at 9-10 ¶ 32), prepared the land for growing and bought various irrigation infrastructure (*id.*), and negotiated and entered into a large purchase order for hemp (*id.* at 10 ¶ 34).[56] Meanwhile, the Stadtler Parties "control[led] the expenditure of the funds" and "assume[d] managerial responsibilities at the Farm." (*Id.* at 12 ¶ 45.) Also, the Gorrie Parties allege various misconduct by Dawson that indicates he was physically present at the Farm, had the authority to dictate the nutritional balance used for the hemp plants and decide whether employees were paid, and was present for calls with outside investors. (Doc. 77 at 12 ¶ 46, 15 ¶ 62.) The Gorrie Parties also allege that Stadtler required IGD to "enter into a joint venture with Houchin" (*id.* at 14 ¶ 57) and insisted "Houchin would be the sole investor in the property" (*id.* at 15 ¶ 62). Assumed true, these facts show that both parties had some degree of control and participated in the direction and course of the alleged joint venture.

For similar reasons, the facts alleged demonstrate that both parties participated in the gains and losses of the joint venture. "The term 'losses' is not limited to monetary losses, but includes time expenditures and out-of-pocket expenses, especially where one party in a joint venture furnishes property and the other only services." *Ellingson*, 527 P.2d

---

the possibility of Houchin investing in the hemp operation].

[56] Some of these responsibilities were explicitly pursuant to the agreements between the parties—under the Three Acre RSA, for example, "IGD [was] responsible for furnishing the Farm to grow the crop on" and "for the cultivation and processing of . . . the harvested crop." (*Id.* at 10-11 ¶ 39.)

at 1103.  According to the Gorrie Parties, if the hemp operation succeeded, the parties shared the profits; if the hemp operation suffered losses, Stadtler would not be repaid for his investments and the Gorrie Parties would risk losing the value of the hemp purchase orders and their efforts to substantially improve the Farm (*e.g.*, "by preparing the land for growing") would be in vain.  (Doc. 77 at 7-10 ¶¶ 27-39; 14-16 ¶¶ 57-63.)  *See also Ellingson*, 527 P.2d at 1103 ("By agreeing to an exchange of services for a share of the profits to be derived from the joint venture, the parties provided for Sloan's participation in any losses.").

Accordingly, the Gorrie Parties have adequately pleaded the existence of a joint venture between the parties.  This conclusion is supported by the general rule that "whether the relationship of joint venturers exists depends upon the intention of the parties." *Tiffany Const. Co. v. Hancock & Kelley Const. Co.*, 539 P.2d 978, 983 (Ariz. App. Ct. 1975). "Such intent may be inferred from the acts and conduct of the parties.  Resolution of this issue is for the trier of fact." *Helfenbein*, 508 P.2d 101 at 104 (internal citations omitted). *See also Mann v. GTCR Golder Rauner, L.L.C.*, 425 F. Supp. 2d 1015, 1023 (D. Ariz. 2006) (finding a genuine issue of material fact as to the parties' intent to form a joint venture and noting "[g]enerally, it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment"); *Ellingson*, 527 P.2d at 1104 ("Where there is a question as to the existence or nature of a joint venture, each case must be resolved upon its own facts.").

### b.     **Breach Of Fiduciary Duty**

The Stadtler Parties contend that, even if the parties were joint venturers, Count Ten still fails because "[the Gorrie Parties] do not adequately explain how Mr. Stadtler or the Trust would have breached [their fiduciary duties]."  (Doc. 87 at 14.)  In response, the Gorrie Parties seem to suggest that because "the parties were joint venturers," it necessarily follows that they "owed each other fiduciary duties."  (Doc. 90 at 13.)

"Partnerships, joint ventures, and corporations are all owed fiduciary duties by those empowered to act on behalf of such businesses." *In re Sky Harbor Hotel Properties, LLC*,

443 P.3d 21, 23 (Ariz. 2019).  *See also Marmis v. Solot Co.*, 573 P.2d 899, 902 (Ariz. Ct. App. 1977) (suggesting that joint ventures create "concomitant fiduciary obligations between the joint venturers").  The fiduciary obligations between joint venturers, which may include "good faith, loyalty, fairness, and honesty," "must be determined from the contract of the parties and the nature of the joint venture."  *Marmis*, 573 P.2d at 902-03 (internal quotation marks omitted).

The Gorrie Parties' operative pleading is replete with allegations that, if true, could constitute a breach of the fiduciary duties the Stadtler Parties owed to the Gorrie Parties as joint venturers.  To name a few, the Gorrie Parties allege that (1) "Dawson intentionally poisoned the hemp plants by using an improper nutrition balance" (Doc. 77 at 12 ¶ 46); (2) "Dawson . . . verbally abused workers and refused to pay workers resulting in litigation being filed against the IGD" (*id.*); (3) "Dawson spent almost the entirety of the funding [from Stadtler] on items for which he provided no farm related receipts for cash withdrawals, and those that he did, he spent on gas, salary and accommodations for himself" (*id.*); (4) Dawson "sabotage[d]" calls with potential investors (*id.* at 15 ¶ 62); (5) Stadtler dissuaded outside investors by insisting "Houchin would be the sole investor" (*id.*); and (6) the Stadtler Parties "concocted a false narrative that the water on the Farm could not support the Hemp Project" (*id.* at 19-20 ¶¶ 88).  Accordingly, Count Ten is not dismissed on this ground.[57]

…

…

…

---

[57]   The Stadtler Parties also request that the Court award them attorneys' fees under A.R.S. § 12-341.01 because the Gorrie Parties' counterclaims "arise out of contract." (Doc. 87 at 14.)  The Court declines to do so, at least at this stage of the case.  The Stadtler Parties' motion resulted in the dismissal of only a handful of the Gorrie Parties' counterclaims and some of the remaining counterclaims sound in contract.  The Stadtler Parties have also asserted their own contract-based claims that remain unresolved.  It is far too early to make any determinations regarding fee-shifting under § 12-341.01.  *See generally Cramton v. Grabbagreen Franchising LLC*, 2022 WL 1719687, *19-20 (D. Ariz. 2022) (discussing the complexity of the fee-shifting analysis under § 12-341.01 in multi-party cases involving both tort and contract claims).

IV.     The Gorrie Parties' Motion For Partial Dismissal Of The SAC

The Gorrie Parties move to dismiss Counts One through Five of the SAC under Rule 12(b)(6).  (Doc. 136.)  In response, the Stadtler Parties move to strike the Gorrie Parties' motion to dismiss as procedurally improper under Rule 12(h).  (Doc. 142.)

The following procedural history provides context for these dueling motions.  On May 2, 2022, the Stadtler Parties filed the FAC.  (Doc. 25.)  On May 27, 2022, the Gorrie Parties answered the FAC.  (Doc. 38.)  On July 14, 2022, the Gorrie Parties answered the FAC.  (Doc. 77.)  On October 29, 2022, after a full briefing (Docs. 103, 109, 114, 115, 123, 126), the Court granted the Stadtler Parties leave to file the SAC.  (Doc. 129.)  On December 5, 2022, the Stadtler Parties did so.  (Doc. 131.)  On December 19, 2022, the Gorrie Parties move to dismiss Counts One through Five of the SAC.  (Doc. 136.)  The Stadtler Parties filed a response opposing dismissal and, concurrently, a motion to strike the Gorrie Parties' motion, arguing that the Gorrie Parties are precluded from filing a Rule 12(b)(6) motion by Rule 12(h).  (Doc. 142.)  More specifically, the Stadtler Parties argue that because the Gorrie Parties answered the FAC and Counts One through Five of the SAC are "essentially the same" as Counts Three through Seven of the FAC, their motion to dismiss is impermissible under Rule 12(h)(2).  (*Id.* at 4-5.)  Noting the Gorrie Parties have not filed a timely answer to the SAC, the Stadtler Parties ask the Court to either "enter a judgment against the [Gorrie Parties] pursuant to Rule 55 . . . and request a hearing on the default judgment" or "require [the Gorrie Parties] to file an answer to the SAC."  (*Id.* at 5.)

The Stadtler Parties are correct that the Gorrie Parties' Rule 12(b)(6) motion is untimely.  The Gorrie Parties filed an answer to the claims now alleged in Counts One through Five of the SAC in July 2022, nearly half a year before they filed the pending motion to dismiss.[58]  The approach is verboten under Rule 12(b), which provides that "[a] motion asserting any of [the Rule 12(b)] defenses must be made before pleading if a

---

[58]     The SAC did not include any new claims as compared to the FAC.  (*Compare* Doc. 25 ¶¶ 123-72 *with* Doc. 131 ¶¶ 107-75.)  More specifically, the FAC asserted nine claims. (Doc. 25 ¶¶ 123-72.)  The SAC asserted six of the nine claims from the FAC, omitting claims for receivership, breach of the April 2020 RSA, and promissory estoppel.  (Doc. 131 ¶¶ 123-72.)

responsive pleading is allowed."  Moreover, "[t]he filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to the amendment of the pleading." *Jaeger v. Howmedica Osteonics Corp.*, 2016 WL 520985, *4 (N.D. Cal. 2016) (internal quotation marks omitted).

With that said, "it is well recognized that a district court may treat an untimely motion to dismiss under Rule 12(b)(6) as a motion for judgment on the pleadings under Rule 12(c)." *Cartessa Aesthetics LLC v. Aesthetics Biomedical Inc.*, 2021 WL 778541, *4 (D. Ariz. 2021). *See also Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 954 (9th Cir. 2004) ("A Rule 12(b)(6) motion must be made *before* the responsive pleading.  Here, the Defendants filed their motion to dismiss *after* filing their answer.  Thus, the motion should have been treated as a motion for judgment on the pleadings, pursuant to Rule 12(c) or 12(h)(2).") (citation omitted).  The Ninth Circuit has lauded the "practical wisdom" of this approach, which promotes efficiency.  *Cf. In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 317-19 (9th Cir. 2017). *See also* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 12, at 344 (2022) ("Technically, a 'Rule 12(b)(6)' motion filed after the defendant has answered is procedurally improper.  That being said, . . . [t]he very sensible prevailing practice of the courts is to treat a post-answer 'Rule 12(b)(6)' motion as a Rule 12(c) motion.").

Here, although the claims alleged in the SAC are essentially identical to those alleged in FAC, and thus the arguments now raised in the Gorrie Parties' motion to dismiss were available to them when they answered the FAC,[59] reaching the merits of their motion to dismiss furthers the interests of judicial economy.  If the Court rejected the Gorrie Parties' motion to dismiss on procedural grounds now, they could simply answer the SAC and refile the same motion under Rule 12(c), which is "functionally identical" to a Rule 12(b)(6) motion.  *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

---

[59]     In fact, it appears counsel for the Gorrie Parties may have taken a motion intended to address the FAC and filed it in relation to the SAC, as the motion refers to the claims by their count numbers in the FAC and addresses claims that the Stadler Parties omitted from the SAC.  (*See, e.g.*, Doc. 136 at 15-16 [arguing for dismissal of a promissory estoppel claim].)

1047, 1054-55 n.4 (9th Cir. 2011) ("Rule 12(c) is 'functionally identical' to Rule 12(b)(6) and . . . 'the same standard of review' applies to motions brought under either rule."). Addressing the merits now will avoid the unnecessary duplication of resources.

Accordingly, the Court will treat the Gorrie Parties' motion to dismiss as a motion for judgment on the pleadings. *See also* Fed. R. Civ. P. 1 (the Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding").

A.    **Additional Background**

The following additional facts are derived from the SAC and are presumed true for purposes of the Gorrie Parties' motion.

