**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D Stadtler Trust 2015 Trust, et al.,<br>Plaintiffs,<br><br>Plaintiff<br><br>v.<br><br>Pamela Gorrie, et al.<br><br>Defendants. | No. CV-22-00314-PHX-DWL<br><br>**ORDER** |

In this action, Daniel Stadtler ("Stadtler"), in his individual capacity and in his capacity as trustee for the D. Stadtler Trust 2015 ("the Trust") (together, "the Stadtler Parties"), has sued Pamela Gorrie ("Gorrie"), Innovative Global Distributions, LLC ("IGD"), Natural Footprints Organic Farm LP ("NFOF"), and NFF Management LLC ("NFF") (collectively, "the Gorrie Parties"). (Doc. 131.) The Gorrie Parties have, in turn, asserted counterclaims against the Stadtler Parties. (Doc. 77.) Additionally, IGD and Gorrie (together, "the IGD Parties") have asserted third-party claims against William Houchin ("Houchin"), who has asserted third-party counterclaims against the IGD Parties. (Doc. 134.) At the root of this sprawling dispute is a failed hemp operation in Salome, Arizona.

Now pending before the Court are summary judgment motions filed by all three sets of litigants. (Docs. 255-257.) For the reasons that follow, each motion is granted in part and denied in part.

…

**BACKGROUND**

I.   <u>Undisputed Background Facts</u>

The Trust owned a 540-acre parcel of agricultural land situated at 68562 56th Street, Salome, Arizona (the "Farm").  (Doc. 17-1 at 2; Doc. 110-1 ¶ 4.)  Stadtler hired non-party William Dawson ("Dawson") to broker a potential sale of the Farm.  (Doc. 110-1 ¶ 5; Doc. 17-1 at 2.)

In November 2019, Dawson, on behalf of Stadtler, began discussing a potential sale of the Farm with Gorrie.  (Doc. 110-1 ¶¶ 5-8.)

On January 17, 2020, the Trust and IGD executed a real estate purchase contract (the "Farm Purchase Agreement") under which IGD would buy the Farm from the Trust for $1.4 million.  (Doc. 17-1.)  Under the Farm Purchase Agreement, the Trust provided seller-carryback financing for a large portion of the purchase price—IGD agreed to pay $20,000 upon signing the agreement, $280,000 at closing, and $1.1 million over the following 18 months according to a payment schedule.  (*Id.* at 2.)

On February 11, 2020, IGD and the Trust executed an Addendum to the Farm Purchase Agreement (the "Purchase Addendum").  (Doc. 17-3.)  The Purchase Addendum required IGD to pay $60,000 at closing and an additional $240,000 within 30 days of closing.  (*Id.*)

On February 27, 2020, the sale closed.  (Doc. 110-1 ¶ 9; Doc. 257-2 at 8).  Around the same time, the Trust and IGD executed a promissory note for $1.34 million (the "Promissory Note") that was secured by a deed of trust (the "Deed of Trust") with IGD as payor and the Trust as beneficiary.  (Doc. 17-2.)

Although the parties dispute why, they agree that the hemp operation the Gorrie Parties intended to operate on the Farm struggled to obtain funding and that IGD did not make the $240,000 payment within 30 days of closing.  (Doc. 77 at 7 ¶¶ 23-26; Doc. 257-2 at 19-21.)

On April 10, 2020, the Trust and NFOF executed a revenue-sharing agreement (the "April 2020 RSA").  (Doc. 17-4.)  At that time, NFOF was leasing the Farm from IGD.

(*Id.* at 2.)  Under the April 2020 RSA, NFOF would pay the Trust "1% of the net revenue from the harvest, process, and sale of hemp products from the operation of the Farm" for up to five years, but with a maximum allocation of $1 million per year.  (*Id.*)

On January 10, 2021, IGD and Stadtler signed another revenue-sharing agreement (the "Three Acre RSA").  (Doc. 17-5 at 1-4.)  Under the Three Acre RSA, IGD agreed to finance the hemp operations on a three-acre parcel of the Farm and provide a UCC-1 lien on the hemp crop from that parcel in exchange for Stadtler providing a $75,000 line of credit, which IGD would repay with revenue generated by the three-acre operation.  (*Id.*) The parties agreed that "[t]he remaining monies from the sale of the hemp product … shall be split equally between the parties."  (*Id.* at 3.)  However, IGD did not subsequently register the UCC-1 lien.  (Doc. 255-2 at 5.)

On January 14, 2021, Stadtler, Gorrie, and Dawson executed a related document entitled "Personal Loan and Agreement."  (Doc. 17-5 at 5-7.)  Under the Personal Loan and Agreement, Gorrie and Dawson agreed to personally guarantee Stadtler's $75,000 line of credit to IGD.  (*Id.*)

From January 10, 2021 to April 30, 2021, Stadtler provided at least $62,575 in funding to IGD.  (Doc. 255-3 at 33.)

On May 11, 2021, IGD and Stadtler executed a document entitled "Addendum to the Original Personal Loan and Agreement, Revenue Sharing Agreement between Pamela J. Gorrie dba [IGD] (the Borrower) and Dan Stadtler (the Lender) executed January 14, 2021 between the parties" (hereinafter, the "Three Acre Addendum").  (Doc. 17-7.)  The Three Acre Addendum stated that Stadtler had already provided more than $100,000 in funding and that hemp cultivation on the three-acre parcel had been unsuccessful.  (*Id.* at 2.)  The Three Acre Addendum stated that Stadtler "will agree to additional funding of the crop" not to exceed $60,000 and that Gorrie, Stadtler, and Dawson would "provid[e] [Stadtler] with an accounting of why additional funding is needed."  (*Id.* at 4.)

On May 26, 2021, IGD and Houchin (Stadtler's nephew) executed a joint-venture agreement (the "JVA") under which Houchin would fund hemp cultivation on a 20-acre

portion of the Farm.  (Doc. 77-5; Doc. 257-6 at 29-32.)  Two days later, IGD and Houchin executed an Addendum to the JVA (the "JVA Addendum") modifying Houchin's stipulated capital contributions.  (Doc. 77-6.)  Houchin ultimately made $72,300 in capital contributions to IGD.  (Doc. 77 at 26 ¶ 23; Doc. 270-4 at 8.)

For reasons that are disputed, the Gorrie Parties' relationships with the Stadtler Parties and Houchin ultimately fell apart, leading to this litigation.

II.   Procedural History

On February 11, 2022, the Stadtler Parties filed a complaint in La Paz County Superior Court, naming the Gorrie Parties as defendants.  (Doc. 1-2 at 10-27.)

On February 27, 2022, Gorrie removed the action to this Court. (Doc. 1.)[1]

On May 2, 2022, the Stadtler Parties filed a First Amended Complaint ("FAC"). (Doc. 25.)

On May 27, 2022, the Gorrie Parties answered the FAC.  (Doc. 38.)  In the same pleading, the Gorrie Parties asserted counterclaims against the Stadtler Parties and the IGD Parties asserted third-party claims against Houchin.  (Doc. 38.)  That same day, the Gorrie Parties also moved for a temporary restraining order ("TRO") and preliminary injunction ("PI") blocking the Trust from pursuing a trustee's sale of the Farm, which was scheduled for June 9, 2022.  (Doc. 39.)  The trustee's sale was later postponed.  (Doc. 60.)

On July 7, 2022, after an evidentiary hearing (Doc. 70), the Court orally denied the Gorrie Parties' TRO and PI request.  (Doc. 82 at 198-206.)

On July 14, 2022, the Gorrie Parties filed their operative pleading, the First Amended Answer, Counterclaim and Third-Party Complaint.  (Doc. 77.)  In it, the Gorrie Parties assert the following 10 counterclaims against the Stadtler Parties: (1) breach of the April 2020 RSA, Deed of Trust, Promissory Note, and Purchase Addendum; (2) declaratory judgment that the April 2020 RSA modified the terms of the Promissory Note, Deed of Trust, and Purchase Addendum; (3) breach of the Three Acre RSA; (4) fraudulent

---

[1]     The Stadtler Parties challenged the validity of Gorrie's removal effort (Doc. 11), but the Court eventually denied the Stadtler Parties' motion to remand (Doc. 21).

inducement; (5) tortious interference with contract; (6) breach of the implied covenant of good faith and fair dealing; (7) injunctive relief; (8) negligence per se; (9) estoppel; and (10) breach of fiduciary duty.  (*Id.* at 17-24.)  In the same pleading, the IGD Parties assert the following five third-party claims against Houchin: (1) breach of the JVA; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory judgment; (4) tortious interference with business expectancy; and (5) breach of fiduciary duty.  (*Id.* at 27-30.)

On December 5, 2022, the Stadtler Parties filed their operative pleading, the Second Amended Complaint ("SAC").  (Doc. 131.)[2]  It asserts the following six claims against the Gorrie Parties: (1) breach of the Three Acre RSA and Personal Loan, as amended by the Three Acre Addendum; (2) breach of Gorrie's personal guarantee of the Personal Loan; (3) unjust enrichment; (4) fraudulent inducement; (5) negligent misrepresentation; and (6) conversion/replevin.  (*Id.* at 27-35.)

On December 9, 2022, Houchin filed his operative pleading, the First Amended Answer to Third-Party Complaint and Third-Party Counterclaim.  (Doc. 134.)  It asserts the following six third-party counterclaims against the IGD Parties: (1) breach of the JVA; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) fraudulent inducement; (5) negligent misrepresentation; and (6) breach of fiduciary duty.  (*Id.* at 19-24.)

On January 6, 2023, the Gorrie Parties filed a second motion for a TRO and PI, again seeking to block the Trust from pursuing a trustee's sale of the Farm.  (Doc. 149.)

On January 11, 2023, after a hearing (Doc. 157), the Court denied this request. (Doc. 184 at 39-47.)

On January 12, 2023, the trustee's sale of the Farm occurred.  (Doc. 179-1; Doc. 257-1.)