In 2019, Gorrie and Dawson began discussing the possibility of IGD purchasing the Farm. (Doc. 131 ¶¶ 12-14.) During those discussions, Gorrie represented to Dawson "that she had the financial wherewithal to purchase the [Farm] and had the financing and expertise to run a profitable hemp growing operation." (*Id.* ¶ 16. *See also id.* ¶¶ 17-28 [describing various specific representations by Gorrie].) However, according to the Stadtler Parties, those representations were false. For example, "Gorrie falsely represented prior to closing that IGD had already filed all of the requisite forms for the Hemp license and paid the filing fee to obtain this license." (*Id.* ¶ 28.) Additionally, around January 13, 2020, "Gorrie showed Mr. Dawson a Bank of America account showing a $5 million deposit that she misrepresented to Mr. Dawson was available to her . . . to purchase the [Farm] and begin the Hemp Operation." (*Id.* ¶ 31.)

Relying on Gorrie's representations, on January 17, 2020, the Trust and IGD executed the Farm Purchase Agreement, under which IGD would purchase the Farm for $1.4 million. (*Id.* ¶¶ 34-35.) The Farm Purchase Agreement also provided that IGD would pay $20,000 in "earnest money" upon signing and another $280,000 at closing. (*Id.* ¶ 34.) IGD would then remit the remaining $1.1 million to the Trust "in payments according to an agreed-upon payment schedule over 18 months." (*Id.*)

Around the same time, Gorrie and Dawson met with several "Canadian Investors"

in Arizona.  (*Id.* ¶ 36.)  Two of the investors "reaffirmed to Mr. Dawson that they would provide several hundred thousand dollars to fund Ms. Gorrie and her entities' acquisition of the [Farm] and commencement of the Hemp Operation on the same terms that Ms. Gorrie had previously represented to Mr. Dawson . . . could be performed."  (*Id.* ¶ 37.)

On January 27, 2020, one of the investors "wired $20,000[] to Pioneer Title as the earnest money to be paid under the Farm Purchase Agreement."  (*Id.* ¶ 40.)  However, the investors ultimately did not invest "anywhere near the amount of money Ms. Gorrie had misrepresented to Mr. Dawson . . . that they would."  (*Id.* ¶ 38.)

On February 6, 2020, Gorrie sent Dawson "evidence to show that . . . two 'reps and silent partners' were ready to invest $5 million in the purchase of the [Farm]" and in the hemp growing operations.  (*Id.* ¶ 41.)

On February 10, 2020, "Gorrie represented that [the] investors 'need us to close the property and the fund will be build (sic) once we have a company running.'"  (*Id.* ¶ 42.  *See also id.* ¶¶ 43-44 [alleging that Gorrie represented to Dawson that the investors "would not be able to loan any funds to acquire the [Farm] and fund the Hemp Operation until after closing"].)  Therefore, Gorrie requested that "Stadtler lower the down payment for the purchase of the [Farm]" to $60,000, with $240,000 due 30 days after closing, "so that her investors would enough time to fund the remaining down payment for the purchase of the [Farm] and capitalize the Hemp Operation so it could get off the ground in a prompt manner."  (*Id.* ¶ 45.)

On February 11, 2020, relying on "Gorrie's assertion that IGD had funding available once the Parties closed on the [Farm]," "Stadtler agreed to sign an [Purchase] Addendum," which lowered the down payment to $60,000 and required IGD to pay an additional $240,000 within 30 days of closing.  (*Id.* ¶ 46.)

The same day, "Gorrie signed a Promissory Note Secured by Deed of Trust and the Deed of Trust . . . with IGD as Payor and the Trust as Beneficiary" for $1.34 million.  (*Id.* ¶ 47.)  Under the Promissory Note, $240,000 was due on March 27, 2020; another payment was due on July 7, 2020, another on January 6, 2021, and the entire principal and interest

were due on or before August 7, 2021.  (*Id.* ¶ 48.)  The same day, Gorrie and Stadtler signed a "Supplement to Escrow Instructions," under which "Gorrie agreed to personally guarantee the Promissory Note."  (*Id.* ¶ 49.)

On February 18, 2020, "Gorrie forwarded an email from The Funding Ninjas stating it could invest in IGD's business if she would send documentation related to officers, assets, [and] cash flow."  (*Id.* ¶ 51.)  Gorrie stated: "This guy is serious.  Needs this and can close."  (*Id.*)  However, she did not send the requested information to the Funding Ninjas, who ultimately "never invested in IGD or NFOF."  (*Id.* ¶ 52.)

On February 21, 2020, one of the Canadian investors wired $30,000 to Pioneer Title as part of the down payment for the Farm.  (*Id.* ¶ 53.)  On February 26, 2020, a different Canadian investor wired another $10,000 to Pioneer Title, completing the $60,000 down payment.  (*Id.* ¶ 54.)

On February 27, 2020, "Gorrie made her sole monetary investment in the purchase of the [Farm] by sending a Fry's Food Store money order for $352.58 to Pioneer Title to fund closing costs."  (*Id.* ¶ 55.)

The same day, the sale of the Farm closed and title was recorded in IGD's name.  (*Id.* ¶ 56.)  However, as of closing, neither IGD nor Gorrie had "a license to grow and harvest hemp" or funding for the $240,000 payment (which was due at the end of March 2020).  (*Id.* ¶¶ 57-58.)

On March 11, 2020, Gorrie told Dawson that "she had secured $20 million in financing from a hard money lender called Main Street Lending."  (*Id.* ¶ 59.)[60]  However, "[t]his funding never materialized."  (*Id.* ¶ 60.)

The Stadtler Parties allege that "[a]fter closing, it soon became clear Ms. Gorrie did not know how to go about getting a Hemp Operation up and running.  (*Id.* ¶ 62.)[61]  "By

---

[60]     "Post-closing Mr. Dawson continued in his role as agent for Mr. Stadtler.  All the material conversations and material information Ms. Gorrie had or gave to Mr. Dawson throughout the post-closing were passed on in precise detail to Mr. Stadtler by Mr. Dawson."  (*Id.* ¶ 61.)

[61]     The SAC provides several examples illustrating Gorrie's alleged lack of know-how.  (*See, e.g.*, *id.* ¶¶ 63-65.)

mid-March, Ms. Gorrie and IGD had not secured liability insurance for the [Farm]" and "Gorrie had no funding for IGD to make payments on the [Farm] or to fund the startup of the Hemp Operation."  (*Id.* ¶¶ 65-66.)  On March 15, 2020, Gorrie asked Dawson where she could get a $200,000 loan.  (*Id.* ¶ 67.)

"By the end of March 2020, Ms. Gorrie had defaulted on the Promissory Note by failing to pay the $240,000[] within 30 days of closing."  (*Id.* ¶ 68.)[62]

"After she defaulted on the Promissory Note, Ms. Gorrie began to represent to Mr. Dawson that she had entered into negotiations with a new investment group based in Australia" that could "provide the full purchase price to acquire the [Farm] and capitalize the Hemp Operation in the form of a loan."  (*Id.* ¶¶ 70, 72.)  She "also represented that she could obtain financing from a former State Senator Silver and/or investors associated with him."  (*Id.* ¶ 71.)  However, the Gorrie Parties "never secured funding from any source." (*Id.* ¶ 74.)

At the end of March 2020, "Gorrie's then-attorney . . . drafted a proposed Revenue Sharing Agreement between NFOF and the Trust for the Hemp Operation."  (*Id.* ¶ 75.)  At that time, NFOF was leasing the Farm from IGD for the hemp operation.  (*Id.* ¶ 76.)  On April 10, 2020, IGD and the Trust executed the April 2020 RSA.  (*Id.* ¶ 77.)  The April 2020 RSA did not contain any language modifying the terms of the Farm Purchase Agreement, Promissory Note, or Deed of Trust.  (*Id.* ¶ 81.)  The Stadtler Parties contend that "[t]he Trust was not required to provide any consideration" under the April 2020 RSA. (*Id.* ¶ 78.)  Additionally, the agreement "did not require NFOF to actually generate any revenue such that no performance by NFOF was actually required if the Hemp Operation did not generate revenue."  (*Id.* ¶ 79.)

In July 2020, Gorrie told Dawson that she was communicating with "Senator Silver and Charles Arnold of RBC Hemp," both of whom were interested in investing in the hemp operation, but that "she was reluctant to give Senator Silver or Mr. Arnold controlling

---

[62]   At that time, "Stadtler was undergoing treatment for an illness."  (*Id.* ¶ 69.) Therefore, he asked Dawson "to continue to help him with the [Farm]."  (*Id.*)

equity in the Hemp Operation." (*Id.* ¶ 83.)

The Stadtler Parties allege that Gorrie convinced Dawson that "any minute[] she would be getting funding to pay for the [Farm] and the Hemp Operation" by "forward[ing] multiple introductory emails with possible lenders, investors, buyers, and business channels as evidence she was about to sign a contract for financing" and also "Googled potential avenues of funding and business and forward[ing] the ideas to investors and Mr. Dawson." (*Id.* ¶¶ 84-85.)  However, "she never actually followed through or took the steps necessary to make any of it happen." (*Id.* ¶ 84.)  "When Mr. Dawson pressed her for information on why the funding was not forthcoming, Ms. Gorrie would claim either that the investors wanted too big of a share, were frauds, or that the inquiry was disrespectful and inappropriate." (*Id.* ¶ 86.)[63]  At some point, "Gorrie began claiming that obtaining funding was less important than obtaining purchase orders." (*Id.* ¶ 88.)  "This conduct continued for the remainder of 2020, into January 2021, and beyond." (*Id.* ¶ 91.)

"In late December 2020, the Hemp Operation was struggling." (*Id.* ¶ 92.)  "Gorrie contacted Mr. Dawson regarding the possibility of obtaining additional funding from Mr. Stadtler or the Trust." (*Id.* ¶ 93.)  She stated that if the operation had a successful crop, "investors such as Senator Silver or the other groups of investors that Ms. Gorrie represented she was in negotiations with during this time period would be more likely to invest in the [Farm] and in the Hemp Operation." (*Id.* ¶ 94.)  "In other words, Ms. Gorrie claimed she needed money to start a 'showroom model' of what she could grow," and that "if she could just get a 'Model Home' to display as evidence of her potential success," investors would provide funding and "she would be able to pay her debt." (*Id.* ¶ 95.)  In pursuit of this goal, in January 2021, Gorrie asked Stadtler to fund the cost of starting hemp

---

[63]      Also, "Gorrie repeatedly misrepresented that the Hemp Operation was instrumental to her getting a visa to remain in the United State[s], that the expiration of her visa was imminent, and that if she lost the Hemp Operation, she would not get another visa and would be deported." (*Id.* ¶ 87.)  "Whenever she had a disagreement with Mr. Dawson or anyone else about the Property or Hemp Operations, she would claim the person was 'destroying her visa' or 'in the way of my immigration' or some other immigration-related accusation." (*Id.* ¶ 110.)  However, "[a]ll of Ms. Gorrie's assertions relating to her immigration status being linked to the Hemp Operation turned out to be false." (*Id.* ¶ 90.)

operations on a small three-acre parcel of the Farm, which would then serve as an "example of success to show her purported investors and buyers." (*Id.* ¶ 96.)

On January 10, 2021, IGD and Stadtler signed the Three Acre RSA, under which IGD would provide "the land, management, purchase of seed, care, harvesting, and a UCC 1 lien on the crop 'for cost of investment provided by Stadtler'" in exchange for a $75,000 line of credit from Stadtler. (*Id.* ¶¶ 97-98.) IGD would use the revenue generated by the three-acre operation to repay the credit used. (*Id.* ¶ 98.) Pursuant to the Three Acre RSA, "Stadtler loaned at least $75,000[] to IGD." (*Id.* ¶ 106.) However, "IGD never registered the requisite UCC 1 lien" and "never used any revenue generated from the three-acre Hemp Operation to repay Mr. Stadtler." (*Id.* ¶¶ 99-100.)