On March 14, 2023, after a slew of motions practice, the Court issued a lengthy order that, among other things, dismissed the Gorrie Parties' fifth, seventh, and eighth

---

[2]      On October 14, 2022, the Stadtler Parties filed a motion for leave to file the SAC. (Doc. 103.)  On November 29, 2022, after extensive briefing (Docs. 109, 114, 115, 123, 126), the Court granted the Stadtler Parties' amendment request.  (Doc. 129.)

1    counterclaims against the Stadtler Parties.  (Doc. 203 at 45-46.)

2    On October 13, 2023, the Stadtler Parties' moved for summary judgment on the

3    Gorrie Parties' remaining counterclaims and partial summary judgment on their own

4    claims (Doc. 255); Houchin moved for summary judgment on the IGD Parties' third-party

5    claims (Doc. 256); and the Gorrie Parties moved for partial summary judgment on the

6    Stadtler Parties' claims and Houchin's third-party counterclaims (Doc. 257).   These

7    motions are now fully briefed.  (Docs. 269-71, 277-79.)[3]

8    **DISCUSSION**

9    I.    <u>Legal Standard</u>

10   "The court shall grant summary judgment if [a] movant shows that there is no

11   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

12   of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

13   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

14   in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

15   1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

16   to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

17   *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is

18   improper where divergent ultimate inferences may reasonably be drawn from the

19   undisputed facts."  *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

20   A party moving for summary judgment "bears the initial responsibility of informing

21   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

22   depositions, answers to interrogatories, and admissions on file, together with the affidavits,

23   if any,' which it believes demonstrate the absence of a genuine issue of material fact."

24   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  *See*

25   *also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

26   There is no issue for trial unless enough evidence favors the non-moving party.

27
28   ---
     [3]    Only Houchin requested for oral argument.  (Docs. 256, 270, 278.)  That request is denied because the issues are fully briefed and argument would not aid the decisional process.  *See* LRCiv 7.2(f).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion.  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks omitted).  For "the party with the burden of persuasion at trial" to succeed in obtaining summary judgment, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotation marks omitted).  The party without the burden of persuasion at trial is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts.  *Celotex Corp.*, 477 U.S. at 322-23.  This distinction reflects that the burden is ultimately on the proponent of each claim to prove it.  *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Where the Court "does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). However, where "it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established." Fed. R. Civ. P. 56(g) (2010 amendments advisory comments).

## II.     The Stadtler Parties' Motion

### A.     **The Gorrie Parties' Counterclaims**

#### 1.     The Parties' Arguments

Although the Stadtler Parties indicate at the outset of their motion that they are seeking summary judgment on "each of the counterclaims filed by" the Gorrie Parties (Doc. 255 at 2), the Stadtler Parties state in their first section heading that they are only seeking summary judgment on Counterclaims One, Four, Six, and Ten. (*Id.* at 16.) The Stadtler Parties argue that damages are an essential element of each of those counterclaims and "the Gorrie Parties have failed to produce evidence sufficient to establish their alleged lost profits damages with reasonable certainty" and "have no expert or witness to competently testify as to damages and have offered only varying and highly speculative estimates of their damages." (*Id.* at 16-19.) More specifically, the Stadtler Parties contend that (1) "the Gorrie Parties have failed to submit sufficient evidence to establish a reasonable certainty that they could plant, germinate, grow, and harvest any crops"; and (2) "the Gorrie Parties have failed to submit sufficient evidence to establish with reasonable certainty the net profits that they allegedly lost." (*Id.* at 19-22.) The Stadtler Parties also argue that because Counterclaim Two is simply a request for declaratory relief concerning Counterclaim One, and Counterclaim One has now been shown to "fail[] as a matter of law," it follows that Counterclaim Two "is moot." (*Id.* at 26.) Finally, as an alternative

- 8 -

basis for seeking summary judgment on Counterclaims One and Two, the Stadler Parties argue that (1) "the April 2020 RSA was not sufficiently clear and certain to effectuate a valid modification for purposes of the Statute of Frauds"; and (2) "[a] loan agreement may not be modified by a subsequent signed writing that does not expressly reference the modification to the original agreement." (*Id.* at 22-26.)

The Gorrie Parties begin by objecting to two categories of evidence cited in the Stadler Parties' motion. First, the Gorrie Parties object to the expert report of Scott Evans (the "Evans Report") because it is unsworn. (Doc. 271 at 2-3.) The Gorrie Parties also contend the Evans Report is inadmissible "because it fails to attach copies of the documents to which it refers." (*Id.*) Second, the Gorrie Parties object, on hearsay grounds, to the Stadler Parties' references to certain comments made by Bankruptcy Judge Collins during IGD's bankruptcy proceeding. (*Id.* at 3.) Next, the Gorrie Parties provide a lengthy narrative of the facts of the case, which is supported by citations to an unsigned declaration from Gorrie. (*Id.* at 3-9, citing Doc. 271-1 [unsigned Gorrie declaration].) Next, the Gorrie Parties contend "there is ample evidence to demonstrate the damages occasioned by both Stadler and Houchin's breaches in this matter." (*Id.* at 9-13.) Next, the Gorrie Parties dispute several of the Stadler Parties' interpretations of the April 2020 RSA and Three Acre RSA (*id.* at 13-14) and several related factual assertions (*id.* at 14-16). Finally, the Gorrie Parties contend that "the statute of frauds is inapplicable because there is a writing and a course of dealing." (*Id.* at 16-18.)

In reply, the Stadler Parties begin by objecting to Gorrie's unsigned declaration, which they contend provides almost all of the evidentiary foundation for the Gorrie Parties' arguments. (Doc. 277 at 2-3.) The Stadler Parties further contend that "the Gorrie Parties' other supporting evidence is inadmissible where not properly authenticated." (*Id.* at 4-5.) The Stadler Parties then reiterate that "summary judgment . . . on counts 1, 4, 6, and 10 of the Gorrie Parties' amended counterclaim . . . is warranted . . . where the Gorrie Parties have failed to produce evidence sufficient to establish their alleged lost profits damages with reasonable certainty." (*Id.* at 5-8.) Alternatively, the Stadler Parties reiterate that

"summary judgment is mandated on Counts One and Two . . . based on the statute of frauds." (*Id.* at 8-9.)  The Stadtler Parties also attach a signed declaration from Evans.  (*Id.* at 12, citing Doc. 277-1 [signed Evans declaration].)   As for Judge Collins's comments, the Stadtler Parties contend they were "not presented for the truth of the matter discussed therein." (*Id.*)

## 2. Evidentiary Objections

The Gorrie Parties' evidentiary objections are unavailing.  Although the Evans Report was not signed under penalty of perjury or initially accompanied by a declaration from Evans, the Stadtler Parties provided a declaration from Evans as an attachment to their reply.  *See, e.g.*, *Am. Fed'n of Musicians of United States & Canada v. Paramount Pictures Corp.*, 903 F.3d 968, 976-77 (9th Cir. 2018) ("For purposes of Federal Rule of Civil Procedure 56(c)(4), there is no meaningful distinction between an expert report accompanied by a sworn declaration and an expert report that is itself sworn.") (footnote omitted); *AMC, LLC v. Nw. Farm Food Coop.*, 481 F.Supp.3d 1153, 1160 n.1 (D. Or. 2020) ("In response to NW Farm's objection, AMC authenticated Dr. Hildebrandt's reports by submitting Dr. Hildebrandt's declaration in which he states under penalty of perjury that the Exhibits to which NW Farm objected are true and correct copies of his reports and that he is prepared to testify to his opinions at trial.") (cleaned up); *Martin v. City of San Jose*, 2020 WL 5910078, *4 n.9 (N.D. Cal. 2020) ("Defendants have generally objected to the Smith expert report as well as other reports from Plaintiffs' experts because they were unsworn, *i.e.*, not attached to declarations from the experts. . . .  Mr. Martin has now cured any problems with the submission of expert declarations as part of his reply brief."); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 539 (4th Cir. 2015) ("[S]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment.") (citation omitted).  Evans's declaration meets the requirements of Rule 56(c)(4) because it is signed under penalty of perjury and "satisfies the functional concerns behind Rule 56(c)(4)—that [Evans] is competent to testify to the

conclusions and opinions in the report." *Am. Fed'n of Musicians*, 903 F.3d at 977.

The Gorrie Parties also contend that Evans failed to provide an appendix identifying the documents he reviewed (Doc. 271 at 2), but Evans did provide such an appendix.  (Doc. 255-3 at 29-32.)  Nor is there any merit to the Gorrie Parties' contention that Evans should have provided copies of every document he reviewed.  (Doc. 271 at 2.)  Appendix B identifies the documents Evans reviewed, and it appears those documents were either publicly filed, otherwise publicly available, or produced in discovery.  (Doc. 255-3 at 29-32.)  Although the Gorrie Parties complain that the failure to attach documents leaves the Court "to assume [the Evans Report] accurately quotes or characterized the documents," the Gorrie Parties have not identified a single document they contend was misquoted or mischaracterized or not made available to then.  *Cf. Brewster v. City of Los Angeles*, 672 F.Supp.3d 872, 1007 (C.D. Cal. 2023) ("Defendants' first argument, that Mr. Cook's analysis is flawed and inadmissible because the underlying VIIC data is not attached to the Dwight Cook Declaration, is disingenuous.  First of all, it is undisputed that the VIIC data and Plaintiffs' reliance upon it was provided to Defendants' Counsel in July 2019, when Plaintiffs first moved for class certification, and Plaintiffs re-sent it to Defendants on January 24, 2023.  As Defendants surely are aware, there is a good reason that Plaintiffs could not have directly attached the data files to the Dwight Cook Declaration, which was submitted in PDF format: the VIIC data is contained in enormous Microsoft Excel spreadsheets. . . .  Defendants have reviewed the data themselves, and because they make no argument to the contrary, the Court infers that they found no problem with how either of Plaintiffs' experts used the dataset.") (citation omitted).