In conjunction with the Three Acre RSA, Stadtler and IGD also signed a Personal Loan, under which Gorrie personally guaranteed Stadtler's $75,000 loan to IGD. (*Id.* ¶ 102.)[64] Neither the Three Acre RSA nor the Personal Loan altered IGD's obligations under the Promissory Note. (*Id.* ¶¶ 101-05.)

By late April 2021, "Gorrie had yet to obtain a successful, commercially significant yield" and "remained in default under the Promissory Note and Deed of Trust." (*Id.* ¶¶ 107-08.)

On May 11, 2021, after discussing (but not signing) a possible joint venture agreement, IGD and Stadtler instead executed the Three Acre Addendum, which modified the Three Acre RSA by, among other things, increasing the three acres to six acres, altering the parties' respective obligations (increasing IGD's farming obligations and adding another line of credit from Stadtler), and changing the distribution of profits going forward. (*Id.* ¶¶ 111-17.) Like the Three Acre RSA, the Three Acre Addendum did not change the parties' obligations under the original Promissory Note and Deed of Trust. (*Id.* ¶¶ 118-19.)

Ultimately, "Gorrie, IG and NFOF defaulted on every agreement they signed with Mr. Stadtler and the Trust." (*Id.* ¶ 120.) The only payment the Gorrie Parties made was the original $60,000 down payment for the Farm in February 2020. (*Id.* ¶ 121.)

---

[64]       Dawson also signed the Personal Loan as a guarantor. (*Id.* ¶ 103.)

On July 6, 2021, "Pioneer Title sent a default notice to . . . Gorrie under the Promissory Note and Deed of Trust." (*Id.* ¶ 122.)

Based on these allegations, the Stadtler Parties assert six claims against the Gorrie Parties: (1) breach of the Three Acre RSA and Personal Loan, as amended by the Three Acre Addendum; (2) breach of Gorrie's personal guarantee of the Personal Loan; (3) unjust enrichment; (4) fraudulent inducement; (5) negligent misrepresentation; and (6) conversion/replevin. (*Id.* ¶¶ 123-72.)

### B.   **Legal Standard**

A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a Rule 12(b)(6) motion to dismiss. *Cafasso*, 637 F.3d at 1054-55 n.4. Therefore, a Rule 12(c) motion "is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." *Fajardo v. Cty. of L.A.*, 179 F.3d 698, 699 (9th Cir. 1999). "For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

### C.   **Analysis**

#### 1.   Counts One And Two

Count One alleges that IGD "breached the Three Acre RSA, Personal Loan, and the [Three Acre] Addendum by failing to pay amounts due and owing." (Doc. 131 ¶ 125.) Gorrie, who "personally guaranteed the Personal Loan," is "responsible for all obligations under these agreements." (*Id.* ¶ 126.) Count Two alleges that Gorrie breached her personal guarantee of the Personal Loan and the Promissory Note. (*Id.* ¶¶ 129-32.)

The Gorrie Parties contend that Counts One and Two fail because the Three Acre Addendum released them from claims arising under any prior agreements between the parties. (Doc. 136 at 14.) More specifically, they argue the Three Acre Addendum operated as a forbearance agreement, tying "repayment . . . of the amounts due for the Farm

1    to the outcome of the joint venture entered into between the parties." (*Id.*)[65]

2         This argument turns on the meaning of the Three Acre Addendum—specifically, on

3    whether the Three Acre Addendum extinguished the parties' obligations under the Three

4    Acre RSA, Personal Loan, and Promissory Note.  "Under Arizona law, contracts are to be

5    given a reasonable construction and read in light of the parties' intentions as reflected by

6    their language and in view of all circumstances." *Chopin v. Chopin*, 232 P.3d 99, 101

7    (Ariz. Ct. App. 2010) (internal quotation marks omitted.)  Although contract interpretation

8    is a question of law, the contracting parties' intent is question of fact left to the factfinder.

9    *Id.* at 102.

10         On a motion for judgment on the pleadings, before accepting the Stadtler Parties'

11    allegations about the parties' intent, the Court must consider whether the Three Acre

12    Addendum is reasonably susceptible to the interpretation offered through such allegations.

13    *Travelers Indem. Co. v. Crown Corr, Inc.*, 2011 WL 6780885, *6 (D. Ariz. 2011), *aff'd on*

14    *other grounds*, 589 F. App'x 828 (9th Cir. 2014) ("If the Court finds that the writing is

15    'reasonably susceptible' to the interpretation suggested by those allegations, the Court may

16    consider whether that interpretation could entitle the Plaintiff to relief in deciding a motion

17    to dismiss.").  If the Court determines that the written language is not susceptible of the

18    meaning asserted, "[d]ismissal of any claims depending solely upon such an interpretation

19    is appropriate because the proponent 'would not be entitled to relief under any

20    interpretation of the facts 'susceptible of proof.'" *Long v. Cty. of Glendale*, 93 P.3d 519,

21    528 (Ariz. Ct. App. 2004).

22         The following allegations provide context.  According to the Stadtler Parties, in

23    January 2021, when the hemp operation was struggling, Gorrie asked about the possibility

24    of obtaining additional funding from Stadtler.  (Doc. 131 ¶¶ 92-93.)  She represented that

---

[65]    The Gorrie Parties also argue that the April 2020 RSA "only required payment once net revenue had been earned, a condition that [the Stadtler Parties] did not plead, and indeed, could not, because the [Three Acre Addendum] demonstrated had not occurred and that this was no party's fault." (Doc. 136 at 14.)  The significance of this point is unclear because the Stadtler Parties no longer assert that the Gorrie Parties breached the April 2020 RSA.  (*See generally* Doc. 131.)

a successful crop could serve as a "showroom model" that would attract other investors so that "she would be able to pay her debt."  (*Id.* ¶¶ 94-95.)  Therefore, she requested that Stadtler fund the starting costs for a hemp operation on three acres of the property.  (*Id.* ¶ 96.)  On January 10, 2021, IGD and Stadtler executed the Three Acre RSA.  (*Id.* ¶ 97.)  Under that agreement, IGD would provide "the land, management, purchase of seed, care, harvesting, and a UCC 1 lien on the crop."  (*Id.* ¶ 98.)  In return, Stadtler would provide a $75,000 line of credit to IGD.  (*Id.*)  The Three Acre RSA required IGD to first repay Stadtler and then any remaining revenue would be split between the parties.  (*Id.*)  The Stadtler Parties also allege that, in conjunction with the Three Acre RSA, "IGD and Mr. Stadtler personally signed a 'Personal Loan and Agreement' pursuant to which Ms. Gorrie agreed to personally guarantee Mr. Stadtler's interest-free loan to IDG of $75,000.[]"  (*Id.* ¶ 102.)  "The Personal Loan . . . only related to the Three Acre RSA" and was personally guaranteed by Gorrie and Dawson.  (*Id.* ¶¶ 103-04.)  As for the Three Acre Addendum, the Stadtler Parties contend it amended the Three Acre RSA in the following ways: (1) the three acres increased to six acres; (2) "IGD's obligations increased to include curing of the flower of the hemp plant"; and (3) the distribution of profits changed such that the $75,000 loan from Stadtler would be repaid first, and as for the remaining revenue, 25% would go to Stadtler, 50% to IGD, and 25% toward the outstanding balance due under the Farm Purchase Agreement.  (*Id.* ¶ 117.)  Under the Three Acre Addendum, Stadtler agreed to extend another line of credit (up to $60,000), but only if "he agreed such funds were necessary to the Hemp Operations."  (*Id.*)  The Three Acre Addendum did not amend any other agreement between the parties.  (*Id.* ¶¶ 118-19.)  From these allegations, the Stadtler Parties suggest the following interpretation—the Three Acre Addendum altered certain terms of the Three Acre RSA, but it did not affect any legal claims arising from prior agreements between the parties and did not affect the terms of any agreement between the parties other than the Three Acre RSA.  (Doc. 142 at 10-11.)

The language of the Three Acre Addendum is reasonably susceptible to this meaning.  The agreement is entitled "Addendum to the Original Personal Loan and

Agreement, Revenue Sharing Agreement between Pamela J. Gorrie dba Innovative Global Distribution LLC (the Borrower) and Dan Stadtler (the Lender) executed January 14, 2021 between the parties." (Doc. 17-7 at 2.)[66]  Immediately below the title, the Three Acre Addendum provides: "The following changes shall be made to the above mentioned agreements, this Addendum shall supersede only those parts of the original agreements dealing with the changes contained in this Addendum." (Doc. 17-7 at 2.)  Thus, it clearly provides that the agreement is intended to alter only the Three Acre RSA and Personal Loan.[67]  Also, although the Three Acre Addendum acknowledges that the lack of revenue generated by the original three-acre crop is neither Stadtler's fault nor IGD's fault, it does not discuss legal claims arising under other agreements between the parties. (*Id.* ["There has been no fault from Dan Stadtler to fund the amount that was agreed to between the parties for the first 3 acre crop. . . .  There has been no fault by IGD LLC, to continue in a good and fair husbandry manner to grow the desired crop, abnormally high weather temperatures were a major factor in the failure of the seedlings.  IGD LLC, chose to slow down in its final planting schedule in the greenhouse in order to correct a few problems with the greenhouse which led to some failure of the hemp plants to grow successfully.  This has been corrected and new planting have resumed in the greenhouse."].)[68]

Because the Three Acre Addendum is reasonably susceptible of the interpretation suggested by the Stadtler Parties, the Court next turns to whether that interpretation would entitle the Stadtler Parties to relief.  In Count One, the Stadtler Parties allege that IGD and

---

[66]    The Farm Purchase Agreement, Purchase Addendum, and the Promissory Note were executed by IGD and the Trust, not Stadtler; they were also executed in 2020, not 2021. (Doc. 131 ¶¶ 35, 46-47.)

[67]    The Three Acre Addendum also states: "Once the loan from Stadtler has been repaid the remaining money from the sales of the hemp shall be divided in the following manner, 25% of the remaining sales of the hemp product shall be paid directly to Stadtler.  75% of the remaining sales of the hemp product shall be split in two ways, 50% shall go directly to Pamela J. Gorrie dba IGD LLC, 25% of the remaining sales of the hemp product shall be paid to Pioneer Title Agency Collections Dept. to be credited towards the remaining outstanding balance on the [Farm]." (Doc. 17-7 at 3.)

[68]    This language is difficult to square with the Gorrie Parties' position that the Three Acre Addendum made it unreasonable for the Stadtler Parties to believe that Gorrie had any hemp-growing expertise.

- 83 -

Gorrie breached the Three Acre RSA, Personal Loan, and Three Acre Addendum by failing to obtain a UCC lien and failing to pay the amounts due under the three agreements. (Doc. 131 ¶¶ 98-99, 125.) Under the Stadtler Parties' interpretation of the Three Acre Addendum, these allegations are sufficient to state a claim for relief. Similarly, in Count Two, the Stadtler Parties allege Gorrie breached her personal guarantee of the Personal Loan and the Promissory Note by failing to pay the Stadtler Parties the money due under those documents. (*Id.* ¶¶ 130-32.) These allegations, assumed true, are also sufficient to state a claim under the Stadtler Parties' interpretation of the Three Acre Addendum.

Accordingly, the Court denies the Gorrie Parties' motion for judgment on the pleadings as to Counts One and Two.

### 2. Count Three

Count Three alleges that the Gorrie Parties have been unjustly enriched, to the Stadtler Parties' detriment, in several ways: (1) owning and using the Farm for two years without making payments toward its purchase price; (2) taking over $100,000 in funding from Stadtler; and (3) selling farm equipment owned by Stadtler and keeping the proceeds. (Doc. 131 ¶¶ 134-39.)