Next, as for the statements by Judge Collins during IGD's bankruptcy proceeding, the Court agrees with the Stadtler Parties that such statements need not be "stricken" because they are not being offered for the truth of the matter asserted (instead, they are only offered to provide context and background) and do not, at any rate, provide the foundation for any of the rulings in this order.

This leaves the Stadtler Parties' objection to Gorrie's unsigned declaration.  That

objection has merit.  An unsigned declaration carries no evidentiary weight at summary judgment.  *See, e.g.*, Fed. R. Civ. P. 56(c)(1)(A); 28 U.S.C. § 1746; *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("[I]n ruling on a motion for summary judgment, a court may substitute an unsworn declaration for a sworn affidavit if the declaration complies with 28 U.S.C. § 1746.  But such documents must be . . . subscribed by the declarant.") (cleaned up); *Young v. Allstate Co.*, 662 F. Supp. 3d 1066, 1072 (C.D. Cal. 2023) ("Young's declarations are fatally defective—neither was signed under penalty of perjury. . . .  Only sworn affidavits—or unsworn declarations that are, *inter alia*, subscribed under penalty of perjury, pursuant [to] 28 U.S.C. § 1746—satisfy the requirement of Rule 56(c)(4).").  Also, unlike the Stadtler Parties in relation to Evans, the Gorrie Parties made no effort to rectify their submission of an unsigned declaration after the deficiency was called to their attention.  *Young*, 662 F. Supp. 3d at 1073 ("If Young's failure to properly subscribe the declarations under penalty of perjury was but a mere oversight, the Court would have expected the Youngs' counsel to have sought immediate *ex parte* relief to obtain leave of Court to file amended and properly subscribed declarations. Allstate pointed out the subscription deficiency in its Reply papers filed on Monday, March 13, 2023.  The Court has yet to receive anything from the Youngs.").  Thus, the Court will not consider Gorrie's unsigned declaration.[4]

       3.    Analysis

       a.    **Damages**

As an initial matter, although the Stadtler Parties' motion papers contain a few passages that can be read as suggesting they are seeking summary judgment on all of the Gorrie Parties' remaining counterclaims (except Counterclaim Two) due to a lack of damages, the relevant section heading states that the Stadtler Parties are only seeking summary judgment on Counterclaims One, Four, Six, and Ten due to a lack of damages. (Doc. 255 at 16; Doc. 277 at 5.)  The Court will limit its analysis accordingly.

---

[4]    The Stadtler Parties also object to Exhibit A (Doc. 271-1 at 10-14) to the declaration. The Court need not resolve that objection because consideration of that exhibit does not affect the disposition of the motions being resolved here.

The four counterclaims at issue are for breach of contract (Counterclaim One), fraud in the inducement (Counterclaim Four), breach of the implied covenant of good faith and fair dealing (Counterclaim Six), and breach of fiduciary duty (Counterclaim Ten).  As the Stadtler Parties correctly note, damages are an essential element of each of those claims. *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004) (breach of contract); *Meritage Homes Corp. v. Hancock*, 522 F. Supp. 2d 1203, 1218 (D. Ariz. 2007) (fraudulent inducement); *United Dairymen of Ariz. v. Schugg*, 128 P.3d 756, 761-62 (Ariz. Ct. App. 2006) (breach of the implied covenant of good faith and fair dealing); *Stazenski v. Coughlin*, 2015 WL 3917039, *4 (Ariz. Ct. App. 2015) (breach of fiduciary duty).  The Gorrie Parties do not argue otherwise.  Thus, to survive summary judgment with respect to those counterclaims, the Gorrie Parties must come forward with sufficient evidence to establish a triable issue of fact as to damages.

Under Arizona law, because "[t]he burden [i]s on the plaintiffs to show the amount of their damages with reasonable certainty," the "plaintiff's evidence" must "provide some basis for . . . an approximately accurate estimate."  *Gilmore v. Cohen*, 386 P.2d 81, 82 (Ariz. 1963).  "The requirement of reasonable certainty in establishing the amount of damages applies with added force where a loss of future profits is alleged . . . because such loss is capable of proof more closely approximating mathematical precision."  *Id.* at 82-83 (cleaned up).  In such cases, the plaintiff must come forward with evidence that would allow the jury to reasonably estimate both (1) how much product the plaintiff would have succeeded in selling; and (2) how much profit the plaintiff would have made from those sales.  *Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 680 P.2d 1235, 1245-47 (Ariz. Ct. App. 1984) ("Rancho Pescado had the burden of proving with reasonable certainty the fact that it could raise catfish in the canal and that it could thereafter market them at a profit as well as proving with reasonable certainty how much profit it would have realized. . . .  [W]e view the evidence as a whole as amounting to nothing more than conjecture and speculation.  The picture which emerges is one of an intelligent and enterprising individual who had an ambitious idea to take advantage of existing waterways to raise and sell catfish.

- 13 -

However, the evidence is insufficient to prove that he would have succeeded in this highly risky industry. . . .  We are of the opinion that the jury did not have sufficient evidence to make a rational judgment as to the fact that Rancho Pescado would have been successful and if so as to the amount of lost future profits.").  As for the latter requirement, profit means revenue minus expenses—a mere estimate of expected revenue is alone insufficient.  *See, e.g., Rancho Pescado*, 680 P.2d at 1245 ("[R]easonable certainty may be provided when the plaintiff devises some reasonable method of computing his *net* loss.") (emphasis added); *Gilliland v. Rodriquez*, 268 P.2d 334, 337 (Ariz. 1954) ("The correct measure of damage to be applied herein is the difference between the value of the probable yield when ready for market and the expense of producing, harvesting the marketing."); *United Verde Copper Co. v. Ralston*, 46 F.2d 1, 2 (9th Cir. 1931) ("The measure of damages for loss of a growing crop where there appears to be a reasonable certainty that it would have matured . . . is to allow for the value of the probable yield under proper cultivation when matured and ready for market, less the estimated expense of producing, harvesting, and marketing."); *McAlister v. Loeb & Loeb, LLP*, 2024 WL 372214, *6 (Ariz. Ct. App. 2024) (affirming trial court's exclusion of lost-profits expert in part because the expert "inexplicably ignored expenses" and "assumed profitability based on (speculative) revenue alone"); *Tourelle Dev., Inc. v. Proffitt*, 2010 WL 1050316, *3 (Ariz. Ct. App. 2010) ("We agree with the superior court that Appellants failed to meet their burden of providing facts to support a 'reasonable basis' for calculating their alleged lost profits damages.  Even assuming Appellants offered satisfactory evidence of the Project's then-current value, that evidence failed to take into account expenses that reasonably would be expected to be incurred before the Project would sell out.") (citation omitted).

The Court has little trouble concluding that the Gorrie Parties have failed to meet their burden as to these requirements.  In their response brief, under the heading "There is ample evidence to demonstrate the damages occasioned by both Stadtler and Houchin's breaches in this matter," the Gorrie Parties begin by attempting to explain their theory as to why Houchin's challenged conduct interfered with their ability to obtain a "minimum

revenue stream" of "between $14,976,000 to $19,989,000," which would have been generated by the sale of hemp and biomass products. (Doc. 271 at 9-11.) However, the only cited proof of the Gorrie Parties' ability to successfully grow and harvest the products necessary to achieve such sales is paragraph 52 of the unsigned Gorrie declaration. (*Id.* at 11 ["Gorrie is able to testify with respect to growing hemp because she was able to grow 205 pounds from 100 plants germinated and grown from 108 seeds. *Gorrie Dec.* ¶ 52"].)[5]

This showing is insufficient to create a triable issue of fact as to the damages associated with the Gorrie Parties' counterclaims against the Stadtler Parties for three independent reasons. First, there is insufficient evidence that the Gorrie Parties could have successfully grown and harvested the hemp and biomass products necessary to achieve the projected sales, as the Gorrie Parties failed in their earlier attempts to grow and harvest such products and the only cited evidence of their ability to succeed in the future is the unsigned Gorrie declaration (who is not, at any rate, designated as an expert on that topic and has no background in agriculture, *see* Doc. 255-5 at 4). *See, e.g., Rancho Pescado,* 680 P.2d at 1245-47. *Compare Gilliland,* 268 P.2d at 388 (holding that witnesses were properly allowed "to testify concerning producing, and marketing of crops" in an action seeking lost profits from a farming operation because "[t]he record shows the witnesses who testified to these matters were qualified and testified from their own knowledge"). Second, the Gorrie Parties have only attempted to identify their lost revenue, and lost profit cannot be calculated unless the claimant also establishes the costs that would have been

---

[5] In the section of the response brief addressing damages, the Gorrie Parties also include what appear to be certain quotations from Gorrie's deposition. Putting aside that those quotations only appear to be offered to explain the Gorrie Parties' methodology for their damage calculations, as opposed to supporting the Gorrie Parties' claimed ability to successfully grow and harvest the products at issue, the Gorrie Parties have not placed the deposition transcript in the record and do not cite to anywhere else in the record where the transcript may be found. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *id.*, advisory committee comment to 2010 amendments ("Subdivision (c)(1)(A) describes the familiar record materials commonly relied upon and requires that the movant cite the particular parts of the materials that support its fact positions. Materials that are not yet in the record— including materials referred to in an affidavit or declaration—must be placed in the record."); *Fleischer Studios, Inc. v. AVELA, Inc.*, 2009 WL 7464165, *2 (C.D. Cal. 2009) ("[T]he court need not search through a voluminous record to locate and identify facts assisting the non-moving party to avoid summary judgment.").

incurred in the course of obtaining the alleged lost revenue.  *See, e.g., Gilliland*, 268 P.2d at 337; *United Verde Copper*, 46 F.2d at 2; *McAlister,* 2024 WL 372214 at *6; *Tourelle Dev.*, 2010 WL 1050316 at *3.  Third, putting aside these fundamental flaws, the point of the discussion in this portion of the Gorrie Parties' brief is to identify the damages caused by Houchin, not the distinct challenged conduct of the Stadtler Parties.