The Gorrie Parties contend that Count Three is not based on a cognizable legal theory because "the myriad contracts entered into between the parties under which the [Stadtler Parties] sought payment under the Farm Purchase Documents . . . remove the analysis of this matter as an equitable matter and render this matter of contractual interpretation." (Doc. 136 at 16.) In response, the Stadtler Parties argue that "the request for relief does not only arise from agreements but also through the [Gorrie Parties'] conversion of [the Stadtler Parties'] property as asserted in Count 6." (Doc. 142 at 11.)[69]

"To recover under a theory of unjust enrichment, a plaintiff must demonstrate five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and

---

[69] Count Six alleges the conversion of personal property owned by Stadtler and farm equipment "paid out of Ms. Gorrie's accounts using Mr. Stadtler's funds." (Doc. 131 ¶¶ 162-70.)

impoverishment, and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). Here, the Gorrie Parties argue that the fifth element is not fulfilled because the parties' relationship is governed by various express contracts. *See, e.g.*, *Trustmark Ins. Co. v. Bank One, Arizona, NA*, 48 P.3d 485, 492 n. 5 (Ariz. App. Ct. 2002) (noting that the "absence of a legal remedy" element is controlled by whether there is a contract governing the parties' relationship).

The Court agrees with the Stadtler Parties that, to the extent their unjust enrichment claim arises from the conversion of Stadtler's personal property, it is not governed by a contract. However, Count Three also alleges unjust enrichment based on "the benefit of the ownership and use of the [Farm]" and the receipt of over $100,000 in funding from Stadtler. Taking the allegations in the SAC as true, the Farm Purchase Agreement and Three Acre RSA (and Three Acre Addendum) governed the Gorrie Parties' possession of the Farm and the funding provided by Stadtler. (*See, e.g.*, Doc. 131 ¶¶ 34-36, 46-50, 124-28.)

Nevertheless, even though Count Three seems based in part on subject matters covered by agreements between the parties, it may proceed as an alternative theory of recovery at this stage of the litigation. Although Arizona law precludes recovery on an unjust enrichment claim where a valid and enforceable contract governs the subject matter of the lawsuit, *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 408-09 (9th Cir. 1992), under Rule 8(e), a plaintiff may plead unjust enrichment as an alternative theory of recovery if the plaintiff has not already received the benefit of the bargain, *Isofoton, S.A. v. Giremberk*, 2006 WL 1516026, *3-4 (D. Ariz. 2006) ("The mere existence of a contract governing the dispute does not automatically invalidate an unjust enrichment alternative theory of recovery."); *Summers v. Gloor*, 368 P.3d 930, 934 (Ariz. Ct. App. 2016) ("Here, however, the jury apparently rejected [Gloor's] claim that the loan contract contemplated repayment in-kind. The parties' relationship relative to the bakery product was therefore not governed by any contract, and Gloor was entitled to seek equitable relief as an alternative."); *U.S. Bank Nat'l. Ass'n. v. Casa Grande Reg'l Med. Ctr.*, 2006 WL

1698288, *6 (D. Ariz. 2006) ("[A]n unjust enrichment claim may be brought in the alternative, subject to a single recovery, so long as the unjust enrichment claim does not seek to relieve the plaintiff of the effects of an express provision in the contract."). Here, the Stadtler Parties allege that they have not received the benefit of their bargains. (*See, e.g.*, Doc. 131 ¶¶ 120-21 ["With the exception of the illusory and unenforceable [April 2020 RSA], Ms. Gorrie, IGD and NFOF defaulted on every agreement they signed with Mr. Stadtler and the Trust. . . .  The only sum [the Gorrie Parties] paid [the Stadtler Parties] was the original February 2020 down payment . . . ."].).

### 3.   Counts Four And Five

Count Four is a claim for fraudulent inducement.  The Stadtler Parties allege that the Gorrie Parties made various material misrepresentations on which the Stadtler Parties relied when taking various actions with respect to the hemp operations, such as agreeing to seller carryback financing for the Farm and lending equipment and money to NFOF.  (Doc. 131 ¶¶ 140-55.)  Count Five, which is a claim for negligent misrepresentation, arises from similar allegations.  (*Id.* ¶¶ 156-61.)

#### a.   **Economic Loss Rule**

The Gorrie Parties contend that Counts Four and Five are barred by the ELR.  (Doc. 136 at 8-10.)  Perhaps recognizing the tension between this argument and their previous assertion that the ELR does not bar *their* fraudulent inducement counterclaim (*see* Doc. 90 at 11), the Gorrie Parties seek to distinguish the Stadtler Parties' fraudulent inducement and negligent misrepresentation claims by arguing that Counts Four and Five request damages that "mirror the damage claims for the alleged breach of contract."  (Doc. 136 at 9.)  In Count Four, the Stadtler Parties allege that they made certain decisions in reliance on the Gorrie Parties' misrepresentations, such as transferring title of the Farm to IGD and lending funds to NFOF, and that these decisions caused the Stadtler Parties to suffer losses "in a sum to be determined at trial."  (Doc. 131 ¶¶ 140-46, 155.)  Count Five alleges similar facts.  (*Id.* ¶¶ 156-61.)

On the one hand, the Gorrie Parties' position is not frivolous.  Unlike the Gorrie

Parties' fraudulent inducement counterclaim, which alleges damages distinct from the subject matter of the agreements between the parties (specifically, the loss of the Vermont Purchase Orders) (Doc. 77 at 20 ¶ 90), the Stadtler Parties allege unspecified "losses" from their transactions with the Gorrie Parties.  It is possible these alleged damages are limited to the risks the parties contracted for in their various agreements.  If so, as compared to the Gorrie Parties' fraudulent inducement claim, there is a stronger argument that Counts Four and Five would be barred by the ELR.  *Cook*, 258 P.3d at 153 ("[T]he contract law policy of upholding the parties' expectations favor limiting the Cooks' claims to those in contract and, where there has been no injury besides that to the subject property, there is no strong policy reason to impose tort liability. . . .  Because the Cooks are seeking remedies for purely economic loss from Orkin's alleged failure to adequately perform its promises under the Agreement, the ELR bars their tort claims.").  On the other hand, construing the pleadings in the light most favorable to the Stadtler Parties, it is not clear that the damages alleged in Counts Four and Five were bargained for by the parties.  Also, as discussed *supra*, although the scope of the ELR is "hazy," *Firetrace USA*, 800 F. Supp. 2d at 1050, courts in Arizona have generally declined to apply the ELR to claims alleging fraudulent inducement or negligent misrepresentation, reasoning that the policy underlying the ELR does not support limiting parties to contractual remedies that were created by misrepresentations.  *See, e.g.*, *BMO Harris Bank NA,* 2022 WL 4781944 at *12; *Barrett-Jackson Auction*, 2020 WL 9349176 at *3-4; *Martin*, 2018 WL 2431837 at *7; *Maki*, 2016 WL 11474775 at *4; *Jes Solar*, 2015 WL 10943562 at *5.  *See also Miidas Greenhouses, LLC v. Glob. Horticultural, Inc.*, 244 P.3d 579, 582 (Ariz. Ct. App. 2010) (under *Flagstaff Affordable Housing*, the "different policies . . . served by tort and contract law . . . should serve as the bases for determining when a party should be entitled to seek tort remedies and when the party should be limited to contract remedies" by the ELR).

The Court acknowledges that in the case cited by the Gorrie Parties, *CIT Fin. LLC v. Treon, Aguirre, Newman & Norris PA*, 2016 WL 6610604 (D. Ariz. 2016), the court applied the ELR to bar a fraudulent inducement claim.  However, the *CIT Finance* court

also noted that the ELR is not a *per se* rule precluding tort liability—"rather, a court must examine each case to determine whether 'the facts preponderate in favor of the application of tort law or commercial law exclusively or a combination of the two.'" *Id.* at *5.  There, the defendants allegedly misrepresented the "the quality and capabilities of the equipment" covered by the parties' contract.  *Id.*  Noting that "[t]his allegation is indistinguishable from the allegation underlying Plaintiff's breach of contract claim," the court found that the contract claims predominated and thus, the ELR barred the tort claims.  *Id.*[70]  In contrast, here the alleged misrepresentations giving rise to the tort claims are distinguishable from the allegations underlying the Stadtler Parties' contract claims.  (*Compare* Doc. 131 ¶¶ 123-25 [alleging that IGD breached the Three Acre RSA, Personal Loan, and Three Acre Addendum by "failing to pay amounts due and owing"] *with id.* ¶¶ 140-54 [alleging the Gorrie Parties mispresented that "although funding from the prior investors had not materialized, they had other funding sources including hard money lenders and other investors," that "they were competent to run Hemp Operation and knew how to run such a business," and that they had "relationships within the pharmaceutical industry . . . [and] and relationships with alleged investors, lenders, the Australian Investment Group, Canadian Investors, and the Silverman Investment Group"].)[71]  Assuming the truthfulness of the Stadtler Parties' allegations, this case is more analogous to *Jes Solar*, where the plaintiff sought "damages directly related to losses caused by fraudulent misrepresentations made by the Defendants which induced the Plaintiffs to enter into contractual agreements and to perform, pursuant to provisions of those contracts, which caused them economic losses."  2015 WL 10943562 at *5.  The *Jes Solar* court found that the ELR did not bar the plaintiffs' fraudulent inducement claim because "[f]raud is not a loss to be bargained for

---

[70]    *But see KD & KD Enterprises, LLC v. Touch Automation, LLC*, 2006 WL 3808257, *2 (D. Ariz. 2006) ("Fraud and contract claims are independent and compatible even when the fraudulent allegations concern the quality and characteristics of goods.").

[71]    *See also Morris v. Achen Const. Co.*, 747 P.2d 1211, 1213 (Ariz. 1987) ("It is clear that the tort of fraudulently inducing one to enter into a contract can be committed without there also being a breach of the contract itself.  Indeed, the tort of fraudulent inducement would necessarily be completed before a breach of the contract could occur.").

by contracting parties." *Id.*  Similarly, here, taking the allegations in the SAC as true, the risk of the alleged misrepresentations was not bargained for or allocated in the agreements. *See also Barrett-Jackson Auction*, 2020 WL 9349176 at *4 ("The Court is unconvinced that the Arizona Supreme Court would expand the doctrine's applicability to include fraud and negligent misrepresentation done to *induce* a party to enter a contract given Arizona's 'narrower' approach to the doctrine."); *Maki*, 2016 WL 11474775 at *4 ("Plaintiff argues that his claim does not arise out of the contract, but out of the allegedly fraudulent misrepresentations that induced him to enter into the contract.  This Court has specifically addressed this type of fraud claim and held that it is not precluded by the economic loss doctrine."); *KD & KD Enterprises*, 2006 WL 3808257 at *2 ("The key rationale underlying the economic loss doctrine presupposes that there has been a fair and equitable negotiation of the allocation of risk between the parties. . . .  Fraudulent misrepresentation, however, undermines the ability of parties to negotiate freely, and therefore negates the presumption that an equitable negotiation has occurred.  It is unreasonable to restrict a party to contractual limitations of liability when fraudulent representations resulted in an unequal, unfair bargaining process.  In such a situation the traditional concern of tort law prevails—protecting society from an unreasonable risk of harm.").