These flaws are not remedied in the next section of the response brief, where the Gorrie Parties contend that their theory of damages as to the Stadtler Parties is "much like the Houchin damage claim" and "involves simple math calculations." (Doc. 271 at 11-12.) Here, the Gorrie Parties contend that "Stadtler's breach of the Jan 21 REV share and May 21 Addendum"—that is, Stadtler's failure to provide the additional $60,000 in funding contemplated in those agreements—"resulted in an inability to plant, germinate, grow and harvest 15,000 seed which had a potential yield of 2 lbs. per plant, or 13,620,000 grams of smokable hemp with a retail value of $81,720,000 due to value of $6 per gram retail sales value." (*Id.* at 12.)  The Gorrie Parties then add: "Gorrie is also able to show the expenses associated with growing the crops because that was the amount of the capital that would need to be repaid to both Stadtler and Houchin at the time of the sale of the crops as provided in each of the agreements with those parties." (*Id.*)  Although this discussion, unlike the discussion regarding Houchin, is at least pitched toward the correct adversaries, it is insufficient to create a triable issue of fact on damages for the first two reasons identified in the paragraph above.  First, there is insufficient evidence that the Gorrie Parties could have, with an additional $60,000 in funding from Stadtler, successfully grown and harvested the products necessary to achieve over *$81.7 million* in retail sales revenue. *See, e.g., Rancho Pescado,* 680 P.2d at 1245-47.  Second, once again, the Gorrie Parties have only identified lost revenue, which is not the same thing as lost profit.  *See, e.g., Gilliland*, 268 P.2d at 337; *United Verde Copper*, 46 F.2d at 2; *McAlister,* 2024 WL 372214 at *6; *Tourelle Dev.*, 2010 WL 1050316 at *3.  Nor is there any merit to the Gorrie Parties' conclusory assertion that the only "expenses associated with growing the crops" would have been repaying certain money to Houchin and/or Stadtler.  This overlooks the obvious

other costs associated with a multi-million dollar farming operation, such as (but not limited to) fertilizer, labor, water, and marketing. *Cf. Gilliland*, 268 P.2d at 337-38 (noting, in case seeking lost profits "for loss of an onion and carrot crop because of inability to pump irrigation water," that the lost revenue had to be offset by the "cost of production, harvesting and marketing").

b.   **Counterclaim Two**

For the reasons stated above, the Stadtler Parties are entitled to summary judgment on Counterclaims One, Four, Six, and Ten. Additionally, Counterclaims Five, Seven, and Eight were dismissed in an earlier order. (Doc. 203.) Thus, the only remaining counterclaims are Counterclaims Two, Three, and Nine.

Of those counterclaims, the Stadtler Parties only raise a proper request for summary judgment as to Counterclaim Two, which is the Gorrie Parties' claim for declaratory relief that the April 2020 RSA "modified the payment obligations" arising from the Promissory Note and the Purchase Addendum and "discharge[d] the preexisting duties under the Promissory Note." (Doc. 77 ¶¶ 78-82.) As noted, the Stadtler Parties advance two alternative bases for seeking summary judgment on Counterclaim Two: (1) the April 2020 RSA did not, for various reasons, modify IGD's obligations under the Farm Purchase Agreement, the Purchase Addendum, the Promissory Note, and Deed of Trust; and (2) Counterclaim Two is contingent on the success of Counterclaim One. Because the Court agrees with the former argument, it is unnecessary to reach the latter.

Under Arizona law, a material term of a written agreement that was subject to the statute of frauds may not, in general, be orally amended. *Executive Towers v. Leonard*, 439 P.2d 303, 305 (Ariz. Ct. App. 1968) ("Where an original agreement comes within provisions of the statute of frauds requiring certain agreements to be in writing, the statute of frauds renders invalid and ineffectual a subsequent oral agreement changing the terms of the written contract."). Instead, "the modification of a material term of an agreement, which was required by the statute of frauds to be in writing, must also be in writing." *Best v. Edwards*, 176 P.3d 695, 698 (Ariz. Ct. App. 2008). The written modification must, itself,

"comply with the statute of frauds."  *Id.* at 700.  *See also id.* at 699 (citing, with approval, a Minnesota case's holding that a "modification to a contract must, itself, satisfy the statute of frauds if it would be subject to the statute of frauds were it a separate contract") (citation omitted).  The Gorrie Parties appear to agree with these principles but argue that the April 2020 RSA is the sort of writing that is sufficient to amend an earlier written agreement that was subject to the statute of frauds.  (Doc. 271 at 16-18.)  Alternatively, the Gorrie Parties argue that a limited exception to the statute of frauds, known as the estoppel or part performance exception, applies.  (*Id.*)

The Gorrie Parties' first argument is unavailing.[6]  To comply with the statute of frauds, a writing must, among other things, "state[] with reasonable certainty the essential terms of the unperformed promises in the contract."  Restatement (Second) of Contracts § 131(c).  *See also Register v. Coleman*, 633 P.2d 418, 421 (Ariz. 1981) ("The statute requires there be a memorandum in writing . . . [that] must contain the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made.").  If the writing does not identify, with reasonable certainty, the essential terms and conditions of the agreement, it is invalid.  *See, e.g., Nowell v. Andrew Wright Enterprises*, 691 P.2d 1107, 1109-12 (Ariz. Ct. App. 1984) (concluding that writing did not comply with statute of frauds due to lack of specificity and applying § 131 of the Restatement); Restatement (Second) of Contracts § 131, cmt. g (noting that "[t]he 'essential' terms of unperformed promises must be stated" and that "omission or misstatement of an essential term means that the memorandum is insufficient").  Additionally, a deficiency in identifying the essential terms and conditions of the agreement "cannot be remedied by resort to parol evidence, nor is parol evidence available to supply a missing term by labeling

---

[6]      In the March 2023 order, the Court did not reach the merits of this issue because "the parties' briefing related to the statute of frauds [was] particularly bare-bones" and "neither side addresse[d] whether the substance of the April 2020 RSA was sufficiently clear and certain to effectuate a valid modification for purposes of the statute of frauds." (Doc. 203 at 52.)  The Court thus concluded that "[w]hether the April 2020 RSA was a sufficient writing to achieve such a modification is . . . a different question for a different day."  (*Id.* at 53.)  Through the parties' summary judgment briefing, that day has now arrived.

an agreement 'ambiguous.'"  *Gray v. Kohlhase*, 502 P.2d 169, 171-72 (Ariz. Ct. App. 1972).  *See also Realty Executives Int'l Servs. LLC v. Devonshire W. Canada Ltd.*, 2020 WL 5057655, *4 (D. Ariz. 2020) ("The statute requires a writing that . . . sets forth the terms and conditions of all of the promises constituting the contract.  REI does not dispute that the 2008 Agreement omits much of this information, but instead contends that the missing terms can be supplied by 'context and performance'—in other words, by parol evidence.  On this point, REI is just wrong.") (citations omitted); *Custis v. Valley Nat. Bank of Phoenix*, 375 P.2d 558, 561 (Ariz. 1962) ("Where a written memorandum is deficient for the reason that essential terms are omitted, parol evidence is not admissible to supply these missing terms.").

The language of the April 2020 RSA does not indicate that the parties intended it to modify the Promissory Note, Deed of Trust, or Purchase Addendum.  Under the April 2020 RSA, NFOF and the Trust agreed to share revenue from the Farm.  Nothing in the agreement references the Promissory Note, Deed of Trust, or Purchase Addendum or suggests any intent to modify them.  (Doc. 17-4.)  The April 2020 RSA does say that it "sets forth the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior agreements, term sheets and understandings between the parties relating to the subject matter hereof."  (*Id.* at 4.)  But the subject matter of the April 2020 RSA is NFOF's agreement to give 1% of the Farm's revenue to the Trust.  That differs from the subject matter of the Promissory Note, Deed of Trust, and Purchase Addendum, with dealt with IGD's obligation to make certain loan repayments to the Trust.  The bottom line is that without the introduction of parol evidence—which, as discussed, is not allowed in this context—it is impossible to conclude that the April 2020 RSA was intended to modify IGD's repayment obligations under the Promissory Note, Deed of Trust, or Purchase Addendum.

The Gorrie Parties' fallback argument invokes the "part performance" or "estoppel" exception to the statute of frauds, which precludes "a party . . . from asserting the Statute of Frauds as a defense when he has induced or permitted another to change his position to

his detriment in reliance on an oral agreement which would be within the Statute." *William Henry Brophy Coll. v. Tovar*, 619 P.2d 19, 22 (Ariz. Ct. App. 1980).  *See generally Owens v. M.E. Schepp Ltd. P'ship*, 182 P.3d 664, 668 (Ariz. 2008) ("The 'part performance' exception to the statute of frauds is grounded in the equitable principle of estoppel.  The label 'part performance' is in some ways a misnomer: the relevant acts need not be required by the oral agreement, but rather must be undertaken in reliance on the agreement.  In addition to providing an equitable basis for ordering specific performance, acts of part performance serve an important evidentiary function—they excuse the writing required by the statute because they provide convincing proof that the contract exists.  So that this exception does not swallow the rule, the acts of part performance take an alleged contract outside the statute only if they cannot be explained in the absence of the contract.") (citations omitted).  The Gorrie Parties' reliance on this doctrine is unavailing because the only evidence they cite in an attempt to satisfy its requirements is the unsigned Gorrie declaration.  (Doc. 271 at 16-17.)  As discussed in earlier parts of this order, that declaration has no evidentiary value at summary judgment.

Accordingly, the Stadtler Parties are entitled to summary judgment on Counterclaim Two.