The Gorrie Parties also argue that the ELR bars Counts Four and Five because the Stadtler Parties had a contractual remedy under the Purchase Addendum, which "provided for all contingencies" and existed "irrespective of whether the promise to pay was intentionally fraudulent," if IGD failed to pay the $240,000 within 30 days of closing. (Doc. 136 at 9-10.)   As relevant here, the Purchase Addendum provides: "Buyer understands and is aware that if the Buyer meets a portion of the terms and conditions contained in line 7, but fails to fulfill all the terms and conditions therein without an agreement between Buyer & Seller for any extensions of time, Seller shall have the right to cancel this sale and the Buyer will for fit [sic] all monies paid to the Seller." (Doc. 17-3 at 2 ¶ 9.)  Line 7 reads: "Buyer and Seller have agreed to change the amount of down payment money required to close escrow on this purchase contract to be $60,000[].  Buyer

1    shall be required to deposit an additional $240,000[] within 30 days from close of escrow

2    which will complete the down payment required under the original [Farm Purchase

3    Agreement] . . . ." (*Id.* at 2 ¶ 7.)

4        As a factual matter, the provision allowing the Trust to cancel the sale if IGD failed

5    to timely pay the $240,000 does not establish that the Stadtler Parties had a contractual

6    remedy for any and all misrepresentations by Gorrie. The Stadtler Parties allege that they

7    continued to detrimentally rely on misrepresentations by Gorrie as the business relationship

8    progressed, long after the 30-day cancellation window had closed. (*See, e.g.*, Doc. 131

9    ¶¶ 147-51 [alleging that the Gorrie Parties misrepresented their ability to pay for the Farm

10   according to the timeline set forth in the Promissory Note and Deed of Trust, their ability

11   to qualify for loans, the extent to which investors were seriously interested in financing the

12   hemp operation, and their experience and qualifications to run a hemp operation].) In other

13   words, the Stadtler Parties allege that the Trust decided to refrain from exercising its

14   contractual right to cancel the sale (and chose to enter into other agreements with the Gorrie

15   Parties) because Gorrie continued to misrepresent both her ability to establish and run a

16   hemp operation and the availability of funding. Thus, the fact that the Trust could have

17   cancelled the sale upon IGD's failure to pay $240,000 within 30 days of closing does not

18   establish that Counts Four and Five are barred by the ELR.

19                            b.    **Reasonable Reliance**

20       Next, the Gorrie Parties contend that the "proof of funds" upon which Stadtler

21   allegedly relied when executing the Farm Purchase Agreement "does not even begin to

22   meet anything a reasonable person would rely on to close a sale, and therefore the

23   reasonable reliance standard is not met." (Doc. 136 at 10-11. *See also id.* at 11 [describing

24   the document as an "obvious scam"].) Also, they assert that neither IGD nor Gorrie

25   transmitted the document to Stadtler. (*Id.*) In response, the Stadtler Parties argue that "not

26   only is reasonableness of reliance a question of fact . . . , but the referenced document . . .

27   is not the only document [the Stadtler Parties] include to demonstrate the multiple

28   falsehoods told by Ms. Gorrie . . . to induce [the Stadtler Parties] to enter into the

agreements."  (Doc. 142 at 8.)

The "proof of funds" is a reference to paragraph 142 of the SAC, which alleges that before entering into the Farm Purchase Agreement, Gorrie showed Stadtler and Dawson "bank statements showing a deposit of $5 million, and a loan contract from 'silent partners' for $5 million and represented to [the Stadtler Parties] that these were evidence they had funding ready and available to purchase the [Farm]."  (Doc. 131 ¶ 142.)  This is one of a number of alleged funding-related misrepresentations by the Gorrie Parties that give rise to Count Four.  (*See id.* ¶¶ 140-51.)

"A fraud claim requires justifiable reliance on the misrepresentation."  *Gray v. Shaw*, 2007 WL 5439746, *5 (Ariz. Ct. App. 2007).  *See also St. Joseph's Hosp. & Med. Ctr. v. Rsrv. Life Ins. Co.*, 742 P.2d 808, 813 (Ariz. 1987) (noting that Arizona follows the definition of negligent misrepresentation provided by the Restatement (Second) of Torts § 552, which describes "liability for pecuniary loss caused to them by their justifiable reliance upon the information").

The Stadtler Parties are correct that reasonableness of reliance is generally "a question of fact for the jury."  *Pluto Properties, LLC v. Hendricks & Partners, Inc.*, 2009 WL 3644803, *3 (Ariz. Ct. App. 2009).  *But see id.* ("When the facts are undisputed, however, the court may determine as a matter of law whether a party was justified in relying upon a representation.").  Moreover, the Stadtler Parties allege numerous other misrepresentations by Gorrie to support their claims for fraudulent inducement and negligent misrepresentation.  (*See, e.g.*, Doc. 131 ¶ 141 [alleging the Gorrie Parties misrepresented that they were able and intended to perform under the Farm Purchase Agreement, Promissory Note, Deed of Trust, and Purchase Addendum]; *id.* ¶ 143 (alleging the Gorrie Parties misrepresented that "they had other funding sources including hard money lenders and other investors lined up"]; *id.* ¶ 144 [alleging that the Gorrie Parties misrepresented that "they were competent to run Hemp Operation and knew how to run such a business"].)  Thus, the Stadtler Parties' fraudulent inducement and negligent misrepresentation claims do not turn on whether reliance on the "proof of funds" document

1    was justified.

2                c.    **Rule 9(b)**

3        The Gorrie Parties also seek to dismiss Counts Four and Five on the ground that the

4    Stadtler Parties failed to adequately plead the elements of fraud with particularity as

5    required by Rule 9(b).  (Doc. 136 at 11.)

6        As noted elsewhere, a fraudulent inducement claim requires "(1) a representation;

7    (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of

8    its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner

9    reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance

10    on its truth; (8) the hearer's right to rely on it; [and] (9) the hearer's consequent and

11    proximate injury." *Duncan*, 507 P.3d at 514-15.  Meanwhile, "[a] person may be liable for

12    negligent misrepresentation if he fails to exercise reasonable care and competence in

13    obtaining or communicating information and thereby, in the course of his business or

14    employment, provides false information for the guidance of others in their business

15    transactions, causing the recipients of the information to incur damages because they

16    justifiably relied on the false information." *PLM Tax Certificate Program 1991-92, L.P.*

17    *v. Schweikert*, 162 P.3d 1267, 1270 (Ariz. Ct. App. 2007).  Federal rules require that the

18    circumstances constituting fraud be stated "with particularity."  Fed. R. Civ. P. 9(b).  *See*

19    *also Van Go*, 2016 WL 4974968 at *3 ("Where a plaintiff alleges fraud or

20    misrepresentation, Rule 9(b) imposes heightened pleading requirements.  While malice,

21    intent, knowledge, and other conditions of mind may be alleged generally, the

22    circumstances constituting fraud must be pled with particularity.").[72]

23        The Gorrie Parties argue that the SAC is marred by the following defects: (1) the

---

[72]      The Gorrie Parties assert, and the Stadtler Parties don't seem to dispute, that claims for negligent misrepresentation are, like claims for intentional misrepresentation and fraud, subject to Rule 9(b)'s heightened pleading requirements.  Even though this issue may be more complicated than the parties' briefing lets on, the Court will assume that the Gorrie Parties are correct.  *Casey v. Wright Med. Tech., Inc.*, 2020 WL 736306, *4-5 (D. Ariz. 2020) (noting that "[w]hether Rule 9(b) applies to negligent misrepresentation claims is an issue that has divided numerous courts of appeals" and that "district courts in the Ninth Circuit have issued conflicting rulings"); *Sweeney v. Darricarrere*, 2009 WL 2132696, *12 n.109 (D. Ariz. 2009) (same)

SAC does not demonstrate that the Gorrie Parties knew the alleged misrepresentations were false; (2) the SAC offers only conclusory allegations as to whether the Gorrie Parties did not intend to perform under the Farm Purchase Agreement; (3) the SAC doesn't allege that the Stadtler Parties were ignorant of the alleged misrepresentations' falsity; (4) the SAC doesn't specify "who made the allegedly offending representations"; (5) to the extent Counts Four and Five are alleged against NFOF and NFF, the SAC fails to allege sufficient facts demonstrating fraud and, as to the Farm Purchase Agreement specifically, NFOF did not exist at the time the contract was executed; and (6) to the extent Counts Four and Five rely on the Three Acre Addendum, the plain language of the agreement demonstrates that "it would have been entirely unreasonable for [the Stadtler Parties] to have relied on [the Gorrie Parties'] professed expertise on running a hemp operation."  (Doc. 136 at 12-14.) The Court will address each alleged defect in turn.[73]

First, the Gorrie Parties argue that paragraphs 141 and 142 of the SAC, specifically, "do not meet element (4) of fraudulent inducement because [the Stadtler Parties] simply stated that IGD and Gorrie did not intend to pay without more specificity as to why [the Stadtler Parties] believe that to be the case."  (Doc. 136 at 12-13.)  As noted, the fourth element of a fraudulent inducement claim requires a plaintiff to prove "the speaker's knowledge of its falsity or ignorance of its truth."  *Duncan*, 507 P.3d at 515.  Paragraphs 141 and 142 of the SAC allege that the Gorrie Parties "materially misrepresented to [the Stadtler Parties] that they could and would pay for the [Farm] under the terms contemplated in the Farm Purchase Agreement and addenda thereto, Promissory Note or Deed of Trust" and the Gorrie Parties "showed [the Stadtler Parties] and Mr. Dawson, *inter alia*, bank statements showing a deposit of $5 million, and a loan contract from 'silent partners' for $5 million and represented to [the Stadtler Parties] that these were evidence they had funding ready and available to purchase the [Farm]."  (Doc. 131 ¶¶ 141-42.)  The Gorrie

---

[73]    The Court notes that not all of these alleged defects seem to implicate Rule 9(b).  At any rate, because the Gorrie Parties group all of these challenges together under the assertion "each fraudulent inducement claim fails to plead all elements with particularity" (Doc. 136 at 12), the Court will follow the same organizational structure here.

Parties' characterization of these allegations as "simply stat[ing] that IGD and Gorrie did not intend to pay" (Doc. 136 at 12-13) is somewhat confusing.  But more important, even assuming the Stadtler Parties did not make specific allegations explaining why they believe Gorrie never intended to perform under the Farm Purchase Agreement, the absence of such allegations is not fatal to their fraudulent inducement claim.  The SAC alleges that Gorrie made numerous misrepresentations about her funding, the extent to which her residency relied on the success of the hemp operation, what she intended to do after IGD obtained title to the Farm, and whether IGD had already completed the application process for a hemp license.  (*See, e.g.*, Doc. 131 ¶¶ 17-31.)  The SAC also alleges the Gorrie Parties knew that they did not have the funding required to adhere to the payment schedule in the Farm Purchase Agreement, knew they would not qualify for loans that would cover those amounts, and knew that Gorrie did not have the experience or qualifications to run a successful hemp operation.  (*Id.* ¶¶ 148-51.)  Taking these allegations as true, the SAC clearly alleges that Gorrie knew her representations were false and thus sufficiently pleads the fourth element of fraudulent inducement.  Although a fraud claim *can* arise from a contracting party's misrepresentation that she intended to perform under an agreement, such an allegation is not a required element of the claim.  *See, e.g.*, *McAlister v. Citibank (Ariz.), a Subsidiary of Citicorp*, 829 P.2d 1253, 1260 (Ariz. Ct. App. 1992) ("Fraud can be based upon unfulfilled promises or expressions concerning future events only if statements regarding those events 'were made with the present intent not to perform.'") (citation omitted).  Further, in the Court's view, the allegations that Gorrie knew she did not have and could not obtain sufficient funding and did not have the expertise to run the hemp operation allow for a plausible inference that the Gorrie Parties did not intend to perform under the relevant agreements.