B.    **The Stadtler Parties' Affirmative Claims**

1.    The Parties' Arguments

The Stadtler Parties also seek summary judgment on their first two claims against the Gorrie Parties.  (Doc. 255 at 10 ["Relevant here are the following counts: Count One: Breach of Contract (Three Acre RSA and Personal Loan, as amended by the Addendum to Three Acre RSA); and Count Two: Breach of Contract (Personal Guarantee)."]; *id.* at 26 [section heading: "Summary judgment is warranted in favor of the Stadtler Parties on Counts One and Two of the SAC"].)  The Stadtler Parties contend that, under the Three Acre RSA, "if the crop did not produce enough income to repay Mr. Stadtler $75,000.00, he had the right to enforce the Personal Loan and Agreement against Ms. Gorrie" and that "IGD and Ms. Gorrie admit they breached several provisions of the contracts related to the

Three Acre RSA." (*Id.* at 27.) The Stadtler Parties further contend that "[u]nder the Personal Loan and Agreement, if the hemp project was not successful and could not repay Mr. Stadtler, Mr. Stadtler was entitled to recover the money from Ms. Gorrie," but "[d]espite demand, Ms. Gorrie did not repay Mr. Stadtler." (*Id.*) Therefore, the Stadtler Parties seek summary "judgment against Ms. Gorrie and in favor of Mr. Stadtler for $75,000.00." (*Id.* at 27-28.)

The Gorrie Parties' responsive argument, in its entirety, is as follows: "As provided in the express language of the Personal Loan and Agreement, Gorrie is not responsible under the personal guarantee to repay the note 'until 5 days from the final sale of all hemp product produced on these three (3) acres.' However, as provided in the bankruptcy schedules, the hemp product from the three (3) acres has not been sold and is still being held by IGD. As a result, the pre-condition for the personal guarantee has not been met and any demand for payment is not ripe." (Doc. 271 at 18.)

In reply, the Stadtler Parties assert that "summary judgment is warranted . . . on counts one through three." (Doc. 277 at 9-10.)

## 2.   Analysis

At the outset, the Stadtler Parties did not seek summary judgment on Count Three until their reply brief. Accordingly, the Court declines to consider that request. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *Maese-Thomason v. Embry-Riddle Aeronautical Univ.*, 2023 WL 5822513, *13 (D. Ariz. 2023) ("[T]his rule applies with particular force in the summary-judgment context.").

Regarding Counts One and Two, the Stadtler Parties are correct that where "the contractual language is clear," Arizona courts will "afford it its plain and ordinary meaning and apply it as written." *Liberty Ins. Underwriters, Inc. v. Weitz Co., LLC*, 158 P.3d 209, 212 (Ariz. Ct. App. 2007). However, "[t]he intent of the parties to an ambiguous contract is a question of fact which cannot properly be resolved on motion for summary judgment." *Hamada v. Valley Nat. Bank*, 555 P.2d 1121, 1124 (Ariz. Ct. App. 1976). "Where contract

language is susceptible to more than one interpretation, the matter should be submitted to the jury." *State v. Mabery Ranch, Co., L.L.C.*, 165 P.3d 211, 219 (Ariz. Ct. App. 2007).

The Stadtler Parties' primary argument is that "[u]nder the Personal Loan and Agreement, if the hemp project was not successful and could not repay Mr. Stadtler, Mr. Stadtler was entitled to recover the money from Ms. Gorrie." (Doc. 255 at 27.) In fact, the Personal Loan and Agreement states that "in the event that this hemp crop fails to repay the Note . . . Stadtler may within 5 days from the final sale of all hemp product produced on these three (3) acres demand Pamela J. Gorrie and William Dawson to pay . . . Stadtler the remaining outstanding balance within 5 days from such notice." (Doc. 17-5 at 6.) The Stadtler Parties have not established, on this record, that there been a "final sale of all hemp product produced" or that no more hemp product will be produced in the future. Alternatively, even if the "final sale" has occurred, the record is undeveloped as to when it occurred and whether Stadtler gave the required notice within five days of that date.

The Stadtler Parties also contend that "IGD and Ms. Gorrie admit they breached several provisions of the contracts related to the Three Acre RSA: they did not provide a UCC 1 lien, they did not restrict use of the funds to expenses for the Three Acre hemp operation, they did not provide any revenue from the sale of the hemp to the Stadtler Parties, and they did not repay Mr. Stadtler as promised upon demand." (Doc. 255 at 27.) But even assuming that some of these breaches are established on this record—for example, the Gorrie Parties admit that IGD did not provide the required a UCC-1 lien (Doc. 255-2 at 5)—the rule is that when, as here, restitution is sought as damages for breach by non-performance, "restitution is available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach." Restatement (Second) of Contracts § 373, cmt. a. *See also id.*, illustration 2 ("A contracts to build a house for B for $100,000, progress payments to be made monthly. After having been paid $40,000 for two months, A commits a breach that is not material by inadvertently using the wrong brand of sewer pipe. B has a claim for damages for partial breach but cannot recover the $40,000 that he has paid A."). The record is wholly undeveloped as to

whether the UCC-1 lien breach, or the other asserted breaches, constituted partial breaches and a reasonable factfinder could, when drawing all inferences in favor of the Gorrie Parties, conclude that they were. *Cf. Farnsworth v. Evans*, 2011 WL 2176160, *6 (Ariz. Ct. App. 2011) ("[V]iewing the facts in the light most favorable to Evans, there are genuine issues of material fact . . . whether there was a material breach by Keen, precluding summary judgment.").[7]

Finally, the Stadtler Parties point to a provision in the Three Acre Addendum stating that "[t]here has been no fault by IGD LLC, to continue in a good and fair husbandry manner to grow the desired crop, abnormally high weather temperatures were a major factor in the failure of the seedlings.  IGD LLC, chose to slow down in its final planting schedule in the greenhouse in order to correct a few problems with the greenhouse which led to some failure of the hemp plants to grow successfully.  This has been corrected and new planting have resumed in the greenhouse." (Doc. 17-7 at 2.)  But this language does not clearly and unambiguously alter the provisions in the Personal Loan Agreement governing when Gorrie's payment obligations would be triggered.

III.   The Gorrie Parties' Motions

   A.   **The Stadtler Parties' Claims**

The Gorrie Parties move for summary judgment "on Counts One, Two, Three, Four,

_____

[7]   Additionally, as for one of the Stadtler Parties' breach theories—that Gorrie used $25,242 of Stadtler's funding between January 2021 and April 2021 for personal expenditures—the Stadtler Parties attempt to establish the factual predicate for this theory by citing a table that Evans apparently created after reviewing the Gorrie Parties' financial documents.  It states that $25,242 is the "total funds used by Gorrie" during those months. (Doc. 255-3 at 34.)  But no explanation is provided for how Evans concluded that all of these expenditures were for Gorrie's personal use.  The Court thus does not consider this fact to be adequately established for purposes of the Stadtler Parties' request for summary judgment on their affirmative claims. *Cf. Greene v. Bd. of Regents of Univ. Sys. of Georgia*, 2023 WL 5837501, *20 (S.D. Ga. 2023) ("The moving party must carry its burden by presenting credible evidence affirmatively showing that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party.  In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. . . .  Plaintiff has the only expert evidence as to whether Hall complied with the standard of care.  However, even uncontradicted expert opinion testimony is not conclusive, and the jury has every right not to accept it.  Consequently, Hershberger's opinions are not so credible that they would entitle Plaintiff to a directed verdict.") (cleaned up).

1    Five [of the SAC] and a narrowing of Count Six."  (Doc. 257 at 3.)  The Gorrie Parties'

2    various arguments in support of that request are addressed individually below.

3                        1.    Full Credit Bid Rule And Anti-Deficiency Statute

4            The Gorrie Parties seek summary judgment on Counts Three, Four, and Five on the

5    ground that the January 2023 trustee's sale of the Farm extinguished those claims under

6    Arizona's Full Credit Bid Rule, which is set out in A.R.S. § 33-814(D).  (Doc. 257 at 3-5.)

7    In a related vein, the Gorrie Parties argue as to Count Two that "Stadtler's failure to bring

8    a deficiency action within 90 days of the trustee's sale bar[s] his claims against Gorrie

9    pursuant to the Personal Guarantee."  (*Id.* at 5.)  The Stadtler Parties, in turn, disavow any

10   claim for relief "under the Promissory Note and Deed of Trust" in Counts Three, Four, and

11   Five but contend that summary judgment is improper because those counts also "pray for

12   relief under other agreements."  (Doc. 269 at 4.)[8]  As for Count Two, the Stadtler Parties

13   clarify that it is not a claim regarding Gorrie's "personal guarantee of the Farm Purchase

14   Agreement," but rather a claim that "Gorrie breached the Personal Loan and Agreement

15   that secures the Three Acre RSA."  (*Id.* at 9.)  The Gorrie Parties do not respond to these

16   arguments in their reply.  (Doc. 279.)

17           The Gorrie Parties are not entitled to summary judgment based on these arguments.

18   A.R.S. § 33-814(D) provides: "If no action is maintained for a deficiency judgment within

19   the time period prescribed in subsections A and B of this section [usually 90 days after the

20   trustee's sale], the proceeds of the sale, regardless of amount, shall be deemed to be in full

21   satisfaction of the obligation and no right to recover a deficiency in any action shall exist."

22   Courts have interpreted this language as meaning that "borrowers, partners, guarantors, and

23   other persons 'directly, indirectly or contingently liable on the contract' are protected by

24   subsection D's 90-day limit for bringing a deficiency action."  *M & I Bank, FSB v.*

25   *Coughlin*, 805 F. Supp. 2d 858, 861 (D. Ariz. 2011).  *See also Equity Income Partners, LP*

26

27   ───────────────
     [8]    Although the Stadtler Parties only mention "Counts Four and Five of the SAC" in
28   the portion of their brief responding to the Gorrie Parties' arguments regarding A.R.S.
     § 33-814(D) (Doc. 269 at 6), the table appearing several pages earlier in their brief indicates
     they also seek to defend Count Three against those arguments (*id.* at 4).