Second, as for the Farm Purchase Agreement, the Gorrie Parties contend that the SAC fails to allege that Gorrie knew the alleged misrepresentations were false when she made them.  (Doc. 136 at 12-13.)  This is incorrect.  After alleging numerous misrepresentations by the Gorrie Parties, the SAC states: "[The Gorrie Parties] knew that

their representations were false." (Doc. 131 ¶ 147. *See also id.* ¶¶ 149-51 [alleging the Gorrie Parties knew that (1) the Gorrie Parties could not qualify for loans, (2) "no other investors were seriously interested" in the hemp operations, (3) Gorrie "had no experience or qualifications to run a profit-generating Hemp Operation," and (4) the Gorrie Parties "had no credible prospect of growing and yielding a sufficient hemp crop to make a profit"].) Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." If the Stadtler Parties cannot prove that Gorrie knew her statements were false, they will not prevail on that claim at summary judgment or trial. At this stage, however, the Court does not "test the evidence." *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

Third, the Gorrie Parties argue that "[t]he SAC nowhere alleges that [the Stadtler Parties] were ignorant of any of [the Gorrie Parties'] representations['] falsity." (Doc. 136 at 13.) Again, this is incorrect: The SAC alleges that the Stadtler Parties "believed [the Gorrie Parties'] representations were truthful and justifiably relied on their truthfulness and took actions as a result to Mr. Stadtler's and the Trust's detriment." (Doc. 131 ¶ 152.) The SAC also alleges facts demonstrating why the Stadtler Parties believed the representations were truthful, including that Gorrie purported to substantiate some of the alleged misrepresentations by sending various documents to the Stadtler Parties. (*See id.* ¶¶ 22-23, 31, 142-43.)

In a related vein, the Gorrie Parties contend that paragraph 147 of the SAC, which alleges that the Gorrie Parties "knew they did not have the funds to pay $240,000[] at closing" (*id.* ¶ 147), does not demonstrate that Gorrie falsely represented that IGD had the funds or that the Stadtler Parties believed that was so. (Doc. 136 at 13.) According to the Gorrie Parties, "[the Stadtler Parties] both knew and contracted that the Trustee was not going to be fully paid prior to the transfer of title and thus there is no falsity to allege for this non-existent representation." (*Id.*)

To plead fraud, a plaintiff "must set forth an explanation as to why the statement or omission complained of was false or misleading." *Van Go*, 2016 WL 4974968 at *3

(citation omitted).  Here, viewing paragraph 147 in the light most favorable to the Stadtler Parties, the Court interprets it as alleging that, at closing, the Stadtler Parties did not know that the Gorrie Parties had not secured outside funding sources to cover the $240,000 payment that would be due by the 30-day deadline.  This interpretation is supported by other allegations in the SAC.  (*See, e.g.*, Doc. 131 ¶¶ 44-46.)  Thus, the fact that the Stadtler Parties knew the Gorrie Parties did not have this funding available *before* closing does not undermine the allegation that Gorrie falsely represented that certain investors had agreed to fund the $240,000 after closing.

Fourth, the Gorrie Parties contend the SAC is unclear as to who made the alleged misrepresentations because, at several points, the statements are "attributed to the [Gorrie Parties] as a whole."  (Doc. 136 at 13.)  In the Court's view, this is contrived confusion.  First, many of the alleged misrepresentations are attributed to Gorrie specifically.  (*See, e.g.*, Doc. 131 ¶¶ 41-44, 59-60, 70-73.)  Second, to the extent some of the misrepresentations are attributed to the Gorrie Parties generally, there is a reasonable inference that Gorrie is the alleged speaker, given that the rest of the Gorrie Parties are entities incapable of speaking on their own and the Stadtler Parties do not allege the existence of any other human speaking on those entities' behalf.  If anything, it is possible Gorrie made the misrepresentations in her capacity as a member or partner of the entities; however, this level of detail is not required at the pleading stage.  Rule 9(b) requires that a complaint "identif[y] the circumstances of the alleged fraud so that defendants can prepare an adequate answer."  *Cooper*, 137 F.3d at 627 (internal quotation marks omitted).  Requiring the Stadtler Parties to specify, for each misrepresentation, whether Gorrie was speaking on behalf of herself, IGD, NFOF, or NFF would require Rule 9(b) to carry more weight than it was meant to bear.

Fifth, the Gorrie Parties contend that the SAC fails to state a "legally cognizable fraud claim against NFOF" because it does not allege that "funds were actually lent or transferred to NFOF, that there was a contract regarding this loan arrangement, that farm equipment was actually lent to NFOF, or that there was a contract regarding this farm

equipment lending arrangement." (Doc. 136 at 13.) The Gorrie Parties also argue that NFOF could not have fraudulently induced the Stadtler Parties into executing the Farm Purchase Agreement because NFOF did not exist at that time. (*Id.*)

These arguments are unavailing. The SAC alleges that the Gorrie Parties made misrepresentations both before and after the execution of the Farm Purchase Agreement (including misrepresentations after NFOF came into existence in March 2020) that were intended, *inter alia*, to induce Stadtler to "lend funds and farm equipment to NFOF" and also alleges that "Gorrie, IGD, and/or NFOF took the Equipment belonging to Mr. Stadtler and would not allow him to retrieve it." (Doc. 131 ¶¶ 146, 169.) Thus, even if Stadtler did not lend funds to NFOF, and even if the fraudulent inducement claim rests in part on conduct that occurred before NFOF came into existence, the SAC alleges that Gorrie knowingly made false material representations that she intended Stadtler to act upon and that Stadtler's belief in and reasonable reliance on those representations resulted in NFOF obtaining possession of his farm equipment. These allegations, assumed true, are sufficient.

Sixth, to the extent Counts Four and Five rely on the Three Acre Addendum, the Gorrie Parties contend that "the Parties came to an agreement regarding the past history of the crop failures. Therefore, it would have been entirely unreasonable for [the Stadtler Parties] to have relied on [the Gorrie Parties'] professed expertise on running a hemp operation." (Doc. 136 at 14.)[74] As relevant here, the Three Acre Addendum provides:

> There has been no fault from Dan Stadtler to fund the amount that was agreed to between the parties for the first 3 acre crop. . . . There has been no fault by IGD LLC, to continue in a good and fair husbandry manner to grow the desired crop, abnormally high weather temperatures were a major factor in the failure of the seedlings. IGD LLC, chose to slow down in its final planting schedule in the greenhouse in order to correct a few problems with the greenhouse which led to some failure of the hemp plants to grow successfully. This has been corrected and new planting have resumed in the

---

[74] Similarly, in their reply, the Gorrie Parties argue that "it is impossible for Stadtler to argue that he relied on Gorrie's expertise" because he knew at closing that "Gorrie did not have a license to grow and harvest Hemp" and she asked Dawson "how to get the property certified as organic." (Doc. 159 at 5.) As this argument was raised for the first time in reply, the Court need not address it. *Zamani*, 491 F.3d at 997. Nevertheless, even if it had been properly raised, this argument is unpersuasive.

greenhouse.

(Doc. 17-7 at 2.)  This language does not establish that, as a matter of law, it was unreasonable for the Stadtler Parties to believe Gorrie had hemp-growing expertise.  If anything, it suggests that IGD and Stadtler agreed, at that time, that IGD had the ability to operate a successful hemp operation given the right circumstances (*i.e.*, weather, greenhouse conditions, and funding).

Accordingly, the Court denies the Gorrie Parties' motion for judgment on the pleadings as to Counts Four and Five.

## V.    The Gorrie Parties' Motion For Partial Dismissal Of Third-Party Counterclaims

In the final motion before the Court, the Gorrie Parties move to dismiss Counts One, Two, Four, and Five of Houchin's operative pleading.  (Doc. 158.)

### A.    **Additional Background**

The following facts are derived from Houchin's operative pleading, his First Amended Answer to Third-Party Complaint and Third-Party Counterclaim (Doc. 134), and are presumed true for purposes of the Gorrie Parties' motion to dismiss.

Houchin learned of the hemp operation from Stadtler, who is Houchin's uncle.  (*Id.* 12 ¶ 15, 13 ¶ 20.)[75]  After Houchin expressed interest, "Stadtler told Houchin that there may be an opportunity to invest in the business and asked Houchin if he wanted to see the [Farm]."  (*Id.* at 13 ¶ 21.)

"[I]n early 2021, Houchin and Stadtler traveled to Blythe to visit the [Farm] . . . and to meet with Gorrie."  (*Id.* at 13 ¶ 22.)  "The meeting lasted approximately 20 minutes, with Gorrie spending the majority of that time explaining to Houchin the supposed hemp operation."  (*Id.* at 13 ¶ 25.)  During the meeting, "Gorrie indicated that she had relationships with seed distributors, had done an internship with a seed distributor, and was working with a Senator on another project."  (*Id.* at 13 ¶ 26.)  "At the end of the meeting, Houchin told Gorrie that he would put additional thought into entering into the business

[75]    Before 2018, Houchin did not know Stadtler and was "unaware of the family relationship."  (Doc. 134 at 12 ¶ 16.)

relationship she proposed with IGD." (*Id.* at 13 ¶ 27.)

On May 26, 2021, Houchin and IGD executed the JVA. (*Id.* at 12 ¶ 12.) The purpose of the JVA was to "(a) prepare a 20-acre plot of [the Farm] for cultivation; (b) plant and cultivate industrial hemp on the plot; and (c) harvest and dry the hemp in preparation for sale." (*Id.* at 12 ¶¶ 13-14.) "Pursuant to the JVA, IGD was to create a limited liability company (the 'JV LLC') in order to carry out the purpose of the venture." (*Id.* at 13 ¶ 29.) "Houchin and IGD were to each own 50% of the membership interests in the JV LLC." (*Id.* at 13 ¶ 30.) "Notwithstanding the foregoing, the JVA provided that if the hemp harvested by IGD averaged less than one (1) pound per plant, Houchin would receive 60% of the profit therefrom and IGD would receive 40%." (*Id.* at 13 ¶ 31.) "Alternatively, if the hemp harvested by IGD averaged more than one (1) pound per plant, Houchin and IGD would split the profit therefrom equally." (*Id.* at 14 ¶ 32.) Before the JVA was executed, the Gorrie Parties told Houchin that Dawson was the "farm manager" and "was experienced in farming operations and capable of managing the operations of the venture" on the twenty-acre plot. (*Id.* at 14 ¶¶ 35-36.)

The JVA required IGD contribute the 20-acre plot to the venture and "to provide day-to-day oversight over the venture's operation" on that plot. (*Id.* at 14 ¶¶ 33-34.) The JVA also required Houchin to "contribute cash funding in seven (7) phases" over 24 weeks. (*Id.* at 14 ¶¶ 37-38. *See also id.* at 14 ¶ 39 ["Houchin was to provide the 'funding for each phase within three (3) business days following IGD's request for such funding, provided that any such request shall be accompanied by confirmation, in a form satisfactory to Houchin, that any pending phase [is] complete.'"].)

The JVA also included the following representations and warranties:

> IGD represented and warranted that it had "full power and authority to own its properties and to carry on its business as now conducted and as proposed to be conducted[.]" . . . IGD further represented and warranted that [t]here are no claims, demands, disputes, actions, suits, proceedings or investigations pending or, to the best of IGD's knowledge, threatened against or directly or indirectly affecting IGD . . . . IGD also represented and warranted that it "[was] able to bear the economic risk of an investment in the [LLC] for the duration of [the JVA]."

(*Id.* at 14-15 ¶¶ 40-44.)  According to Houchin, "the accuracy of the representations and warranties made by IGD in the JVA was a condition precedent to Houchin's performance under the JVA." (*Id.* at 15 ¶ 46.)

"On May 27, 2021, IGD notified Houchin that it was in the process of creating the JV LLC but that it would not be able to get an EIN for the JV LLC 'for a few business days.' . . . As a result, IGD requested interim funding from Houchin until the JV LLC's bank account could be established." (*Id.* at 15 ¶¶ 48-49.) "Accordingly, Houchin executed a First Addendum to Joint Venture Agreement dated May 28, 2021" ("JVA Addendum"). (*Id.* at 15 ¶ 50.)  The JVA Addendum modified Houchin's contribution obligations under the JVA; specifically, Houchin agreed to provide $72,300 of "interim funding" to IGD "as soon as practical" after execution of the JVA Addendum.  (*Id.* at 15 ¶ 51.)  IGD agreed to "hold and control" the interim funding for the "express and sole purpose" of the joint venture and was required to transfer the interim funding into the LLC's bank account "upon formation of the entity and establishment of its bank account." (*Id.* at 15-16 ¶¶ 52-53.)