*v. Chicago Title Ins. Co.*, 387 P.3d 1263, 1268 (Ariz. 2017) ("Arizona's foreclosure scheme protects the borrower and any other person directly, indirectly, or contingently liable under the loan, such as partners and guarantors, from deficiency judgments.").  However, courts have left for another day "whether a borrower/trustor who actively defrauds the lender/beneficiary . . . is protected by § 33-814's 90-day limitations period from an action grounded in fraud in addition to a claim for deficiency on the secured contract.  This is not an obvious consequence of the Deed of Trust Act." *M & I Bank,* 805 F. Supp. 2d at 873.  Additionally, even if "if a defrauding borrower is protected from fraud suits, it hardly means that other participants in the fraud should share in that immunity, or that violators of their own separate contracts with the lender should have special privilege to do so." *Id.* at 873-74.

Although A.R.S. § 33-814(D) precludes the Stadtler Parties from pursuing an action for a "deficiency judgment" related to Promissory Note and Deed of Trust against the borrower (here, IGD) and any person indirectly or contingently liable under those agreements, that principle does not compel the entry of summary judgment on Counts Three, Four, and Five because those claims in their now-narrowed form only seek relief based on other agreements, including the Three Acre RSA.  Likewise, Count Two, which alleges that Gorrie breached the Personal Loan and Agreement, is not implicated because that contract required Gorrie to guarantee IGD's obligations under the Three Acre RSA, not IGD's obligations under the Promissory Note and Deed of Trust.  (Doc. 17-5 at 7.)  Accordingly, the Gorrie Parties' request for an across-the-board grant of summary judgment as to Counts Two, Three, Four, and Five is denied.

2.    Counts Four And Five: Fraudulent Inducement And Negligent Misrepresentation

The Gorrie Parties argue that "Stadtler cannot meet his burden to demonstrate fraud in the inducement for either the purchase of the Farm or under the [Three Acre RSA] as modified by the [Three Acre Addendum]."  (Doc. 257 at 6-8.)  For similar reasons, the Gorrie Parties argue that "Stadtler cannot sustain a negligent misrepresentation claim for

either the Farm Purchase Agreement or the [Three Acre RSA] or the [Three Acre Addendum]."  (*Id.* at 8-9.)  The Stadtler Parties respond that they "have submitted evidence that—at a minimum—creates an issue of fact as to whether the Gorrie Parties fraudulently induced the Stadtler Parties into entering into the Three Acre RSA, Personal Loan and Agreement, and the Three Acre Addendum, and into loaning the Gorrie Parties farm equipment."  (Doc. 269 at 8.)  The Stadtler Parties do not provide much evidence in their response brief, but their argument seems to be that (1) in 2021 (well after the sale of the Farm) Gorrie made misrepresentations about the need for a $75,000 loan to help accomplish a successful hemp harvest that would help her secure further investment from others; (2) Stadtler made a substantial loan in reliance on these representations as part of the Three Acre RSA; and (3) Gorrie then used a substantial portion of that loan for her own personal expenditures rather than to achieve a successful harvest.  (Doc. 110-2 ¶¶ 12-13; Doc. 255-3 at 21, 34.)  In reply, the Gorrie Parties argue that "Stadtler's Response utterly fails to demonstrate the high burden necessary to prove both the fraud in the inducement or negligent misrepresentation."  (Doc. 279 at 2.)

        The Gorrie Parties are not entitled to summary judgment on Count Four.  As an initial matter, although the Gorrie Parties argue there is insufficient evidence of fraudulent inducement in relation to the purchase of the Farm, the Stadtler Parties have now agreed to narrow Count Four to subsequent agreements (*i.e.*, the Three Acre RSA, Three Acre Addendum, and Personal Loan and Agreement).  (Doc. 269 at 4.)  The Stadtler Parties have come forward with sufficient evidence to survive summary judgment as to their fraudulent inducement claim related to those agreements.

        A "fraudulent inducement claim . . . requires proof of the following elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; and (9) the hearer's consequent and proximate injury."  *Lemad Corp. v. Miravista Holdings, LLC*, 2014 WL 4649593, *5 (Ariz.

Ct. App. 2014) (cleaned up).  *See also Meritage Homes*, 522 F. Supp. 2d at 1218 (same). Here, the representations by Gorrie to Dawson (which Dawson conveyed to Stadtler) satisfy the first element despite the fact they went through an intermediary.   Although Arizona courts have not definitely resolved whether "the principle of indirect representation" applies in Arizona, *Leizerman v. Wick*, 2009 WL 325434, *3 (Ariz. Ct. App. 2009), in the Court's view "[i]t should be obvious that one cannot avoid fraud liability by sending a misrepresentation through an intermediary."  *M & I Bank, FSB v. Coughlin*, 2011 WL 5445416, *5 (D. Ariz. 2011).  *See also* Restatement (Second) of Torts § 533 ("The maker of a fraudulent misrepresentation is subject to liability . . . if the misrepresentation . . . is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the [injured party], and that it will influence his conduct in the transaction or type of transaction involved.").

Turning to the next elements, "[t]he general rule" is "that the jury must resolve questions of materiality and reliance in a fraud claim."  *Lerner v. DMB Realty, LLC*, 322 P.3d 909, 914 (Ariz. Ct. App. 2014).  Here, a reasonable juror could conclude that Gorrie represented that the requested investment would be used to achieve a successful harvest and that Stadtler made the investment in reliance on this expectation.  (Doc. 17-5 at 3 ["This agreement is for a $75,000 investment which will plant 3 acres of hemp crop."]; Doc. 110-2 ¶¶ 12-13 ["Ms. Gorrie said that if IGD could show a successful grow of hemp crop, she would be able to attract other investors to help pay for the Property and a larger hemp operation. . . .  I related this idea to Mr. Stadtler who agreed to lend her up to $75,000.00 to get three acres of the Property planted."].)

The Stadtler Parties have also presented a report showing that their accounting expert concluded, after reviewing bank statements from the Gorrie Parties, that Gorrie used at least $25,242 of Stadtler's funding for her own personal expenditures.  (Doc. 255-3 at 34.)  Although, as explained in footnote seven, this evidence is not sufficiently developed to support a grant of summary judgment in favor of the Stadtler Parties on their affirmative claims, it still supplies enough evidence of falsity for the Stadtler Parties to avoid summary

judgment on those claims.  A reasonable juror could also infer that Gorrie intended to use some of the money for personal expenditures at the time she made the representation—according to the Stadtler Parties' proof, she began spending the money for personal use the very same month the Three Acre RSA was signed.  (Doc. 17-5 at 4; Doc. 255-3 at 34.) Finally, a reasonable juror could also conclude that Stadtler had the right to rely on Gorrie's representations and that in making the challenged representations to Dawson, Gorrie intended to induce the conduct that followed.  *See, e.g.*, *Dawson v. Withycombe*, 163 P.3d 1034 (Ariz. Ct. App. 2007) ("A person may rightfully rely upon a misrepresentation of fact even when he may have discovered the falsity of the statement by a simple investigation.").

These conclusions are not undermined by the Gorrie Parties' undeveloped assertion that "Stadtler cannot sustain a fraudulent inducement claim under either [the Three Acre RSA] or the [Three Acre Addendum] because his Agent was intimately involved in all aspects of the deal and was considered by Stadtler to be competent."  (Doc. 257 at 10.) Although the Gorrie Parties do not cite any authority to support this argument, their theory appears to be that because Count Four relies on Gorrie's alleged misrepresentation regarding "her experience and her competence to run a hemp operation and that the proceeds of the hemp operation would be huge," but in Stadtler's eyes Dawson *was* competent, it follows that any fraudulent inducement claim fails.  (*Id.* at 10-11.)  This argument is unavailing because, at a minimum, Count Four is also premised on a different misrepresentation by Gorrie (*i.e.*, how she would use the funds) that is unrelated to her relative competence in relation to Dawson.  *Cf. Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 1993 WL 313162, *2 (N.D. Cal. 1993) ("Kodak cites no authority supporting the proposition that plaintiffs must present every theory of the case in opposition to a motion for summary judgment.").

Finally, because there is sufficient evidence of fraudulent inducement for Count Four to survive summary judgment, the Stadtler Parties' negligent misrepresentation claim in Count Five—which, as now narrowed by the Stadtler Parties (Doc. 269 at 5), is premised on the same theories and evidence—also survives summary judgment.  *Cf. Wigod v. Wells*

1    *Fargo Bank, N.A.*, 673 F.3d 547, 573 (7th Cir. 2012) ("Negligent misrepresentation

2    involves the same elements as fraudulent misrepresentation, except that (1) the defendant

3    need not have known that the statement was false, but must merely have been negligent in

4    failing to ascertain the truth of his statement; and (2) the defendant must have owed the

5    plaintiff a duty to provide accurate information.").  *See also KB Home Tucson, Inc. v.*

6    *Charter Oak Fire Ins. Co.*, 340 P.3d 405, 412 n.7 (Ariz. Ct. App. 2014) (identifying

7    elements of negligent misrepresentation).

8                     3.    <u>Count Six: Conversion/Replevin</u>

9         The Gorrie Parties seek partial summary judgment "narrowing the only potential

10   personal property subject to . . . Count Six . . . to the Tractor." (Doc. 257 at 18.)  According

11   to the Gorrie Parties, Count Six must be narrowed in this fashion because Stadtler "cannot

12   sustain a Replevin/Conversion claim with respect to" the Farm and certain equipment that

13   Stadtler "has taken control over" or "exercises complete dominion over."  (*Id.* at 9.)  In

14   response, the Stadtler Parties concede that they have now recovered the Farm and most of

15   the equipment "that was the subject of Count [Six]" but contend that because "Gorrie

16   admits that she sold a tractor that . . . Stadtler lent her and kept the money for herself,"

17   Count Six survives.  (Doc. 269 at 9-10.)  In reply, the Gorrie Parties argue that "Stadtler is

18   now in possession of all items except for the disputed tractor," which does not "belong[]

19   to Stadtler because Gorrie maintains that the tractor was purchased with funds given to the

20   venture from which Stadtler now seeks damages."  (Doc. 279 at 5.)