On May 28, 2021, pursuant to the JVA Addendum, Houchin transferred $72,300 to IGD. (*Id.* at 16 ¶ 54.)  However, the interim funding was not deposited into JV LLC's bank account.  (*Id.* at 16 ¶ 55.)  The same day, "IGD and Gorrie terminated Dawson from his position as farm manager." (*Id.* at 16 ¶ 56.)

On July 5, 2021, IGD asked Houchin to remit "the remaining amount under phase one," totaling $27,250, as well as an additional $5,000 for "an accountant's retainer." (*Id.* at 16 ¶ 57.)  The same day, IGD also asked Houchin to remit $73,000 for phase two of the JVA.  (*Id.* at 16 ¶ 58.) "At the time of IGD's request, IGD had not provided Houchin with verification that the JV LLC had been formed or that its bank account had been established." (*Id.* at 16 ¶ 59.)  When Houchin requested that verification, IGD confirmed the LLC had been formed (under the name "PGHF1 LLC") and that IGD was the LLC's manager; however, IGD "had not obtained an EIN for the JV LLC or established its bank account." (*Id.* at 16 ¶¶ 60-62.)  Houchin also asked for confirmation that phase one had been completed.  (*Id.* ¶ 63.) "Despite requesting Houchin's contribution for phase two,

1    IGD confirmed that phase one was not complete." (*Id.* at 16 ¶ 64.)[76]

2         In early July 2021, Houchin learned that Stadtler, who held a security interest in the

3    Farm, was asserting a breach of the agreement secured by the Farm. (*Id.* at 17 ¶ 66.) The

4    Gorrie Parties did not notify Houchin of this fact, "despite requesting additional funds from

5    him" during the same period. (*Id.* at 17 ¶ 67.)

6         On July 15, 2021, "Houchin asked IGD its position with respect to the breach

7    asserted by Stadtler" and "notified IGD that a breach of any agreement with Stadtler

8    secured by the Property constituted a breach of the JVA." (*Id.* at 17 ¶¶ 68-69.) In response,

9    IGD described its contractual relationship with Stadtler as "very complicated" and stated

10   that the notice of default sent by Stadtler was "not a notice of default at all" because it

11   "fail[ed] to comply with even the most basic requirements of those documents." (*Id.* at 17

12   ¶ 70.) "IGD did not provide Houchin with copies of any of the underlying documents or

13   with an explanation as to how it planned on addressing Stadtler's asserted breach." (*Id.* at

14   17 ¶ 71.) Houchin later learned that, on or about July 15, 2021, "Stadtler recorded a Notice

15   of Trustee's Sale related to the [Farm]." (*Id.* at 17 ¶ 72.)

16        "On August 19, 2021, Houchin, again, asked that IGD explain what—if anything—

17   it planned to do with respect to the pending trustee's sale and its implications" on the JVA.

18   (*Id.* at 17 ¶ 73.) "IGD failed to provide Houchin with any substantive information" in

19   response. (*Id.* at 18 ¶ 74.) After this correspondence, "IGD ceased communicating with

20   Houchin." (*Id.* at 19 ¶ 84.)

21        Based on these allegations, Houchin asserts third-party counterclaims against the

22   Gorrie Parties, alleging (1) breach of the JVA, (2) breach of the implied covenant of good

23   faith and fair dealing, (3) unjust enrichment, (4) fraudulent inducement, (5) negligent

24   misrepresentation, and (6) breach of fiduciary duty. (*Id.* at 19-24 ¶¶ 85-147.)

25        B.    **Legal Standard**

26        "[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege sufficient

---

27   [76]    At the same time, IGD indicated that the remaining amount due under phase one
28   was $37,500, rather than $32,250 (*i.e.*, the total IGD asked for on July 5, 2021). (*Id.* at 17
     ¶ 65.)

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings*, 714 F.3d at 1144 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable theory." *Mollett*, 795 F.3d at 1065 (citation omitted).

C.   **Analysis**

As an initial matter, the JVA is incorporated by reference throughout Houchin's pleading. (*See, e.g.*, Doc. 134 at 12 ¶ 12, 13 ¶ 28, 14-15 ¶¶ 40-46.) Accordingly, the Court may consider the JVA (Doc. 77-5) without converting the Gorrie Parties' motion to dismiss into a motion for summary judgment. *Ritchie*, 342 F.3d at 907-08.

1.   Counts One And Two

In Count One, Houchin alleges that IGD breached the JVA by making certain representations and warranties that were either false when made or rendered false after the JVA's effective date. (Doc. 134 at 19 ¶¶ 85-93.) In Count Two, Houchin alleges that IGD breached the implied covenant of good faith and fair dealing by making false representations and warranties in the JVA that interfered with Houchin's ability "to receive the full benefit of the bargain." (*Id.* at 20 ¶¶ 94-105.)

For context, both IGD and Houchin made representations and warranties in the JVA. (Doc. 77-5 at 7-10.) As relevant here, in § 4.01 of the JVA, IGD represented and warranted that: (1) "IGD . . . has full power and authority to own its properties and to carry on its business as now conducted and as proposed to be conducted . . . "; (2) "There are no claims, demands, disputes, actions, suits, proceedings or investigations pending or, to the best of

IGD's knowledge, threatened against [IGD] . . . which presently or with the passage of time would be reasonably likely to have a Material Adverse Effect on IGD's performance of its obligations under this Agreement, the Limited Liability Company Agreement or the Related Agreements"; and (3) "IGD is able to bear the economic risk of an investment in the Company for the duration of this Agreement."  (*Id.* at 7-9.)  The JVA also included an indemnification provision requiring IGD to "indemnify and hold harmless Houchin at all times from and after the Closing Date, against and in respect of Losses arising from or relating to . . . any breach of any of the representations or warranties made by IGD in this Agreement or the Related Agreements."  (*Id.* at 13 [JVA § 7.02].)

In their motion to dismiss, the Gorrie Parties contend that Houchin waived any claims arising from IGD's representations in the JVA (which are the representations upon which Counts One and Two rely).  (Doc. 158 at 8-9.)  The Gorrie Parties point to § 6.02 of the JVA (entitled "Houchin's Conditions Precedent"), which provides, in relevant part:

> The obligation of Houchin to consummate the Joint Venture and Related Transactions is subject to the satisfaction, prior to or on the Closing Date, of each of the following conditions, the failure of any one of which shall excuse Houchin from consummating the Joint Venture and Related Transactions unless any such conditions are waived (in whole or in part) by Houchin in writing. . . .  (g) Due Diligence. Houchin shall have reviewed, investigated, ascertained and verified to its satisfaction, in its sole discretion, the business and affairs of IGD and all facts, IGD information and other matters regarding IGD referred to in this Agreement or given or provided in connection with this Agreement, including without limitation, an independent review of the past financial statements of IGD.

(Doc. 77-5 at 12-13.)  Based on this language, the Gorrie Parties contend that "[f]ollowing consummation of the JVA, Houchin waived his claim for breach of contract and breach of the implied covenant of good faith and fair dealing for the representations alleged in Houchin's Counterclaim."  (Doc. 158 at 9.)  Houchin responds that "waiver is 'a question of fact to be determined by the trier of fact.'"  (Doc. 170 at 10.)

At first blush, the Gorrie Parties seem to be advancing a claim of waiver by conduct, which, as Houchin correctly notes, is a question of fact for the jury.  *Jones v. Cochise Cnty.*, 187 P.3d 97, 105 (Ariz. Ct. App. 2008) ("Arizona courts have held waiver is 'a question of fact to be determined by the trier of fact.'") (citation omitted); *Concannon v. Yewell*, 493

P.2d 122, 123 (Ariz. Ct. App. 1972) ("It is, of course, true that one party may waive any provision of a contract made for his benefit. . . . Waiver need not be expressed but may be inferred from conduct and is therefore a question of fact to be determined by the [factfinder]."). However, in their reply, the Gorrie Parties clarify that they view the due diligence provision as a "condition precedent" that obligated Houchin "to conduct an investigation of IGD prior to providing funding." (Doc. 181 at 7.) Thus, according to the Gorrie Parties, Houchin "knowingly waived his right to investigate these issues, which he could have so easily done, and therefore dismissal of the breach of contracts claims is appropriate." (*Id.*)

It is unclear why the "due diligence provision," assuming it operated as a condition precedent to *Houchin's* performance under the JVA, would bar Houchin from asserting his breach of contract claim in Count One. "To determine what the parties intended, we 'consider the plain meaning of the words in the context of the contract as a whole.'" *MTR Builders, Inc. v. Jahan Realty Mgmt. Corp.*, 2016 WL 1425797, *4 (Ariz. Ct. App. 2016) (citation omitted). A "condition precedent" is "an act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *Biltmore Bank of Arizona v. First Nat. Mortg. Sources, L.L.C.*, 2008 WL 564833, *7 (D. Ariz. 2008). Even if the due diligence provision was a condition precedent and was not fulfilled before the JVA was executed, that would at most excuse Houchin's obligations under the JVA, not IGD's obligations, and certainly would not preclude Houchin from asserting a breach of contract claim against IGD.[77]

Moreover, in taking this position, the Gorrie Parties effectively interpret the "due diligence" provision as a contractual waiver of Houchin's legal right to assert a breach of contract claim based on IGD's representations. "The purpose of contract interpretation is to determine and enforce the parties' intent." *US W. Commc'ns, Inc. v. Arizona Corp. Comm'n*, 915 P.2d 1232, 1235 (Ariz. Ct. App. 1996). "To determine the parties' intent,

---

[77]     Alternatively, if the due diligence provision were construed as a condition precedent to the formation of the JVA, it could be argued that the JVA was not formed, *see Biltmore Bank*, 2008 WL 564833 at *7; however, the Gorrie Parties do not take this position.

we 'look to the plain meaning of the words as viewed in the context of the contract as a whole.'" *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 941-42 (Ariz. Ct. App. 2010). "Waiver is the voluntary and intentional relinquishment of a known right or such conduct as warrants an inference of the relinquishment of such right." *City of Tucson v. Koerber*, 313 P.2d 411, 418 (Ariz. 1957). *See also Cavallo v. Phoenix Health Plans, Inc.*, 518 P.3d 759, 765 (Ariz. 2022) (intent to waive a known right is required for waiver). Here, Houchin's representations in the "due diligence" provision, in general and as "conditions precedent," do not evince an intent to waive his ability to assert the breach of contract claim alleged in Count One. This is particularly so because, under this interpretation, the due diligence provision would conflict with the indemnification provision, which generally obligates IGD to indemnify Houchin for "[l]osses arising from or relating to . . . any breach of any of the representations or warranties made by IGD in this Agreement or the Related Agreements." (Doc. 77-5 at 13 [JVA § 7.02].) *See also ELM Ret. Ctr.*, 246 P.3d at 942 ("In interpreting a contract, . . . each part of a contract must be read together, 'to bring harmony, if possible, between all parts of the writing.'").

As for Count Two, the waiver argument is unavailing because "the covenant of good faith and fair dealing may not be waived" in an agreement. *Cavallo*, 518 P.3d at 766. *See also Sky Harbor Hotel*, 443 P.3d at 24 (parties may not "erase," "limit," or "eliminate" the covenant of good faith and fair dealing in an operating agreement).

### 2. Counts Four And Five

In Count Four, Houchin alleges that the Gorrie Parties made various false representations, both in the JVA and elsewhere, that Houchin relied upon in deciding to participate in the joint venture. (Doc. 134 at 21-23 ¶¶ 116-30.) Similarly, in Count Five, Houchin alleges that the Gorrie Parties negligently "provided inaccurate, material information to Houchin for the purpose of guiding Houchin's decision in relation to the JVA" and that Houchin reasonably relied on that information to guide his decisions regarding the joint venture. (*Id.* at 23-24 ¶¶ 131-40.)