21        This appears to be an instance of the parties talking past each other.  The Gorrie

22   Parties do not seek full summary judgment on Count Six—rather, they seek partial

23   summary judgment such that Count Six may only be based on the tractor.  This approach

24   is permissible. *Cf. Paul Johnson Drywall Inc. v. Sterling Grp. LP*, 2024 WL 1285629, *18

25   (D. Ariz. 2024) ("Under Rule 56(a), Sterling is entitled to seek partial summary judgment,

26   including to narrow the grounds on which PJD may argue it breached the contract, even if

27   such a motion does not eliminate PJD's contract claims.").  Meanwhile, the Stadtler Parties

28   seem to agree that Count Six should be limited in this fashion.  Accordingly, the Court

grants partial summary judgment on Count Six, limiting its applicability to the tractor.

### 4.   Count One: Breach of Contract

Finally, the Gorrie Parties contend that "Stadler cannot sustain a breach of contract claim on . . . the [Three Acre RSA] as modified by the [Three Acre Addendum] because he breached the contract first." (Doc. 257 at 9-10.) The Stadler Parties respond that the Gorrie Parties "do not identify which provision" of these agreements "Stadler supposedly breached, nor do they explain why . . . Gorrie and the Gorrie Parties should not be required to repay . . . Stadler the $100,000.00 they admit he lent them." (Doc. 269 at 10-11.) In reply, the Gorrie Parties argue that "[t]he most substantial and material obligation that Stadler had under the [Three Acre Addendum] was to fund the $60,000 on an as needed basis [and] draw basis with all parties working together in a timely manner to furnish the funding and do any accounting" and "his decision to only supply funds to Dawson and unwillingness to work with Gorrie on the accounting or determination of what funds were needed to finish the crop, breached his obligations under the [Three Acre Addendum] and excused Gorrie's performance thereunder" because "[t]his breach was highly material." (Doc. 279 at 5.)

The Gorrie Parties are not entitled to summary judgment on Count One. As noted, summary judgment is generally inappropriate in a breach-of-contract action where the meaning of the disputed provision is ambiguous. *Hamada*, 555 P.2d at 1124; *Mabery Ranch*, 165 P.3d at 219. Under the Three Acre Addendum, Stadler agreed to provide additional funding up to $60,000 "as needed." (Doc. 17-7 at 4.) The contract further contemplated that Gorrie, Stadler, and Dawson would "work together" to provide "Stadler with an accounting of why additional funding is needed." (*Id.*) Although the Gorrie Parties have come forward with evidence (*i.e.,* Stadler's deposition testimony) that Stadler eventually stopped providing funding directly to Gorrie because he questioned whether she would use the money to purchase necessary items for the Farm (Doc. 257-2 at 14-18), it is undeveloped on this record whether Stadler ever received the sort of "accounting[]" that was arguably required to trigger his obligation to provide more funding. Additionally, even

1   assuming that giving money to Dawson instead of Gorrie breached the contract, a jury trial

2   would still be needed to assess materiality.  *Zancanaro v. Cross*, 339 P.2d 746, 750 (Ariz.

3   1959) ("Ordinarily the victim of a minor or partial breach must continue his own

4   performance."); *RCS Cap. Dev., LLC v. A.B.C. Developmental Learning Centers (U.S.A.)*

5   *Inc.*, 2012 WL 2115377, *3 (Ariz. Ct. App. 2012) ("[W]hether a breach is material is a

6   question for a jury.").

7       B.   **Houchin's Claims**

8           1.   The Parties' Arguments

9       The IGD Parties argue that "Houchin's failure of memory . . . bars his claims with

10  respect to Count Four . . . and Count Five" because it prevents him from establishing some

11  of their elements through his testimony.  (Doc. 257 at 11-17.)  The IGD Parties further

12  contend that "Houchin materially breached the JVA first" and "an uncured material breach

13  of contract relieves the non-breaching party from the duty to perform."  (*Id.* at 17.)

14      Houchin responds that there is enough evidence of fraud and negligent

15  misrepresentation to survive summary judgment.  (Doc. 270 at 5-8, 10-11.)  Houchin

16  further contends that he was too exhausted to continue during the deposition, that "in light

17  of Houchin's exhaustion, the parties agreed to end the deposition for that day, and further

18  agreed that it would be continued at a later date," that "[t]he IGD Parties . . . never issued

19  a notice of Houchin's continued deposition—despite Houchin requesting that they provide

20  potential dates for the same," and that instead "the IGD Parties are attempting to use

21  Houchin's exhaustion during his deposition and their own subsequent failure to continue

22  his deposition, as the parties agreed, to form the basis of their summary judgment

23  argument."  (*Id.* at 8-10.)  Additionally, Houchin contends that many of the cited deposition

24  excerpts "mischaracterize or misstate [his] testimony."  (*Id.* at 14-20.)  Finally, Houchin

25  contends that the IGD Parties' argument that they are entitled to summary judgment

26  because he "did not respond to a July 2, 201 draw request from IGD until July 8, 2021 . . .

27  fails for multiple reasons."  (*Id.* at 12.)

28      In reply, the IGD Parties contend that Houchin's "recitation of facts regarding . . .

1    his testimony is misleading."  (Doc. 279 at 6.)   The IGD Parties further contend that

2    Houchin's "testimony that he did not know about the nonpayment by Gorrie to Stadtler is

3    unavailing and certainly not enough to sustain his burden of demonstrating fraudulent or

4    negligen[]t misrepresentation." (*Id.*)  Finally, the IGD Parties argue that "Gorrie was under

5    no obligation to retake Houchin's deposition after a review of the transcript indicated that

6    Houchin's inability to recall was not due to tiredness, but was apparently a testimonial

7    tactic." (*Id.* at 9.)

8              2.    Analysis

9                    a.    **Houchin's Memory**

10           In the JVA, IGD represented that it had "full power and authority to own its

11   properties and to carry on its business" and that there were "no claims, demands . . .

12   threatened against or directly or indirectly affecting IGD . . . which presently or with the

13   passage of time would be reasonably likely to have a Material Adverse Effect on IGD's

14   performance of its obligations under this Agreement, the Limited Liability Company

15   Agreement or the Related Agreements."  (Doc. 257-6 at 7-8.)   At the motion-to-dismiss

16   stage, the Court concluded that Houchin had successfully pleaded fraudulent inducement

17   and negligent misrepresentation because some of these representations could be reasonably

18   construed as false if IGD had, at the time it executed the JVA (*i.e.*, May 26, 2021), already

19   defaulted on payments to Stadtler under the Promissory Note that was secured by the Deed

20   of Trust on the Farm.  (Doc. 203 at 31, 108.)   Notwithstanding the Gorrie Parties'

21   arguments about Houchin's memory during his deposition, the evidence in the record,

22   when construed in its most favorable light, provides enough support for Houchin's

23   fraudulent inducement claim to survive summary judgment.

24           As discussed, a "fraudulent inducement claim . . . requires proof of the following

25   elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge

26   of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the

27   recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity,

28   (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; and (9) the hearer's

consequent and proximate injury." *Lemad Corp.*, 2014 WL 4649593 at *5 (cleaned up). As for the first two elements, IGD represented in the JVA that it had "full power and authority to own its properties and to carry on its business." (Doc. 257-6 at 7.) However, Stadtler's declaration states that IGD had already defaulted on the Promissory Note before April 2020. (Doc. 110-1 ¶¶ 10, 17.) A reasonable juror could therefore conclude that IGD's representation in the JVA was false.

A reasonable juror could also conclude that this representation was material, that Houchin did not know it was false, and that he relied on it. Houchin testified that he did not know at the time he signed the JVA that IGD owed money to Stadtler and that he likely would not have signed the JVA had he known. (Doc. 270-2 at 15, 18, 29-30, 44.) Additionally, because IGD was the entity that had defaulted on its payments to Stadtler, a juror could easily conclude that IGD knew the representation was false. (Doc. 110-1 ¶¶ 10, 17.) And finally, a juror could reasonably infer from the JVA's text that IGD intended for Houchin to rely on IGD's representations about its authority to use the property that was the subject of the joint venture (*i.e.*, the Farm) and that Houchin had a right to rely on those representations, which he apparently understood to be true at the time.

As for negligent misrepresentation, the elements, as discussed above, are "(1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the incorrect information; and (5) resulting damage." *KB Home Tucson, Inc.*, 340 P.3d at 412 n.7. For reasons that overlap with the fraudulent-inducement analysis, there is sufficient evidence in the record for Houchin to avoid summary judgment as to the first four elements. As for the fifth element, a juror could reasonably conclude that Houchin suffered damages where he made $72,300 in capital contributions to IGD (Doc. 77 at 26 ¶ 23; Doc. 270-4 at 8) only for IGD to later fail to prevent the foreclosure of the property covered by the JVA.

…

b.   **Breach of Contract**

The IGD Parties' final argument is that Houchin cannot maintain a breach-of-contract claim under the JVA because Houchin breached it first by waiting five days to respond to one of IGD's draw requests. (Doc. 257 at 17.) This argument fails for a host of reasons. First, the factual predicate for this argument is that IGD submitted the draw request on July 2, 2021 and Houchin did not respond until July 8, 2021. (*Id.*)[9] In support of these very specific facts, the IGD Parties submit a truncated portion of Houchin's deposition testimony. (Doc. 257-5 at 41.) In the excerpt, the IGD Parties' attorney says the relevant dates for the draw request were July 2 and July 8, but Houchin does not appear to indicate his agreement with those dates. (*Id.*)[10] Further, Houchin submits evidence that suggests the draw request was not formally submitted to him until July 5, 2021. (Docs. 270-6, 270-7.)