The Gorrie Parties contend that Counts Four and Five are barred by the ELR and

1     fail to establish justifiable reliance.  (Doc. 158 at 3-5, 7-8.)  They also argue that Count

2     Four, specifically, lacks the particularity required by Rule 9(b) and impermissibly relies on

3     a future promise.  (Doc. 158 at 6-7.)

4                a.     **Economic Loss Rule**

5         The Gorrie Parties contend that Counts Four and Five are barred by the ELR because

6     the claims are inseparable from the "essence" of the JVA, request damages identical to

7     those sought in the breach of contract claim, and seek purely economic damages.  (*Id.* at 4-

8     5.  *See also id.* at 3 ["State and federal courts in Arizona have repeatedly found that the

9     ELR applies to fraud and negligent misrepresentation claims, especially when those losses

10    are purely economic."].)  In response, Houchin argues that, in Arizona, the ELR is limited

11    to products liability claims and construction defect cases.  (Doc. 170 at 3.)  Houchin then

12    analogizes to *Griffey v. Magellan Health Inc.*, 562 F. Supp. 3d 34, 41 (D. Ariz. 2021),

13    arguing that "*Griffey* makes it clear that . . . this Court will not extend the [ELR] without

14    direction from the Arizona Supreme Court."  (Doc. 170 at 4-5.)

15        Although the Court disagrees with Houchin's position that *Griffey* is "binding law"

16    that precludes the Court from applying the ELR outside products liability and construction

17    defect cases, it is also clear the scope of the ELR is not as broad as the Gorrie Parties

18    contend.  In *Flagstaff Affordable Housing*, the Arizona Supreme Court explained that

19    "application of the economic loss doctrine should rest on explicit consideration of the

20    relevant tort and contract law policies."  223 P.3d at 672 n.5.  *See also Greyhound Lines*

21    *Inc. v. Viad Corp.*, 2016 WL 6833938, *7 (D. Ariz. 2016) (noting that, in *Flagstaff*

22    *Affordable Housing*, "the Arizona Supreme Court explained that application of the doctrine

23    to various tort claims requires a context-specific analysis that must take into account the

24    policies behind contract and tort law").  "While tort law seeks to promote safety and spread

25    the costs of accidents, contract law 'seeks to preserve freedom of contract and to promote

26    the free flow of commerce.'  Thus, if 'common law contract remedies provide an adequate

27    remedy because they allow recovery of the costs of remedying the defects . . . and other

28    damages reasonably foreseeable to the parties upon entering the contract[,]' there is no

strong policy reason to also provide a tort remedy." *Id.*

Here, the Court is not convinced that the Arizona Supreme Court would apply the ELR to bar Houchin's tort claims. In Count Four, Houchin alleges that the Gorrie Parties made various misrepresentations, including not only the information expressly warranted in the JVA but also other information regarding Gorrie's ability to oversee a successful hemp operation and Dawson's participation therein (which was not memorialized in the JVA). (Doc. 134 at 21-22 ¶¶ 116-21.) According to Houchin, the Gorrie Parties knew these representations were false and made them for the purpose of inducing Houchin to participate in the joint venture. (*Id.* at 22 ¶¶ 122-27.) Although some of these allegations overlap with Houchin's breach of contract claim, others contain distinct facts outside the scope of the JVA. (*Compare id.* at 19 ¶¶ 85-93 *with id.* at 21-22 ¶¶ 116-27.) Count Five relies on allegations similar to those that give rise to Count Four. (*Id.* at 23-24 ¶¶ 131-40). These distinctions, combined with the previously discussed policy concerns that may arise when the ELR is applied to a claim of fraudulent inducement, weigh against dismissing Counts Four and Five on this ground.[78]

Finally, as for the Gorrie Parties' contention that the ELR bars Counts Four and Five because Houchin could have cancelled the JVA during the "due diligence" period (Doc. 158 at 5), this argument fails on the facts. Houchin alleges that he learned that the Gorrie Parties' representations were false after the due diligence period ended—*e.g.*, in early July 2021, Houchin learned that Stadtler held a security interest in the property and was asserting a breach of the Farm Purchase Documents. (Doc. 134 at 17 ¶ 66.) And, consistent with the observation above that Counts Four and Five are not wholly derivative of Houchin's contract claim, some of the alleged misrepresentations do not constitute breaches of the JVA. (*See, e.g.*, *id.* at 16 ¶ 56 [alleging that IGD and Gorrie fired Dawson on May 28, 2021, two days after the parties executed the JVA].)

---

[78] The Gorrie Parties also emphasize the fact that Houchin seeks "purely economic damages" as determinative of whether the ELR applies. (Doc. 158 at 5 ["[P]urely economic damages are sought which alone suggest that the ELR is an appropriate bar."].) But "[i]n Arizona the ELR is not a per se rule denying tort liability to all plaintiffs who suffer only economic losses." *Jes Solar*, 2015 WL 10943562 at *3.

b. **Rule 9(b)**

The Gorrie Parties argue that Count Four fails under Rule 9(b) because Houchin fails to allege "with particularity" the materiality of and Houchin's justifiable reliance on the alleged misrepresentations. (Doc. 158 at 6.) According to the Gorrie Parties, because of these alleged defects, "IGD cannot adequately answer Houchin's fraud claim." (*Id.*)

Rule 9(b) requires that the circumstances constituting fraud be stated "with particularity." In other words, [a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted). However, "malice, intent, knowledge, and other conditions of mind may be alleged generally." *Van Go*, 2016 WL 4974968 at *3.

Houchin has adequately pleaded the circumstances constituting fraud under Rule 9(b). Count Four alleges that IGD and Gorrie (the "who") made specific false representations about IGD's business affairs and the Gorrie Parties' ability to run a hemp operation (the "what"). (Doc. 134 at 22 ¶¶ 117-20.) Count Four further alleges that the representations were false because IGD had potential claims pending against it and had defaulted on the Promissory Note and the Gorrie Parties did not know how to oversee the joint venture's operations (more of the "what"). (*Id.* at 22 ¶¶ 119-21.) Count Four alleges that the misrepresentations were made before the JVA was executed (the "when") both in conversations with Houchin and as express representations in the JVA (the "where" and "how"). (*Id.* at 22 ¶¶ 117-27.) Count Four also alleges that the Gorrie Parties knew the representations were false and made them knowing that Houchin would rely upon them in deciding to participate in the joint venture. (*Id.* at 22 ¶¶ 124-26.) Additionally, Count Four alleges that Houchin did not know the representations were false and relied upon them to his detriment. (*Id.* at 22-23 ¶¶ 126-28.) Finally, Count Four alleges that "but for [the Gorrie Parties] making said representations . . . , [Houchin] would not have participated in the joint venture" (demonstrating materiality). (Doc. 134 at 22 ¶ 127.) These allegations are sufficient to meet Rule 9(b)'s heightened pleading requirements.

### c. **Future Promise**

The Gorrie Parties also contend that Counts Four and Five should be dismissed because they rely on a future promise. (Doc. 158 at 7.) Specifically, Houchin alleges that, before the JVA was executed, Gorrie represented that "Dawson would manage the operations on the JVA Plot," yet Dawson was terminated two days after the JVA was executed (and immediately after IGD received funding from Houchin). (Doc. 134 at 16 ¶ 56, 22 ¶ 121.) According to the Gorrie Parties, this allegation cannot support a fraudulent inducement or negligence misrepresentation claim because it is a promise to perform a future act. (Doc. 158 at 7.)[79]

"Representations which give rise to an action of fraud must, of course, be of matters of fact which exist in the present, and not merely an agreement or promise to do something in the future . . . ." *Waddell*, 108 P.2d 565 at 569. Similarly, "no claim of relief for negligent misrepresentation can be premised upon a promise of future conduct." *McAlister*, 829 P.2d at 1261. "To this there is one exception, that when a promise to perform a future act is made with the present intention on the part of the promisor that he will not perform it, it is such a representation as will give rise to an action of fraud." *Waddell*, 108 P.2d at 569.

Here, interpreting the allegations in the light most favorable to Houchin, Counts Four and Five rest on the premise that Gorrie made a future promise to Houchin (*i.e.*, that Dawson would manage the relevant hemp operations) with no intention of performing consistent with the promise. This allegation is plausible in light of the other factual allegations in the pleading. That IGD terminated Dawson only *two days* after the JVA was executed, immediately after receiving funding from Houchin under the JVA, allows for the plausible inference that Gorrie did not intend to allow Dawson to oversee the hemp operations when she made the promise to Houchin. *Twombly*, 550 U.S. at 556.

---

[79] The Gorrie Parties also argue that "IGD fulfilled the future promise to perform the act by allowing Dawson to oversee the operations on the JVA plot of land," which shows that "IGD had the intention of performing consistent with the alleged representation." (Doc. 158 at 7.) These are factual arguments not appropriate on a motion to dismiss.

d.     **Justifiable Reliance**

Finally, the Gorrie Parties argue that, as a matter of law, Houchin could not have justifiably relied on the alleged misrepresentations because (1) he signed the JVA, which included conditions precedent requiring him to independently investigate IGD's representations; and/or (2) his close relationship with Stadtler makes the alleged reliance "hard to believe."  (Doc. 158 at 8.)

The "conditions precedent" argument fails here for the same reasons it failed in relation to Counts One and Two.  Also, as discussed, Houchin's fraudulent inducement claim does not rely solely on the representations in the JVA.  At any rate, Arizona courts have emphasized that contracting parties cannot rely upon such provisions to avoid fraud claims.  *See, e.g.*, *Wagner v. Rao*, 885 P.2d 174, 177 (Ariz. Ct. App. 1994) ("Although parties may contractually disclaim potential tort liability by a clear expression of intent to do so, our courts have carved out an exception for cases involving fraud. . . .  [A] seller should not be permitted to hide behind an integration clause to avoid the consequences of a misrepresentation.") (citations omitted); *S Dev. Co. v. Pima Cap. Mgmt. Co.*, 31 P.3d 123, 128 (Ariz. Ct. App. 2001) ("[W]e find merit in the appellees' argument that the existence of an 'as is' provision in a purchase contract generally operates only as a waiver of breach of warranty claims, not tort claims.").

As for Houchin's familial relationship with Stadtler, the Gorrie Parties' argument is fact-based and thus not appropriate on a motion to dismiss.  At this juncture, the Court assumes the allegations underlying Houchin's counterclaims are true.  *In re Fitness Holdings*, 714 F.3d at 1144.  Houchin alleges that he did not know (until after the JVA was executed) about Stadtler's security interest in the Farm or that IGD had defaulted on the Promissory Note.  (Doc. 134 at 17 ¶¶ 66-73.)  That Stadtler is Houchin's uncle does not render his reliance on the accuracy of the Gorrie Parties' affirmative representations about IGD unreasonable as a matter of law.

…

…

Accordingly,

**IT IS ORDERED** that:

(1)     The Gorrie Parties' motion for sanctions (Doc. 118) is **denied**.

(2)     The Gorrie Parties' motion for leave to file a second amended counterclaim and first amended third-party complaint (Doc. 146) is **denied**.

(3)     The Stadtler Parties' motion to dismiss (Doc. 87) is **granted in part and denied in part**.  Counts Five, Seven, and Eight of the Gorrie Parties' First Amended Answer, Counterclaim, and Third-Party Complaint (Doc. 77) are dismissed without leave to amend.

(4)     The Stadtler Parties' motion to strike (Doc. 142) is **denied**.

(5)     The Gorrie Parties' partial motion to dismiss the SAC (Doc. 136), which the Court has construed as a Rule 12(c) motion, is **denied**.

(6)     The Gorrie Parties' partial motion to dismiss Houchin's third-party counterclaims (Doc. 158) is **denied**.

Dated this 13th day of March, 2023.

Dominic W. Lanza
United States District Judge