Second, the IGD Parties' position seems to be that Houchin breached the JVA because he didn't "respond" to the draw request within three business days. (Doc. 257 at 18.)[11] But the relevant language from the JVA provides: "Houchin shall supply the funding for each phase within three . . . business days following IGD's request for such funding, *provided that any such request shall be accompanied by confirmation, in a form satisfactory to Houchin, that any pending phase complete*." (Doc. 257-6 at 5, emphasis added.) Attached to Houchin's response is evidence that could lead a reasonable juror to conclude the "pending phase" was not "complete" at the time of the disputed draw request.

[9]   The IGD Parties' brief states that Houchin did not respond to the alleged July 2, 2021 draw request until July 8, 2023. (Doc. 257 at 17.) This appears to be a typo; it seems the IGD Parties intended to say July 8, 2021.

[10]   The IGD Parties contend that Houchin acknowledged on page 134 of his deposition transcript that he received the draw request on July 2, 2021. (Doc. 257 at 17.) However, the IGD Parties did not include this page in the deposition excerpts attached to their motion.

[11]   The IGD Parties also contend that Houchin's lawyer's failure to respond to a July 16, 2021 follow-up email until August 19, 2021 further exacerbated this breach, but they do not appear to contend that the lawyer's failure to respond to the follow-up email was itself the alleged breach. (Doc. 257 at 18.) In any case, the IGD Parties have not cited any deposition testimony verifying the July 16 and August 19 dates. Rather, they cite moments in Houchin's deposition where attorneys reference those dates and Houchin, to the extent he comments at all, says he doesn't recall. (Doc. 257-5 at 51-56.) "[Q]uestions are not evidence." *O'Connor v. Boeing N. Am., Inc.*, 216 F.R.D. 640, 644 (C.D. Cal. 2003).

- 34 -

1    (Doc. 270-2 at 36.)

2          Third, even assuming the draw request was received on July 2, 2021, it is unclear

3    that a July 8, 2021 response was actually more than three business days later.  In 2021, July

4    3 and 4 fell over the weekend, so it is at least ambiguous whether the parties would have

5    considered July 5, 2021 to be designated as a holiday celebrating July 4 rather than a

6    business day.  *See, e.g.*, A.R.S. § 1-301(B) ("When any of the holidays enumerated in

7    subsection A of this section [which include "July 4, 'Independence Day'"] falls on a

8    Sunday, the following Monday shall be observed as a holiday.").

9          Finally, even if the response was late, a jury question remains as to whether the late

10   response constituted a material breach.  *RCS Cap. Dev.,* 2012 WL 2115377 at *3

11   ("[W]hether a breach is material is a question for a jury.").

12   IV.    Houchin's Motion

13          A.    **The Parties' Arguments**

14          Houchin advances three discrete arguments in his summary judgment motion.  (Doc.

15   256.)  First, Houchin contends that the IGD Parties' "competing damage computations

16   make it impossible for a jury to fairly estimate damages" and, additionally or alternatively,

17   that there is insufficient evidence to establish with reasonable certainty that the IGD Parties

18   "could plant, germinate, grow, and harvest any crops" and "the net profits that they

19   allegedly lost."  (*Id.* at 8-14, emphasis omitted.)  Second, Houchin contends that the IGD

20   Parties' "declaratory judgment claim is premature and, therefore, subject to summary

21   judgment."  (*Id.* at 15-16.)  Third, Houchin argues that even if IGD's claims survive

22   summary judgment, Gorrie has no right to assert contract-based claims against him because

23   she was not a party to the JVA.  (*Id.* at 17-18.)

24          The IGD Parties respond that "there is ample evidence to demonstrate the damages

25   occasioned by . . . Houchin's breaches in this matter."  (Doc. 271 at 9.)[12]  The IGD Parties

26   further argue that Houchin's declaratory judgment argument "ignores that Gorrie has

27

28   _____
     [12]    The IGD Parties' specific damages arguments related to Houchin are summarized
     more fully in Part II.A.3.a of this order.

                                        - 35 -

1  already sustained substantial damage as the result of the Houchin's breach of agreement

2  made under the JVA Section 7.01(ii)." (*Id.* at 18.)

3          In reply, Houchin argues that the IGD Parties have not established "alleged lost

4  profits with reasonable certainty" because Gorrie "is not qualified to provide a layperson

5  opinion with respect to the IGD Parties' purported ability to grow between 126,000 and

6  189,000 pounds of hemp to maturity" and because the IGD "Parties have not identified any

7  concrete evidence establishing that they were capable of selling hemp." (Doc. 278 at 4-9,

8  emphasis omitted.) Houchin also contends that the IGD Parties failed to address many of

9  his arguments regarding alternative grounds for summary judgment. (*Id.* at 9-10.) Finally,

10  Houchin contends the declaratory judgment claim "is still premature" because this Court

11  has not "entered a judgment against IGD in relation to Stadtler's claims" and IGD has not

12  "pointed to any evidence establishing that it made any payment to Stadtler." (*Id.* at 11-12.)

13          B.    **Analysis**

14          The IGD Parties' third-party claims against Houchin for breach of contract (Claim

15  One), breach of the implied covenant of good faith and fair dealing (Claim Two), tortious

16  interference with business expectancy (Claim Four), and breach of fiduciary duty (Claim

17  Five) each require a showing of damages as an essential element. *Chartone,* 83 P.3d at

18  1111 (breach of contract); *United Dairymen of Ariz.*, 128 P.3d at 761-62 (implied covenant

19  of good faith and fair dealing); *Dube v. Likins,* 167 P.3d 93, 98 (Ariz. Ct. App. 2007)

20  (noting that the "elements of tortious interference with a business expectancy" include

21  "resultant damage to the party whose relationship or expectancy has been disrupted.");

22  *Stazenski*, 2015 WL 3917039 at *4 (breach of fiduciary duty). The IGD Parties do not

23  argue otherwise. Thus, to survive summary judgment with respect to those third-party

24  claims, the IGD Parties must come forward with sufficient evidence to establish a triable

25  issue of fact as to damages. For the reasons discussed in Part II.A.3.a above, the IGD

26  Parties have failed to do so for two independent reasons: (1) insufficient evidence to

27  establish that the IGD Parties could have successfully grown and harvested the hemp and

28  biomass products necessary to achieve the projected sales; and (2) failure to calculate and

1    consider the expenses necessary to achieve the alleged lost revenue.  Thus, Houchin is

2    entitled to summary judgment on Claims One, Two, Four, and Five.

3            This leaves Claim Three, which is the IGD Parties' request for a declaration that

4    "Article 7.01 of the [JVA] obligates Houchin to indemnify and hold IGD and Gorrie

5    harmless in respect of damage, claim, or liability including to a third party arising from any

6    breach by Houchin in the [JVA]," which includes the claims brought by the Stadtler Parties

7    in this action.  (Doc. 77 at 28-29 ¶¶ 43-46.)  Houchin's sole argument is that this claim is

8    premature.   But as discussed, summary judgment is improper where a contract is

9    ambiguous on a disputed issue.  *Hamada*, 555 P.2d at 1124.  It is ambiguous whether the

10   JVA's indemnification provision is only triggered by a judgment against IGD (as Houchin

11   contends) or merely the initiation of a lawsuit (which has already occurred).  Under the

12   JVA, Houchin agreed to "indemnify" IGD not only against "liability" but also against

13   "claim[s]" by third parties.  (Doc. 77-5 at 13.)  Further, the JVA's indemnification process

14   begins when IGD provides "notice" and copies of "pleadings, correspondence or other

15   documents relating thereto," as opposed to copies of a verdict, judgment or final order.  (*Id.*

16   at 14.)  Additionally, the indemnifying party generally agreed "to defend against, settle or

17   compromise such Third Party Claim at the expense of such Indemnifying Party utilizing

18   counsel reasonably acceptable to the Indemnified Party."  (*Id.*)  Thus, Houchin is not

19   entitled to summary judgment on the prematurity issue.

20           Nor is Houchin entitled to summary judgment against Gorrie in relation to Claim

21   Three.  Houchin's argument is that because Gorrie is not a party to the JVA, she is not

22   entitled to enforce its indemnification provision.  But this argument overlooks that "[a]

23   third-party beneficiary is a non-party who has the right to enforce a contract."  *Maricopa-*

24   *Stanfield Irr. & Drainage Dist. v. Robertson*, 123 P.3d 1122,1128 (Ariz. 2005).  "For a

25   person to recover as a third-party beneficiary in Arizona, the contracting parties must

26   intend to directly benefit that person and must indicate that intention in the contract itself."

27   *Sherman v. First Am. Title Ins. Co.*, 38 P.3d 1229, 1232 (Ariz. Ct. App. 2002).  Here, the

28   JVA's indemnification provision states Houchin will "indemnify and hold harmless IGD,

its members, managers, officers, employees and agents." (Doc. 77-5 at 13.) It is thus apparent from the face of the JVA that the indemnification provision was intended not only to benefit IGD, but also its "members, managers, officers, employees and agents." There is also evidence in the record that Gorrie was IGD's manager and/or member. (*See, e.g.*, Doc. 77-5 at 27 [IGD contract with Vermont Hemp Processing, identifying Gorrie as IGD's "manager"]; Doc. 255-3 at 8 [Evans Report, identifying Gorrie as IGD's "sole member"].) Thus, on this record, Houchin has failed to establish that Gorrie does not qualify as a third-party beneficiary who could seek enforcement of the indemnification provision.

Accordingly,

**IT IS ORDERED** that:

1.     The Stadtler Parties' motion for summary judgment on the Gorrie Parties' counterclaims and partial summary judgment on their own claims (Doc. 255) is **granted in part and denied in part**.

2.     Houchin's motion for summary judgment on the Gorrie Parties' third-party claims (Doc. 256) is **granted in part and denied in part**.

3.     The Gorrie Parties' motion for partial summary judgment on the Stadtler Parties' claims and Houchin's third-party counterclaims (Doc. 257) is **granted in part and denied in part**.

Dated this 27th day of August, 2024.

Dominic W. Lanza
United States District Judge

- 38 -